**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| BDO USA, P.C., | |
| Plaintiff, | |
| v. | Case No.: 3:24-cv-179 |
| Ankura Consulting Group, LLC and Phuoc Vin Phan, | Jury Trial Demanded |
| Defendants. | |

## COMPLAINT

Plaintiff BDO USA, P.C. ("BDO") brings this Complaint against Defendants Ankura Consulting Group, LLC ("Ankura") and Phuoc Vin Phan ("Phan") and pleads as follows:

### NATURE OF THE ACTION

1.      Ankura has stolen BDO's Healthcare Transaction Advisory Services ("TAS") practice, valued at more than $60 million, using Phan, a former senior level BDO employee and the Healthcare TAS National Practice Leader, to solicit seven members of his team to leave BDO and join Ankura—all in violation of Phan's fiduciary duty to and agreements with BDO.

2.      As the National Practice Leader, Phan was responsible for managing and overseeing BDO's Healthcare TAS practice and a team of nearly a dozen full-time employees when he was at BDO.  He was handsomely compensated in that role.

3.      But last summer, BDO transitioned from a Delaware partnership to a professional corporation organized under the laws of Virginia.  Phan was dissatisfied with that change and how many stock options he received in the new professional corporation, believing he deserved more than was allotted to him.  Feeling slighted, Phan hatched a plan to leave BDO and to take the

Healthcare TAS practice—its employees and its confidential information and trade secrets lock stock and barrel—with him to Ankura, a direct competitor.

4.      Ankura was a willing partner.  Upon information and belief, last summer, Ankura set its sights on stealing the BDO Healthcare TAS practice rather than building a practice of its own from the ground up and on using Phan to accomplish that goal.

5.      As part of this scheme, while still a partner of BDO, Phan solicited at least seven of the 11 full-time employees in the Healthcare TAS practice—all of whom reported directly to him—to leave their employment with BDO and join Ankura.  His conduct violated his fiduciary duty to BDO as well as the plain terms of his former partnership and employment agreements with BDO.  These were all duties and commitments Ankura knew about.

6.      Phan's egregious misconduct did not end there.  On his way out the door from BDO to Ankura, he stole or attempted to steal voluminous quantities of BDO's confidential information and trade secrets as well as the confidential information of multiple BDO clients, with the goal of taking all of that information to Ankura and using it in his new job for the benefit of Ankura.

7.      Three of the employees Phan solicited to leave BDO and join Ankura also stole or attempted to steal BDO's confidential information and trade secrets and that of its clients and to take that information for Ankura.  Two of them, Thomas Bradey ("Bradey") and Mitchell Thomas ("Thomas"), were successful in their theft.  They transferred substantial quantities of BDO's confidential information and trade secrets to Ankura for Ankura's financial gain.

8.      All remain employed by Ankura today.  Ankura, with Phan's assistance, has stolen BDO's Healthcare TAS practice.  BDO now seeks a verdict that will require Ankura and Phan to pay for what they have stolen and to compensate BDO for the collateral harm their tortious conduct has caused.

## THE PARTIES

9.      BDO is a professional corporation incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Chicago, Illinois.

10.     Ankura is a limited liability company, organized under the laws of the State of Delaware with its principal place of business in the State of New York.

11.     Upon information and belief, Phan is an individual domiciled in the State of Tennessee.  Phan is a former employee of BDO's Nashville, Tennessee office.  Upon information and belief, Phan is a current employee of Ankura's Nashville, Tennessee office.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action includes claims arising under the laws of the United States— specifically, the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836.  This Court has jurisdiction over the remaining claims under 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over BDO because BDO is a citizen of Virginia.

14.     This Court has personal jurisdiction over Ankura because Ankura committed conduct in Virginia giving rise to the claims in this action, including by tortiously interfering with Phan's BDO Partner/Principal Employment Agreement, as amended, which is governed by Virginia law and pursuant to which Phan agreed to "submit to venue and jurisdiction solely before any state or federal court in Virginia."  Ex. 1 at 10 (First Amendment).

15.     This Court has personal jurisdiction over Phan because he agreed in the First Amendment to his BDO Partner/Principal Employment Agreement to "submit to venue and jurisdiction solely before any state or federal court in Virginia, . . . waive[d] any right to raise the

questions of jurisdiction and venue in any action that the Company may bring [and] agree[d] to accept process in any such action." Ex. 1 at 10-11 (First Amendment).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and because Phan agreed in the First Amendment to his BDO Partner/Principal Employment Agreement to "submit to venue and jurisdiction solely before any state or federal court in Virginia, . . . waive[d] any right to raise the questions of jurisdiction and venue in any action that the Company may bring [and] agree[d] to accept process in any such action" (Ex. 1 at 10-11 (First Amendment)), and further Ankura tortiously interfered with Phan's Virginia contract.  BDO further is a citizen of Virginia and was damaged in Virginia by Defendants' conduct.

## FACTS

### A.     BDO's Business, Confidential Information, and Trade Secrets

17.     BDO provides assurance, tax, and financial advisory services to a multitude of clients operating in various industries and sectors throughout the country.  BDO has over 65 U.S. offices, including ones in McLean, Norfolk, and Richmond, Virginia in this District.

18.     BDO invests substantial time and financial resources in acquiring, developing, and maintaining relationships with its clients through its employees.

19.     To that end, BDO employees are granted access to BDO's confidential information, proprietary information, and trade secrets used in performing BDO's business, in servicing BDO's clients, and in further developing lasting relationships with clients on behalf of BDO.

20.     BDO employees are also granted access to BDO clients' confidential information to perform services for those clients.  This includes, among other things:  clients' financial, tax, and revenue information; client and client customer data; and client business plans and operational information.

4

21.    BDO takes extensive steps to protect its confidential, proprietary, and trade secret information.  This includes, but is not limited to:

a.    Maintaining a robust Code of Ethics and Business Conduct policy manual that is required reading for all BDO employees at the time of hire and annually thereafter and that includes extensive requirements and policies regarding the protection and prevention of disclosure of confidential information belonging to BDO and BDO's clients, acceptable use of BDO technology, and the requirement that upon departure from BDO, employees must return all BDO confidential information in their possession, in any form, and thereafter maintain the confidentiality of all confidential information learned during their employment;

b.    Requiring all BDO-issued laptops to be password protected and in some cases requiring other enhanced security mechanisms such as two-factor/multi-factor authentication to use BDO information technology ("IT") systems and to access electronically stored information;

c.    Utilizing a variety of BDO IT system and network security features including password protections, encryption, network intrusion detection systems, restrictions on access to unapproved third-party file sharing and storage systems, and firewalls; and

d.    Requiring senior level employees, such as Phan, Bradey, and Thomas, to enter into employment agreements that require them to keep confidential BDO's and BDO clients' confidential information.

22.    BDO takes these measures to protect its confidential information because the information is not publicly available, and if the information was misappropriated and/or provided to a direct competitor like Ankura, BDO would be competitively disadvantaged and damaged.

**B.    Phan's Tenure at BDO**

23.    BDO's Healthcare TAS practice provides strategic transaction services to a wide variety of healthcare and healthcare-related clients and is valued at more than $60 million.

24.     Phan was the National Practice Leader of BDO's Healthcare TAS practice from approximately May 15, 2019 until January 13, 2024, the effective date of the termination of his employment with BDO.  As the National Practice Leader, Phan was responsible for management and oversight of the Healthcare TAS practice and its employees.

25.     The Healthcare TAS practice had 11 full-time employees as of January 9, 2024, all of whom reported directly to Phan.

26.     Phan joined BDO's predecessor, BDO USA, LLP, as a fixed share partner in the spring of 2019, and he entered into an Amended and Restated Partnership Agreement with BDO USA, LLP effective as of April 9, 2019 (the "Partnership Agreement," attached as Exhibit 2).

27.     Phan's Partnership Agreement prohibits him "at, prior to, or within two years after, his/her termination from the Partnership" from "[l]ur[ing] away or caus[ing] an employee or Partner of the Partnership to leave its employ."  Ex. 2, Partnership Agreement, § 14.5(b).

28.     The Partnership Agreement also requires Phan to keep confidential all BDO and BDO client confidential information at "all times during the term of [his] Partnership and thereafter" and prohibits him from disclosing such information to anyone except "authorized Partnership personnel or as necessary in connection with the business of the Partnership."  Ex. 2, Partnership Agreement, § 14.15(a)-(b).

29.     The Partnership Agreement further provides that it "shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns."  Ex. 2, Partnership Agreement, § 16.8.

30.     In exchange for consenting to the Partnership Agreement, Phan was made a partner of BDO USA, LLP and received substantial compensation, benefits, access to BDO's confidential information and trade secrets, and access to BDO clients' confidential information.

31.     Phan traveled to Virginia on behalf of BDO in April 2022, billing 16.0 hours of time to a BDO client for meetings and work performed in Virginia on April 6 and 7, 2022.

32.     On July 1, 2023, BDO USA, LLP converted to a Delaware professional corporation, changing its name from BDO USA, LLP to BDO USA, P.A. with the same federal employer identification number.  Through this conversion, BDO USA, LLP changed its legal structure while continuing to exist and operate as the same entity.  Under Delaware law, BDO's conversion to a professional corporation did not constitute the dissolution of the firm or the creation of an entirely new firm but, rather, constituted a continuation of the existence of the firm in the form of a professional corporation.

33.     On August 30, 2023, BDO USA, P.A. transferred its jurisdiction of formation from Delaware to Virginia, changing its name to BDO USA, P.C. with the same federal employer identification number.  As with its conversion to a professional corporation, BDO's domestication in Virginia constituted neither the dissolution of the company nor the formation of a new entity. BDO continued to exist and operate as the same entity, only with a different state of incorporation.

34.     All assets, rights, and obligations of BDO USA, LLP are now assets, rights, and obligations of BDO USA, P.C.

35.     On June 30, 2023, Phan's partnership terminated, and he entered into a BDO Partner/Principal Employment Agreement with BDO USA, P.C. effective July 1, 2023 (the "Employment Agreement," attached as Exhibit 1).

36.     Phan re-affirmed his restrictive covenants in the Employment Agreement and, in exchange, he received continued employment with BDO, substantial compensation, benefits, and continued access to BDO's and its clients' confidential information and BDO's trade secrets.

37.     Phan's Employment Agreement incorporates an Agreement Regarding Competition and Protection of Proprietary Interests, which further contains an employee non-solicitation covenant that is nearly identical to the Partnership Agreement's employee non-solicitation covenant.  It states that while employed by BDO and for two years following the termination of his employment, Phan will not "solicit, lure away, or cause an officer, director or employee of [BDO] with whom [he] had contact during [his] employment with [BDO] . . . to leave its employ" or else he will compensate BDO for damages in "an amount equal to thirty percent (30%) of the annual earnings of each officer, director or employee who leaves, to cover recruiting replacements, plus an additional ten percent (10%) for each year of service of the officer, director or employee to cover training costs."  Ex. 1 at 5, ¶ 2(a)(ii).

38.     The Agreement Regarding Competition and Protection of Proprietary Interests further states that Phan will reimburse BDO for all attorneys' fees, costs, and expenses incurred by BDO to enforce the agreement.  Ex. 1 at 8, ¶ 9.

39.     The restrictive covenants and the corresponding damages formulas in Phan's Employment Agreement are substantively similar to those in Phan's Partnership Agreement.

40.     On August 22, 2023, Phan consented to the First Amendment, which amended all terms and conditions in his Employment Agreement regarding governing law, venue, and jurisdiction, as follows:

> This Agreement will be governed by the laws of the State of Virginia, irrespective of the residence of the parties.  Employee agrees to and hereby does submit to venue and jurisdiction solely before any state or federal court in Virginia, and Employee hereby waives any right to raise the questions of jurisdiction and venue in any action that [BDO] may bring.  Employee agrees to accept process in any such action.  Note: this paragraph shall not apply to any employee residing in California.

Ex. 1 at 10-11 (First Amendment).

8

41.     Upon information and belief, Phan was dissatisfied with BDO's decision to convert from a partnership to a professional corporation in the summer of 2023 and did not receive as many stock options in the new professional corporation as he wanted and believed he was entitled to.

42.     Upon information and belief, in or around August 2023, Phan decided to leave BDO and to raid BDO's Healthcare TAS practice and bring it with him to a direct competitor.

**C.      Ankura Orchestrates a Scheme To Steal the BDO Healthcare TAS Practice**

43.     Upon information and belief, on or about August 17, 2023, Ankura spoke with Phan about an opportunity to lead Ankura's transaction advisory services practice, including that Phan could hire a team of employees to run the practice at Ankura, as well as spoke with him about what his and certain subordinates' compensation would be at Ankura if they joined the company.

44.     Upon information and belief, Ankura began plotting in the summer of 2023 to steal BDO's Healthcare TAS practice, including to hire and use Phan to recruit other BDO employees to leave BDO and work for Ankura, notwithstanding Phan's fiduciary obligations to BDO and his employee non-solicitation agreements with BDO and Ankura's knowledge of Phan's lawful obligations.

45.     On January 9, 2024, Phan resigned from BDO.  He subsequently told BDO that he was taking a new position at Ankura.

46.     Between January 5 and January 12, 2024, seven of the then 11 full-time employees in BDO's Healthcare TAS practice—all of whom directly reported to Phan—resigned from BDO. They are Johnny Beauplan ("Beauplan"), Bradey, Zachary Gentry ("Gentry"), Aram Gupta ("Gupta"), William Mixon ("Mixon"), Jeffrey O'Brien ("O'Brien"), and Thomas.

47.     As managers of BDO, Beauplan, Bradey, Gentry, Gupta, O'Brien, and Thomas all had signed agreements with BDO which include confidentiality obligations and employee, client, and prospective client non-solicitation agreements.

48.     Beauplan's, Bradey's, Gentry's, Gupta's, O'Brien's, and Thomas's confidentiality obligations preclude each of them from retaining, using, or disclosing BDO's and BDO clients' confidential information after their departure from BDO, while the non-solicitation agreements preclude them from, among other things, soliciting BDO employees to leave BDO's employ or BDO clients and prospective clients to terminate their relationship with BDO while employed by BDO and for 18 months after their departure from the firm for any reason.

49.     After they submitted their resignations to BDO, BDO asked each of Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas where they intended to work next.  Beauplan told BDO that he intended to work for Ankura, but the other six employees either ignored BDO's question or refused to disclose that they were going to be employed by Ankura or anywhere, further disrupting any possibility for an orderly transfer of work-in-progress to protect clients' interests and, at the same time, betraying their coordinated efforts to keep Defendants' scheme secret for as long as possible.

50.     The near simultaneous departure of Phan and seven of his subordinates also left BDO with limited resources to complete ongoing client work, in several instances to the detriment of their work for BDO and harming BDO and its clients.

51.     Concerned by the near simultaneous departures of Phan and the majority of the members of the Healthcare TAS group led by Phan, BDO sent letters to each of Beauplan, Bradey, Gentry, Gupta, O'Brien, and Thomas on January 23, 2024, reminding them of their obligations not to solicit BDO's clients, prospective clients, or employees, and the corresponding damages they would owe to BDO in the event of a breach, as well as of their obligation to return to BDO all BDO and BDO client confidential information and not to disclose or use any such information after their departure from the firm.

52.     BDO also sent a letter to Mixon on January 23, 2024, reminding him of his confidentiality obligations to BDO as an Experienced Senior Associate of the firm.   Those obligations preclude him from, among other things, retaining BDO and BDO client confidential information after his departure from BDO.

53.     The letters BDO sent to each of Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas on January 23, 2024 directed them to contact BDO's counsel immediately if they possessed any confidential information of BDO and, in the interim, to preserve and protect all BDO confidential information and evidence of communications relating to BDO, its employees, clients, prospective clients, and customers in their possession, custody or control, including all e-mails, voicemails, text messages, instant messages, and any other written or electronic record, and whether in paper or on a personal device or cloud account or any other location.  Only Beauplan responded, and he merely confirmed receipt of the letter BDO sent to him.

54.     On January 23, 2024, BDO also provided draft affirmations to each of Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas to sign by January 26, 2024, confirming that they had no BDO confidential information in their possession, custody, or control.  Only Mixon responded and provided a signed affirmation.

55.     Instead, on January 25, 2024, counsel for Ankura spontaneously reached out to counsel for BDO via e-mail, advising that Beauplan, Bradey, Gentry, Gupta, O'Brien, Phan, and Thomas were now employed by Ankura, and that counsel for Ankura had recently been made aware of potential issues that may arise from Ankura's employment of Phan and these other six former BDO employees.

56.     Subsequently, on or about February 9, 2024, Mixon announced on his personal LinkedIn.com profile that he had joined Ankura as a "Senior Associate, Healthcare TAS."

57.     Thus, by mid-February 2024 at the latest, Phan, Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas were all employed by Ankura in Ankura's transaction advisory services practice—a practice now led by Phan.

58.     In the weeks and months prior to submitting his resignation, Phan covertly solicited BDO employees.  Upon information and belief, Phan directly or indirectly solicited Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas to leave BDO's employ and join Ankura, in violation of his employee non-solicitation agreements with BDO.

59.     Upon information and belief, Phan is continuing to directly or indirectly solicit BDO employees, including Alistair Anthony ("Anthony"), to leave BDO's employ and work for Ankura in violation of his employee non-solicitation agreements with BDO.

60.     Upon information and belief, Anthony received an offer to join Ankura in or around February 2024.

61.     Phan violated his fiduciary duty to BDO by soliciting BDO employees to leave BDO's employ and join Ankura while still employed by BDO.

62.     Ankura is and has been aware of Phan's continuing obligations and commitments to BDO, including his employee non-solicitation agreements with BDO.

63.     Upon information and belief, Ankura has encouraged, persuaded, facilitated, and induced Phan's breaches of his contracts with and fiduciary duty to BDO to steal the BDO Healthcare TAS practice, for Ankura's own financial gain.

**C.     Phan, O'Brien, Bradey, and Thomas Committed Egregious Misconduct, Stealing Voluminous Quantities of BDO's Confidential Information, When They Left BDO for Ankura—All for Ankura's Financial Gain**

64.     On January 10, 2024, the day after Phan tendered his resignation to BDO, BDO discovered that Phan had improperly and without authorization taken over 12.5 gigabytes of data

out of BDO's secure IT systems using BDO File Exchange and that he was attempting to steal an additional nearly 1.2 gigabytes of data from BDO.

65.     BDO File Exchange is BDO's web-based file transfer system.  It provides a way to transfer files securely between BDO employees, BDO clients, and/or other third parties for business purposes.  To transfer files via BDO File Exchange, BDO employees can upload files from their BDO-issued computers to BDO File Exchange and then send an e-mail message to the intended recipient of the files, alerting them to download the files that have been sent to them.

66.     Between December 23, 2023 and January 2, 2024—while BDO was closed for the holidays—Phan used BDO File Exchange to successfully upload 1,715 files, comprising over 12.5 gigabytes of data, from his BDO-issued laptop to BDO File Exchange.

67.     Phan then accessed BDO File Exchange via his personal comcast.net e-mail address and, between December 23, 2023 and January 2, 2024, used that access to download the 1,715 files belonging to BDO onto a non-BDO issued computer.

68.     The over 12.5 gigabytes of data Phan improperly removed from BDO's network included substantial quantities of BDO confidential information.  Among other things, Phan stole or attempted to steal BDO client and prospective client contact lists that contain:  BDO's confidential financial information, such as in-process volumes of work in dollars, by client, and separated by business line; clients' and prospective clients' average annual revenue and number of employees; and/or annotations about whether BDO submitted a proposal to, or performed work for, the client or prospective client, and the type of work sought or performed.

69.     The over 12.5 gigabytes of data Phan improperly removed from BDO's network also included substantial quantities of BDO clients' confidential information, including financial due diligence information requests, reports, and updates for multiple BDO clients and transactions;

quality of earnings ("QoE") and quality of revenue analyses for multiple BDO clients and transactions; and project proposals, master services agreements, and statements of work with clients containing confidential BDO pricing information.

70.     BDO also discovered on January 10, 2024 that Phan was attempting to use BDO File Exchange to transfer an additional 1,124 files containing confidential information belonging to BDO and BDO clients, comprising nearly 1.2 gigabytes of data, from BDO's secure IT systems by sending them to a personal comcast.net e-mail address and a personal yahoo.com e-mail address.

71.     BDO took swift action and terminated Phan's access to BDO File Exchange on January 10, 2024, thus blocking him from effectuating the unauthorized download of the additional 1.2 gigabytes of data from BDO's network.

72.     BDO immediately contacted Phan and scheduled a meeting with him on Microsoft Teams for January 12, 2024.  When BDO began confronting Phan about the sudden departures of many of his subordinates, Phan abruptly ended the meeting.

73.     Later that same afternoon on January 12, 2024, BDO sent Phan a letter by e-mail with an urgent request to continue meeting with him because BDO had evidence that he had taken and retained a large quantity of BDO confidential information, and BDO needed to meet with him immediately to discuss how he would return that information to BDO, consistent with the obligations in his Employment Agreement.

74.     BDO's in-house and outside counsel, and others from BDO, held a follow-up meeting with Phan on January 13, 2024 via a Zoom call.  Phan consented to the Zoom call being recorded by BDO.

75.     Prior to the meeting, at BDO's request, Phan gave BDO an inventory listing the BDO files that he had improperly removed from BDO's secure IT systems by e-mailing them to himself via BDO File Exchange—all of which he represented had been either saved to a local drive on a personally-owned MacBook Pro or synced to a personal Apple iCloud account.

76.     During the recorded Zoom call on January 13, 2024, Phan shared the contents of his computer screen and BDO's counsel supervised him while he permanently deleted from his personally-owned MacBook Pro and his personal Apple iCloud account all of the BDO confidential information he represented in the inventory was still in his possession, custody, or control.

77.     BDO accelerated Phan's departure from the firm due to his egregious misconduct and theft and attempted theft of BDO's confidential information, separating him effective January 13, 2024.

78.     After the recorded Zoom call, BDO sent Phan a draft affirmation, giving him the opportunity to state under oath that he was in compliance with his BDO non-solicitation restrictive covenants pertaining to BDO employees, clients, and prospective clients; that he had returned all of the confidential information that had been in his possession, custody, or control and he did not retain any other confidential information of BDO; and that he reaffirmed his Employment Agreement and all of the post-employment obligations in that agreement.

79.     As of the date of this filing, Phan has refused to sign the affirmation.

80.     Phan violated his fiduciary duty to and contractual agreements with BDO by stealing and attempting to steal BDO's confidential information and that of its clients.

81.     Upon information and belief, Phan stole and attempted to steal BDO's and BDO clients' confidential information to take with him to Ankura for Ankura's financial gain.

82.     O'Brien, Bradey, and Thomas also improperly and without authorization stole BDO's and BDO clients' confidential information when they left BDO and joined Ankura.

83.     On or about January 9, 2024—the day he resigned from BDO—O'Brien used BDO File Exchange to e-mail himself a .zip file entitled "Personal Files.zip."  He subsequently downloaded the .zip file onto a personal laptop.

84.     "Personal Files.zip" was a 0.4 gigabyte file containing approximately 232 documents, including, but not limited to, multiple templates used by the BDO Healthcare TAS practice to perform transaction services for clients from the start of a project to completion, from template statements of work containing confidential BDO pricing information and fee estimates, to template report deliverables for financial due diligence reports and findings—all of which were contained in a folder entitled "Aram Gupta – a – Internal File Sharing."

85.     O'Brien consented to participating in a recorded Zoom call with BDO's outside counsel and Ankura's counsel on February 8, 2024, after the start of his employment with Ankura, to discuss and securely return the information he had stolen from BDO.

86.     During the recorded Zoom call, O'Brien admitted that all but a few files contained in "Personal Files.zip" that he retained after he left BDO were not personal in nature but instead contained templates, workpapers, and other data that belonged to BDO.

87.     According to O'Brien, he "[does not] have a good answer" regarding why he put BDO's data into a .zip file called "Personal Files.zip" and that the files included "not just my files" but projects that "other folks" in the BDO Healthcare TAS practice "had worked on, too."

88.     At the conclusion of the Zoom call, BDO's counsel supervised O'Brien while he permanently deleted from his personally-owned computer all of the BDO confidential information he retained after leaving BDO and represented was still in his possession, custody, or control.

16

89.     In addition, upon information and belief, on or about January 9 and 12, 2024, Bradey used a personal ShareFile.com data room to transfer about 3.2 gigabytes of BDO's and BDO clients' data from BDO's secure IT systems.  Bradey improperly retained the data after his departure from BDO.

90.     Subsequently, on or about January 22-26, 2024, Bradey downloaded about 3.2 gigabytes of the data he stole from BDO onto a personal external hard drive and separately transferred about 2.9 gigabytes of data onto his Ankura-issued laptop after he started working for Ankura, all of which he then uploaded to Ankura's 365 OneDrive cloud storage system.

91.     The BDO Healthcare TAS practice was authorized to use BDO TAS ShareFile.com data rooms for business purposes only.  However, Bradey was prohibited from using personal ShareFile.com data rooms to steal BDO's or BDO clients' confidential information or from retaining it after his departure from the firm.

92.     Bradey consented to participating in a recorded Zoom call with BDO's outside counsel, his personal attorney, and Ankura's counsel on February 16, 2024, after he started working for Ankura.

93.     During the recorded Zoom call, Bradey shared on the screen the contents of his personal external hard drive and his Ankura-issued laptop, thereby showing the file names and file properties of the BDO files he had improperly retained after leaving BDO and put onto those devices and Ankura's Microsoft 365 OneDrive cloud storage system.

94.     Many of BDO's files that Bradey stole from BDO and then uploaded to Ankura's Microsoft 365 OneDrive cloud storage system were accessed and modified in late January and early February 2024, after Bradey started working for Ankura.

95.     Upon information and belief, Bradey has used BDO's confidential and proprietary information and trade secrets in his employment by Ankura, for the benefit of Ankura and for Ankura's financial gain.

96.     The confidential and proprietary information Bradey stole from BDO and improperly retained after his departure from BDO includes substantial quantities of client confidential information, including notes from management discussions during transaction due diligence.

97.     Bradey also stole the following BDO confidential information and trade secrets and transferred them to Ankura:

a.      A project status list that lists work performed by the BDO Healthcare TAS group for dozens of BDO clients, including BDO's confidential names for transactions, the status of those transactions, and BDO's gross billings, with billable hours and pricing information including hourly rates of employees who worked on the projects, as well as BDO's total collections for that work;

b.      A client contact list, created on January 4, 2024—four days before Bradey resigned from BDO—which separates BDO clients into three categories:  "Talk to now," "Talk to later," and "Others"; and

c.      Templates and work papers the BDO Healthcare TAS practice developed to relay results of transactional due diligence work for clients, such as QoE or financial due diligence reports.

98.     At BDO's insistence to prevent further misappropriation of BDO's confidential and proprietary information and trade secrets and to protect and preserve BDO clients' confidential information, upon information and belief, Ankura has retaken possession of Bradey's Ankura-

issued laptop and disabled access to his original Microsoft 365 OneDrive account, both of which contain the information he stole from BDO, and is securing his Ankura-issued laptop at Ankura's offices in Washington, D.C.

99.     Upon information and belief, on or about January 15, 2024, Thomas logged into the same personal ShareFile.com data room as Bradey had and then used it to take approximately 4.2 gigabytes of BDO's data out of BDO's secure IT system.  Thomas improperly retained the data after his departure from BDO.

100.    Thomas downloaded the 4.2 gigabytes of retained BDO data to his Ankura-issued laptop on or about January 23, 2024, after his employment with Ankura commenced.

101.    Like Bradey, as a member of the Healthcare TAS practice, Thomas had permission to use a BDO TAS ShareFile.com data room for business purposes only, but he was prohibited from using personal ShareFile.com data rooms to steal BDO's or BDO clients' confidential information or to retain such information after leaving his employment with BDO.

102.    Thomas consented to participating in a recorded Zoom call with BDO's outside counsel, his personal attorney, and Ankura's counsel on February 16, 2024, after he started working for Ankura.

103.    During the recorded Zoom call, Thomas shared the contents of the screen of his Ankura-issued laptop and showed the file names and file properties of the BDO files he had retained after leaving BDO and downloaded onto that device.

104.    The folders and files that Thomas retained after leaving BDO were extensive, including what, during the recorded Zoom call, Thomas referred to as "dump" files of approximately 20 separate Healthcare TAS projects or transactions that he worked on while he was employed at BDO.

105.     The files Thomas improperly retained after leaving BDO also included client engagement letters, the terms and conditions of which are designated as "Confidential," and draft and executed statements of work for multiple BDO clients with existing client engagement letters, which include sensitive BDO pricing information and which are designated "Confidential" because they incorporate the terms and conditions of confidential engagement letters.

106.     At BDO's insistence to prevent further misappropriation of BDO's confidential information and trade secrets and to protect and preserve BDO clients' confidential information, upon information and belief, Ankura has retaken possession of Thomas's Ankura-issued laptop that contains the information he stole from BDO and is securing it at Ankura's offices in Washington, D.C.

107.     Ankura is and has been aware of Phan's, O'Brien's, Bradey's, and Thomas's continuing obligations to BDO regarding BDO and BDO client confidential information and trade secrets.  Upon information and belief, all remain actively employed by Ankura to this day.

### COUNT I
### (Misappropriation of Trade Secrets – Defend Trade Secrets Act Against Ankura)

108.     BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 107 as if fully set forth herein.

109.     BDO owns various trade secrets related to how it acquires, develops, services, and retains relationships with its clients and prospective clients.  These include, but are not limited to, client and prospective client contact lists; BDO pricing information contained in proposals, bids, contracts, statements of work, and work estimates; and workpapers and templates developed by BDO to perform transaction advisory services in a consistent, efficient, and effective manner.

110.     These items have independent economic value to BDO because they are not known to others who can obtain value from use of the information.  To wit:  with this information,

competitors would be able to identify BDO's clients and prospective clients, understand how BDO prices and bids on work, and underbid BDO on proposals to perform healthcare transaction advisory services, and, if selected for the work, utilize BDO's templates for start-to-finish services, thereby allowing the competitor to offer the same product as BDO, either at a lower cost and higher margin or for a lower price.

111.    These items are subject to reasonable measures to keep the information confidential.  For example, BDO requires all employees to read upon hiring and each year of employment, as well as abide by, the confidentiality requirements contained in BDO's Code of Ethics and Business Conduct policy manual.  BDO further requires senior level employees—including Bradey and Thomas—to sign employment agreements containing confidentiality obligations which, among other things, preclude them from retaining, using, or disclosing the information contained in those items after their departure from BDO.  BDO also utilizes a variety of IT system and network security features to protect these items.

112.    Ankura's employees, including Bradey and Thomas, stole BDO's trade secrets—including client and prospective client contacts lists, BDO pricing information, and confidential workpapers and templates—and transferred them from BDO to Ankura, including by putting them onto Ankura-issued devices and/or cloud accounts, without BDO's authorization, thereby disclosing BDO's trade secrets without consent.

113.    Ankura acquired BDO's trade secrets by improper means through its employees Bradey and Thomas when Bradey and Thomas transferred the trade secrets from BDO to Ankura and put them onto Ankura-issued devices and/or cloud accounts.

114.    Ankura knew or should have known that the trade secrets were acquired by improper means because Ankura notified BDO that Bradey and Thomas had retained them after

leaving BDO and transferred them to Ankura-issued devices and/or cloud accounts, without BDO's authorization.

116. Ankura's actions were willful and malicious.  Ankura has encouraged, persuaded, facilitated and induced Bradey's and Thomas's breaches of their contracts with BDO for Ankura's own financial gain.

116. Ankura's actions have caused damage to BDO because BDO has lost control of its trade secrets and lost a competitive advantage in the market.  Furthermore, BDO has had to expend significant resources to uncover the extent of the theft of its trade secrets.

117. BDO is entitled to a jury trial on its DTSA claim against Ankura, relief and judgment against Ankura, damages in an amount to be proven at trial including exemplary damages, all equitable relief including restitution, as well as attorneys' fees, interest, costs, and other such relief that this Court deems just and equitable.

**COUNT II**
**(Misappropriation of Trade Secrets – Virginia Uniform Trade Secrets Act ("VUTSA")**
**Against Ankura)**

118. BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

119. As alleged above, BDO owns various trade secrets related to how it acquires, develops, services, and retains relationships with its clients and prospective clients.  These include, but are not limited to, client and prospective client contact lists; BDO pricing information contained in proposals, bids, contracts, statements of work, and work estimates; and workpapers and templates developed by BDO to perform transaction advisory services in a consistent, efficient, and effective manner.

120. This information has independent economic worth because it is not known to others who can obtain value from use of the information—specifically because if a competitor had this

information, it could perform the work that BDO performs for its clients, using the templates and work product developed by BDO to service its clients, at a reduced cost and/or strategically underbid BDO in pursuing work with BDO's clients and prospective clients.

121.    BDO takes reasonable efforts to maintain the secrecy of this information, including by requiring all employees to read and abide by the confidentiality requirements contained in BDO's Code of Ethics and Business Conduct policy manual; by requiring senior level employees, including Bradey and Thomas, to sign employment agreements containing confidentiality obligations during and after employment, which, among other things, preclude them from retaining, using, or disclosing the information after their departure from BDO; as well as by utilizing a variety of IT system and network security features to protect the information.

122.    Ankura's employees, including Bradey and Thomas, stole BDO's trade secrets and transferred them from BDO to Ankura, including by putting them onto Ankura-issued devices and/or cloud accounts, without BDO's authorization, thereby disclosing BDO's trade secrets without BDO's consent.

123.    Ankura misappropriated BDO's trade secrets by acquiring them through improper means through its employees Bradey and Thomas when Bradey and Thomas transferred the trade secrets from BDO to Ankura and put them onto Ankura-issued devices and/or cloud accounts.

124.    Ankura knew or should have known that the trade secrets were acquired by improper means because Ankura notified BDO that Bradey and Thomas had retained them after leaving BDO and transferred them to Ankura-issued devices and/or cloud accounts, without BDO's authorization.

125.    Ankura's actions were willful and malicious.  Ankura has encouraged, persuaded, facilitated, and induced Bradey's and Thomas's breaches of their contracts with BDO for Ankura's own financial gain.

126.    Ankura's actions have caused damage to BDO because BDO has lost control of its trade secrets and lost a competitive advantage in the market.  Furthermore, BDO has had to expend significant resources to uncover the extent of the theft of its trade secrets.

127.    BDO is entitled to a jury trial on its VUTSA claim against Ankura, relief and judgment against Ankura, damages in an amount to be proven at trial including punitive damages, all equitable relief including restitution, as well as attorneys' fees, interest, costs, and other such relief that this Court deems just and equitable.

**COUNT III**
**(Tortious Interference with Phan's Employment Agreement Against Ankura)**

128.    BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 127 as if fully set forth herein.

129.    BDO had a valid, enforceable, and binding contract with Phan, made under the laws of Virginia, in the form of Phan's amended Employment Agreement with BDO, pursuant to which Phan is prohibited from soliciting BDO employees with whom he had contact during his employment with BDO to leave BDO's employ during his employment with BDO and for two years after the termination of his employment with BDO.

130.    Ankura has knowledge of BDO's and Phan's contractual relationship.

131.    Ankura intentionally interfered with Phan's Employment Agreement by inducing Phan to breach his employee non-solicitation restrictive covenant with BDO in order to profit off of Phan's solicitation of BDO employees, including at least Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas.

132.    Ankura's interference with Phan's contract was improper and malicious because Ankura's sought to misappropriate the goodwill that BDO had built with its employees through Phan and to use Phan as a tool to raid BDO's Healthcare TAS practice for Ankura's own financial gain and to BDO's detriment.

133.    By facilitating, encouraging, persuading and inducing Phan to breach his contract with BDO as well as by hiring seven of the 11 full-time employees of BDO's Healthcare TAS practice (including six of the seven located in Nashville) that was led by Phan, Ankura has caused BDO damages, including interference in BDO's business operations, damage to employee relationships, damage to client and referral relationships, and lost profits.

134.    BDO is entitled to a jury trial on its tortious interference claim against Ankura and relief and judgment against Ankura, damages in an amount to be proven at trial, all equitable relief including restitution, as well as attorneys' fees, interest, costs, and other such relief that this Court deems just and equitable.

**COUNT IV**
**(In the Alternative, Tortious Interference with Phan's Employment Agreement Against Ankura Pursuant to Tenn. Code Ann. § 47-50-109)**

135.    BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 134 as if fully set forth herein.  BDO pleads COUNT IV in the alternative to COUNT III.

136.    BDO had a valid, enforceable, and binding contract with Phan, made under the laws of Virginia, in the form of Phan's amended Employment Agreement with BDO, pursuant to which Phan is prohibited from soliciting BDO employees with whom he had contact during his employment with BDO to leave BDO's employ during his employment with BDO and for two years after the termination of his employment with BDO.

137.    Ankura has knowledge of BDO's and Phan's contractual relationship.

138.    Ankura intentionally interfered with Phan's Employment Agreement by inducing Phan to breach his employee non-solicitation restrictive covenant with BDO in order to profit off of Phan's solicitation of BDO employees, including at least Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas.

139.    Ankura's interference with Phan's contract was malicious and improper because Ankura's sought to misappropriate the goodwill that BDO had built with its employees through Phan and to use Phan as a tool to raid BDO's Healthcare TAS practice for Ankura's own financial gain and to BDO's detriment.

140.    By facilitating, encouraging, persuading and inducing Phan to breach his contract with BDO as well as by hiring seven of the 11 full-time employees of BDO's Healthcare TAS practice (including six of the seven located in Nashville) that was led by Phan, Ankura has caused BDO damages, including interference in BDO's business operations, damage to employee relationships, damage to client and referral relationships, and lost profits.

141.    Ankura's conduct has violated Tenn. Code Ann. § 47-50-109, entitled Procurement of Breach of Contracts.

142.    BDO is entitled to a jury trial on its tortious interference claim against Ankura and relief and judgment against Ankura, treble damages in an amount to be proven at trial, all equitable relief including restitution, as well as attorneys' fees, interest, costs, and other such relief that this Court deems just and equitable.

## COUNT V
### (Unjust Enrichment Against Ankura)

143.    BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 142 as if fully set forth herein.

144.     Ankura has wrongfully derived substantial benefits from its theft of the BDO Healthcare TAS practice, including by its hiring away of Phan and, in concert with Phan, seven of 11 members of the Healthcare TAS practice who reported to Phan, and by its misappropriation of BDO and BDO clients' confidential and proprietary information.

145.     Upon information and belief, Ankura hired away former BDO employees Phan, Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas to service and solicit their BDO clients in violation of their client non-solicitation agreements with BDO.

146.     Upon information and belief, Ankura knew that the BDO Healthcare TAS practice was highly profitable and valued in the millions of dollars, yet Ankura elected to take the practice, with Phan's assistance, without paying BDO for it.

147.     Upon information and belief, Phan, Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien, and Thomas all remain employed by Ankura in Ankura's transaction advisory services practice, which is now led by Phan.

148.     Allowing Ankura to retain the value of the BDO Healthcare TAS practice it stole and the stolen confidential information from BDO would be inequitable.

149.     BDO is entitled to a jury trial on its unjust enrichment claim against Ankura and relief and judgment against Ankura, damages in an amount to be proven at trial, all equitable relief including restitution, as well as attorneys' fees, interest, costs, and other such relief that this Court deems just and equitable.

## COUNT VI
### (Breach of Contract – Employment Agreement Against Phan)

150.     BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 149 as if fully set forth herein.

151.     Phan entered into a valid, enforceable, and binding Employment Agreement as part of BDO's conversion from a partnership to a professional corporation, effective as of July 1, 2023.

152.     Phan entered into his contract with BDO for good and valuable consideration, including, but not limited to, continued employment with BDO; substantial compensation; insurance, retirement, and healthcare benefits; and continued access to BDO's confidential information.

153.     During his employment with BDO and for a period of two years thereafter, Phan owes BDO a contractual duty not to solicit BDO employees with whom he had contact during his employment with BDO to leave BDO's employ.

154.     In the event of a breach, Phan's contract states he must compensate BDO in an amount equal to thirty percent (30%) of the annual earnings of each lost employee, plus an additional ten percent (10%) for each year of service of the lost employee to cover training costs, as well as attorneys' fees, costs, and expenses incurred by BDO to enforce the Employment Agreement.

155.     Phan violated his restrictive covenants by soliciting Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien and Thomas—BDO employees with whom he had contact while employed by BDO—to leave BDO and work for Ankura.

156.     Phan owes BDO thirty percent (30%) of the annual earnings of each of the seven employee he solicited away from BDO, plus an additional ten percent (10%) for each year of service of each employee to cover training costs.

157.     As a direct and proximate result of Phan's breach, BDO has suffered damages, including interference in BDO's business operations, damage to employee relationships, and lost profits.

158.   BDO is entitled to relief and judgment against Phan and damages in an amount to be proven at trial, all equitable relief including an injunction restraining any further breach of the Employment Agreement and restitution, as well as attorneys' fees, expenses, interest, costs, and other such relief that this Court deems just and equitable.

## COUNT VII
### (Breach of Fiduciary Duty Against Phan)

159.   BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 158 as if fully set forth herein.

160.   As a former partner of BDO USA, LLP and then senior level employee of BDO USA, P.C., Phan was entrusted with confidential information of BDO and its clients as well as responsibility to act solely for the benefit of BDO in all matters connected with his partnership with and, later, employment by BDO.

161.   Phan therefore owed duties to BDO as a fiduciary to act solely for the benefit of BDO during his partnership with and, later, employment by BDO.

162.   Phan breached his fiduciary duty to BDO by soliciting Beauplan, Bradey, Gentry, Gupta, Mixon, O'Brien and Thomas—BDO employees with whom he had contact while employed with BDO—to leave BDO and work for Ankura and to take the Healthcare TAS practice from BDO to Ankura, for Ankura's financial gain.

163.   Phan also breached his duty to BDO by misappropriating or attempting to misappropriate BDO's trade secrets, and by stealing and attempting to steal BDO's confidential information and that of its clients, to take with him to his new employer, Ankura, for Ankura's financial gain.

164.    As a direct and proximate result of Phan's breach, BDO has suffered damages, including interference in BDO's business operations, damage to employee and client relationships, and lost profits.

165.    BDO is entitled to relief and judgment against Phan and damages in an amount to be proven at trial, all equitable relief including restitution, as well as interest, costs, and other such relief that this Court deems just and equitable.

### COUNT VIII
### (Unjust Enrichment Against Phan)

166.    BDO repeats and incorporates by reference the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

167.    Phan wrongfully derived substantial benefits from BDO when, as an employee of BDO, he solicited seven of his 11 level subordinates in BDO's Healthcare TAS practice to leave BDO and join Ankura and stole BDO and BDO client confidential information, while at the same time being handsomely compensated as a senior level employee of the firm.

168.    Allowing Phan to retain the value of the compensation he received from BDO while simultaneously helping Ankura steal the BDO Healthcare TAS practice would be inequitable.

169.    BDO is entitled to relief and judgment against Phan and damages in an amount to be proven at trial, all equitable relief including restitution, as well as interest, costs, and other such relief that this Court deems just and equitable.

### JURY DEMAND

BDO demands a trial by jury on all claims so triable.

### REQUESTED RELIEF

WHEREFORE, BDO respectfully requests that the Court enter judgment against Ankura and Phan and award the following relief:

a.      Judgment in favor of BDO against Ankura for Counts I through V and against Phan for Counts VI through VIII;

b.      An award of damages (actual, compensatory, exemplary, punitive, statutory (treble) in the alternative, or otherwise) in an amount to be determined at trial as a result of Defendants' conduct;

c.      An award of damages measured by the unjust enrichment of Defendants by their unlawful conduct;

d.      Equitable relief as this Court deems just and proper, including the disgorgement of any and all unlawful gains, and an injunction against Phan restraining any further breach of his Employment Agreement;

e.      An award of attorneys' fees, interest, costs, and expenses incurred by BDO as a result of the action; and

f.      Such further and other legal and equitable relief as the Court may deem just and necessary under the circumstances.


                                        Respectfully submitted,


                                        /s/ *Julie H. McConnell*
*Of counsel*:                           Julie H. McConnell (Virginia Bar No. 89245)
                                        MCDERMOTT WILL & EMERY LLP
Michael Sheehan                         500 North Capitol Street, N.W.
MCDERMOTT WILL & EMERY LLP              Washington, D.C.  20001
Chicago, IL                             (202) 756-8000
                                        jmcconnell@mwe.com
Mark Meredith
MCDERMOTT WILL & EMERY LLP              *Attorneys for Plaintiff BDO USA, P.C.*
New York, NY