# Exhibit 2

# AMENDED AND RESTATED PARTNERSHIP AGREEMENT

# BDO USA, LLP

Amended and Restated Partnership Agreement (the "Agreement") dated as of November 4, 2017 (the "Effective Date") among the Partners of BDO USA, LLP, a limited liability partnership registered under the laws of the State of Delaware (the "Partnership"). Said Partners hereby adopt the following Agreement applicable to periods from and after the Effective Date.

## ARTICLE I

### Name, Location, Purpose, and Continuation

**1.1**     The Partnership is engaged in the practice of public accounting under the name BDO USA, LLP. Those names, and any other name which may hereafter be adopted by the Partnership, are the sole property of the Partnership and no individual Partner shall have any right to their use upon termination of his/her interest in the Partnership. The term "Partnership" includes predecessors of the present Partnership unless otherwise indicated.

**1.2**     The purpose of the Partnership is to carry on the practice of the profession of public accounting and such other activities as may be consistent with and appropriate or incident to the practice of this profession or the business objectives of the Partnership.

**1.3**     The Partnership shall maintain an executive office and such additional offices at such places within and without the United States as the Board of Directors of the Partnership (the "Board of Directors") may from time to time determine.

**1.4**     The Partnership shall continue until it is terminated or dissolved in accordance with the provisions of Section 16.2. The death, retirement or withdrawal of a Partner, the admission of a new Partner, a change in the interest of any Partner or the personal bankruptcy of any Partner, whether voluntary or involuntary, shall not dissolve or terminate the Partnership.

**1.5**     The interest of a Partner in the Partnership shall continue until it is terminated by the occurrence of the earliest of the following, as applicable: (a) his/her retirement; (b) his/her permanent disability; (c) his/her death; (d) his/her unavailability; (e) his/her withdrawal; or (f) the termination of his/her interest by vote of the Board of Directors, all as more fully provided in Articles VII, VIII, IX and XI.

**1.6**     For purposes of this Agreement: (a) the term "Variable Share Partner" shall include all those persons to whom variable units have been allocated by the Board of Directors as provided in Section 4.1 herein, even if any such person cannot be a member of the Partnership by reason of any provision of law or the principles, rules and regulations of the accounting profession; (b) the term "Fixed Share Partner" shall include those persons who have been allocated fixed units by the Board of Directors as provided in Section 4.1 herein, even if any such person cannot be a member of the Partnership by reason of any

provision of law or the principles, rules and regulations of the accounting profession; and (c) the term "Partner" shall include both Variable Share Partners and Fixed Share Partners.

# ARTICLE II
## Board of Directors

2.1     Unless, and to the extent not, delegated to the Chief Executive Officer of the Partnership (the "Chief Executive Officer") and/or other appropriate members of executive management of the Partnership in accordance with this Agreement, the business and affairs of the Partnership shall be subject to the oversight of the Board of Directors.  Without limiting the foregoing, the Board of Directors shall approve the business strategy of the Partnership to be created and implemented by the Chief Executive Officer and appropriate members of executive management of the Partnership.  The Board of Directors, with input from the Chief Executive Officer and other appropriate members of executive management of the Partnership, shall also have responsibility for, and review of, the following matters to the extent not otherwise delegated to the Chief Executive Officer and/or other appropriate members of executive management of the Partnership:

(a)     Admission of new Partners and the terms of their admission;

(b)     Allocation of income to Partners, and designation of each Partner as a Fixed Share Partner or Variable Share Partner upon such Partner's admission and at any time thereafter;

(c)     Determination of the amount of required capital (as defined in Section 6.1) of the Partnership and each Partner;

(d)     Determination or modification of the retirement date of a Partner and of his/her eligibility for retirement benefits;

(e)     Election of the Chairperson of the Board of Directors referred to in Section 2.14;

(f)     Termination of the interest of a Partner pursuant to Section 11.4 and establishing terms of payment to him/her;

(g)     Acquisition of accounting and non-accounting practices from others, and combinations or mergers of practices with others, including the terms of any such acquisition, combination or merger;

(h)     Action or inaction not in the ordinary course of the business of the Partnership (and not otherwise reserved to the Partners under this Agreement);

(i)     The amendment of this Agreement, as provided in and subject to the limitations set forth in Section 16.2;

(j)     Determination of the persons to whom and the rates and times at which interest on undistributed earnings, contributed capital or indebtedness shall be paid pursuant to Section 5.2B, 6.2A or 12.9, respectively, and the rates at which interest on voluntary contributions of capital shall be paid pursuant to Section 6.3; and

(k)     Approval of the terms of any long- or short-term borrowing facility of the Partnership.

**2.2**     (a)     The Board of Directors shall consist of (i) the Chief Executive Officer (as provided in Section 3.1), (ii) ten Variable Share Partners elected by the Variable Share Partners (the "Elected Partner Directors"), subject to section 2.9, and (iii) any additional Directors appointed by the Board of Directors pursuant to Section 2.2(b), Section 2.3 and Section 2.4.  It is a goal of the Partnership that, to the extent practicable, the composition of the Board of Directors be representative of the geographical and functional areas of the Partnership.

(b)     In connection with any expansion transaction by the Partnership of another firm, business entity, or group of individuals who, upon consummation of such expansion transaction, will become Partners (whether such expansion transaction is consummated via merger, purchase of assets, significant lateral hiring or otherwise), the Board of Directors may, if it deems it desirable and in the best interests of the Partnership, appoint additional Directors (each, a "Lateral Partner Director") for a single term no greater than three years (a "Lateral Partner Director Term"); *provided, however*, that (i) any Lateral Partner Director must be a Variable Share Partner; (ii) the total number of Lateral Partner Directors serving on the Board of Directors at any time shall not exceed four (4), and (iii) upon expiration of any Lateral Partner Director Term, no vacancy shall exist and the size of the Board of Directors shall be reduced accordingly.  A Lateral Partner Director shall be (i) appointed by the affirmative vote of at least two-thirds of the total number of Directors then in office, (ii) a voting member of the Board of Directors and (iii) subject to the provisions regarding termination of membership on the Board of Directors contained in Section 2.13.

**2.3**     The Board of Directors may at any time and from time to time, if it deems it desirable and in the best interests of the Partnership, appoint one (1) retired Partner as a member of the Board of Directors (a "Retired Partner Director").  A Retired Partner Director shall be appointed, and any vacancy in a Retired Partner Director's position may be filled, by the affirmative vote of at least two-thirds of the total number of Directors then in office.  A Retired Partner Director (i) shall be a voting member of the Board of Directors, (ii) shall serve for one or more terms (each such term not to exceed three (3) years) as the Board of Directors may determine and (iii) shall be subject to the provisions regarding termination of membership on the Board of Directors contained in Section 2.13.

**2.4**     At any time at which neither the Chief Executive Officer nor any Elected Partner Director is a member of the Global Board of the coordinating entity of the international group of affiliated BDO independent member firms ("BDO International"), the Board of Directors may, if it deems it desirable and in the best interests of the Partnership, appoint one (1) Variable Share Partner who is a member of the Global Board of BDO International as a member of the Board of Directors (a "BDO International Partner Director").  A BDO International Partner Director shall be appointed, and any vacancy in a BDO International Partner Director's position may be filled, by the affirmative vote of at least two-thirds of the total number of Directors then in office.  A BDO International Partner Director (i) shall be a voting member of the Board of Directors, (ii) shall serve for one or more terms (each such term not to exceed three (3) years) as the Board of Directors may determine and (iii) shall be subject to the provisions regarding termination of membership on the Board of Directors contained in Section 2.13.  Notwithstanding the foregoing, a BDO International Partner Director's term of membership on the Board of Directors shall automatically terminate upon any termination of his/her membership on the Global Board of BDO International or upon the Chief Executive Officer or any Elected Partner Director becoming a member of such Global Board.

**2.5**     Elected Partner Directors shall be apportioned among three classes. Class One shall consist of three members whose terms expire October 31, 2011 and every third year thereafter. Class Two shall consist of three members whose terms expire October 31, 2012 and every third year thereafter. Class Three shall consist of four members whose terms expire October 31, 2013 and every third year thereafter. Except as provided in section 2.9, the term of each Elected Partner Director shall commence on November 1 next following such Elected Partner Director's election; *provided, however*, that the term of an Elected Partner Director who is elected by the Variable Share Partners to complete an unexpired term of a predecessor Elected Partner Director will expire on the October 31 on which such predecessor's term would have expired.

**2.6**     No individual may serve as an Elected Partner Director for more than two Qualified Terms in any nine-year period. For all purposes of this Agreement, a "Qualified Term" shall mean any three-year term, including any Lateral Partner Director Term, if applicable; *provided, however*, that there shall not be taken into account for purposes of determining a Qualified Term any time served as an Appointed Partner Director pursuant to Section 2.9. None of the Chief Executive Officer or any Partner who becomes a Member of the Executive Office (including, without limitation, the Chief Operating Officer, the Chief Financial Officer and the General Counsel) or any national business line leader or the functional business equivalent of any thereof, but excluding any regional managing Partner who is a Variable Share Partner (each, a "Senior Management Partner") shall be eligible to serve as an Elected Partner Director, a Lateral Partner Director, a Retired Partner Director or a BDO International Partner Director. Upon assuming any Senior Management Partner position, an Elected Partner Director, a Lateral Partner Director, a Retired Partner Director or a BDO International Partner Director shall be deemed to have resigned from his/her Director position effective immediately (provided, that if such person is assuming the position of Chief Executive Officer he/she shall by virtue of such office be a member of the Board of Directors pursuant to Section 3.1).

**2.7**     In each round of balloting in the election of Elected Partner Directors, each Variable Share Partner shall be entitled to cast votes for such number of different candidates as shall equal the number of open Elected Partner Director positions to be filled at that time (with each vote so cast to be measured in terms of the units allocated to such Partner as provided in Section 4.1), provided, that any Variable Share Partner actually voting in such round of balloting must cast votes in favor of a number of candidates equal to the number of open Elected Partner positions to be filled at that time. All voting will be by secret ballot, and votes will be counted by an independent party appointed by the Nominating Committee. Voting may take place electronically and will be conducted pursuant to procedures to be adopted by the Nominating Committee in respect of each election. The outcome of each election (or round of voting) of Elected Partner Directors shall be communicated immediately by the independent party to the General Counsel of the Partnership, the Chairperson of the Nominating Committee and the Chairperson of the Board of Directors (or their designee if such person is running for a position on the Board of Directors), who will then report such outcome promptly to the Partners; *provided, however*, that the specific vote totals (including percentages) received by individual nominees shall remain confidential and voting records shall be held on a confidential basis by the General Counsel of the Partnership. For each election of members of the Board of Directors, a quorum shall be deemed to exist when, in accordance with and subject to Section 16.2(b), Variable Share Partners holding a majority of the number of allocated units within the Partnership shall (determined as provided in Section 4.2) have cast votes in such election (an "Election Quorum").

**2.8**     Each Board of Directors election shall be conducted in accordance with the following procedures:

(a)     A Nominating Committee shall be constituted no later than June 1 each year.  The Nominating Committee shall consist of seven (7) Variable Share Partners who have been selected by the Governance Committee of the Board of Directors and ratified by the Variable Share Partners.  The General Counsel of the Partnership shall (i) notify the Variable Share Partners of the slate of Variable Share Partners selected by the Governance Committee for ratification and (ii) establish and notify the Variable Share Partners of a designated period in which the Variable Share Partners shall vote on ratification of the slate of candidates.  The Nominating Committee candidates selected by the Governance Committee are ratified by the Variable Share Partners if: i) the slate of such candidates is approved by a majority of the votes cast in such election and ii) an Election Quorum exists with respect to the votes cast in such election.  Each Variable Share Partner shall be entitled to cast one vote on the ratification of the slate of candidates, provided that such vote cast will be measured in terms of the variable units allocated to such Partner as provided in Section 4.1.  The Nominating Committee may elect a Chairperson from among its members.  A new Nominating Committee shall be selected in connection with each Board of Directors election.  No member of the Board of Directors and no Senior Management Partner shall be eligible for membership on the Nominating Committee.

(b)     The number of persons nominated by the Nominating Committee with respect to each Board of Directors election shall be twice the number of Elected Partner Director positions to be filled at such election.  To assist the Nominating Committee in developing its nominations to the Partnership, the Board of Directors will evaluate the performance of incumbent Directors who are eligible for reelection as Elected Partner Directors (with each such Director absenting himself/herself from discussions relating to himself/herself) and will communicate to the Nominating Committee on an anonymous basis through the General Counsel of the Partnership the recommendation of the Board of Directors as to whether any or all of such incumbent Directors should be nominated for reelection.  The General Counsel of the Partnership and the Chairperson of the Governance Committee of the Board of Directors (except in the event such Director is then standing for re-election to the Board, in which event, another Governance Committee member selected by the Chairperson of the Board, or if both the Chairperson of the Governance Committee and the Chairperson of the Board are standing for re-election to the Board, then another Governance Committee member selected by the Board at large) shall attend all meetings of the Nominating Committee to provide guidance to the Nominating Committee with regard to its activities as set forth in this Agreement.  The General Counsel of the Partnership and the attending Governance Committee member shall not be deemed members of the Nominating Committee and shall therefore not participate in any votes taken by the Nominating Committee.  Members of the Nominating Committee for any Board of Directors election shall not be eligible for nomination for election as Elected Partner Directors by the Nominating Committee in that Board of Directors election.  Notwithstanding the foregoing, the Board of Directors may, by the affirmative vote of a majority of the total number of Directors then in office, authorize the nomination for election of a Variable Share Partner from the Specialized Services business line who is a member of the Nominating Committee if the Board of Directors determines that the limited number of Variable Share Partners practicing in the Specialized Services business line warrants permitting such an otherwise ineligible member of the Nominating Committee to be so nominated.  The Nominating Committee shall present its nominations to the Variable Share Partners no later than September 1 each year.

(c)     The Nominating Committee, with the assistance of the Board of Directors, shall collect and distribute to the Variable Share Partners such information with respect to the persons nominated for election as Elected Partner Directors (including, to the extent feasible, persons nominated by petition pursuant to the preceding paragraph) as the Nominating Committee shall deem appropriate for purposes of enabling the Variable Share Partners to elect Elected Partner Directors on an informed basis.

(d)  Only Variable Share Partners are eligible to vote in each annual Board of Directors election, which shall be conducted in accordance with Section 2.7 and shall commence no later than October 1.

(e)  With respect to open Elected Partner Director positions, there shall be elected that number of nominees as shall equal the number of open Elected Partner Director positions who have received the greatest numbers of votes cast (measured in terms of variable units as provided in Section 4.1), provided that to be so elected, an individual must have received a number of votes greater than fifty percent (50%) of the aggregate number of variable units held by all Variable Share Partners casting votes, and further provided that an Election Quorum exists with respect to the votes cast for the open Elected Partner Director positions.  If the number of nominees so elected is less than the number of Elected Partner Director positions which were open, there shall be a run-off election for the remaining open positions in which there shall be eliminated from the ballot that number of individual nominees receiving the lowest number of votes (measured in terms of variable units as provided in Section 4.1) in the initial round of balloting as shall be necessary such that there will remain on the ballot a number of candidates equal to twice the remaining number of open Elected Partner Director positions.  In the run-off election, there shall be elected that number of nominees as shall equal the number of remaining open Elected Partner Director positions who have received the greatest numbers of votes cast (measured in terms of variable units as provided in Section 4.1), provided that to be so elected, any individual must have received a number of votes greater than fifty percent (50%) of the aggregate number of variable units held by all Variable Share Partners casting votes, and further provided that an Election Quorum exists with respect to the votes cast for the remaining open Elected Partner Director positions in such run-off election.  If there are still positions remaining unfilled, successive rounds of balloting shall occur (within each succeeding round beginning with the third round of balloting, there shall be eliminated from the ballot that number of individual nominees receiving the fewest number of votes in the preceding round (measured in terms of variable units as provided in Section 4.1) as shall be necessary such that there will remain on the ballot a number of candidates equal to the remaining number of open Elected Partner Director positions plus one) in accordance with the foregoing procedures until all of the remaining open Elected Partner Director positions have been filled.  Run-off elections shall be held as promptly as reasonable notice to the Partners and administrative considerations permit.

(f)  In connection with each Board of Directors election, the Board of Directors and the Nominating Committee may jointly develop and implement such supplemental mechanical election procedures as they may deem necessary or appropriate in order to effectuate the intentions of this Article and to achieve an open, fair and timely Board of Directors election, provided that any such supplemental mechanical procedures are not inconsistent with any provisions of this Agreement.

**2.9**  If a vacancy in an Elected Partner Director position results in less than ten (10) Variable Share Partners remaining on the Board of Directors, then the Board of Directors shall, upon the affirmative vote of at least seventy-five percent (75%) of the total number of Directors then in office, fill any vacancy in an Elected Partner Director position on the Board of Directors with a Variable Share Partner within thirty (30) days of the opening of such vacancy by the appointment of a new Elected Partner Director (an "Appointed Partner Director") to serve until the next Board of Directors election of any Elected Partner Directors and until such Appointed Partner Director's successor is elected and qualified.  At the next Board of Directors election following any vacancy in an Elected Partner position, an Elected Partner Director shall be elected to serve the remainder, if any, of the three-year term of the Elected Partner Director who has vacated the Board and such succeeding Elected Partner Director's term of office shall commence on the

date of such election and shall expire on the date on which such predecessor's normal term would have expired. In any Board of Directors election, Elected Partner Directors shall be assigned first to any full three-year terms to be filled at such Board of Directors Election and then to any shorter unexpired terms resulting from an Elected Partner Director who did not complete the full term of office to which he/she had been elected (in descending order by length of term) in the order elected. Individuals elected in the same round of balloting shall be deemed to be elected in the order of the number of votes received by each in such round of balloting.

**2.10** In addition to the Nominating Committee appointed pursuant to Section 2.8 and the Compliance Committee appointed pursuant to Section 2.17, the Board of Directors shall create and appoint a Partners' Matters Committee, a Partners' Compensation Committee, a Financial Oversight Committee, a Governance Committee and a Management Review Committee to consider and report to the Board of Directors on matters assigned to such committees and may create and appoint such other committees of the Board of Directors as the Board of Directors may determine from time to time. The membership of any committees created and appointed by the Board of Directors pursuant to this Section 2.10 may include both Directors and other Variable Share Partners, with such other Partner committee members having such voting powers on such committees as the Board of Directors may, in its discretion, allocate to them.

**2.11** Each Director shall be entitled to one vote in all matters coming before the Board of Directors. At least seventy-five percent (75%) of the total number of Directors then in office shall be necessary for a quorum at any meeting of the Board of Directors. Except as otherwise provided in this Agreement, any proposal being voted on by the Board of Directors shall carry upon the affirmative vote of the majority of the members present at the meeting. A written, electronic or telephone vote, determination, or approval of or assent to a resolution or proposal, whether by way of prior authorization or subsequent ratification, of a majority of the total number of Directors then in office, shall be as effective as a vote taken at a meeting at which a quorum is present.

**2.12** Notwithstanding the provisions of Section 2.1, the Board of Directors shall have no power to (a) sell or otherwise dispose of the whole or a major part of the practice of the Partnership, or (b) liquidate or dissolve the Partnership. Any such action may be taken only upon the affirmative vote of Variable Share Partners holding more than seventy-five percent (75%) of the total number of variable units voted on such matter (subject to the provisions of Section 16.2). For the purpose of this provision, a sale of part of the practice of the Partnership with total gross annual fees of ten percent (10%) or less of the gross annual fees of the Partnership for the last completed fiscal year or twelve (12) months shall not be treated as the sale of a major part of the practice.

**2.13** The Board of Directors may terminate the membership of a member of the Board of Directors at any time. At least seventy-five percent (75%) of the total number of Directors then in office must vote in favor of the termination, not counting the Director on whose membership the vote is being taken, who shall not be eligible to vote on such proposal. Such vote of the Board of Directors shall be only on the proposal to terminate the membership of such particular Director, unlinked with any other matters or any proposed termination of the membership of others. Not less than twenty-five percent (25%) of the Variable Share Partners may at any time request the Board of Directors to terminate the membership of one of its members by delivery to the Board of Directors of a signed petition to such effect. If the Board of Directors does not conduct a vote of the Board of Directors on the termination of the membership of that member in accordance with this section 2.13 within the ten (10) day period following delivery of such petition, a vote of the Variable Share Partners with respect to the removal of such Director shall be

conducted by the Board of Directors within the next twenty (20) days. The member of the Board of Directors who is the subject of such vote shall be immediately removed from the Board of Directors upon the affirmative vote in favor of his/her removal of at least two-thirds of the votes cast; provided that at least seventy-five percent (75%) of the number of votes eligible to be cast in such vote (determined as provided in Section 4.1) have been cast.

**2.14** The Board of Directors shall elect from among its members (excluding the Chief Executive Officer) a Chairperson of the Board of Directors, who shall serve for a one (1) year term. The term of office of the Chairperson of the Board of Directors shall begin on November 1. The Chairperson of the Board of Directors shall chair meetings of the Board of Directors and perform such other duties as are assigned to him/her from time to time by the Board of Directors. In the event his/her membership on the Board of Directors terminates for any reason or in the event he/she becomes the Chief Executive Officer, his/her term in office shall thereupon terminate and the Board of Directors shall as soon as practicable elect his/her successor in office.

**2.15** The Board of Directors shall record its proceedings in appropriate minutes. The whole or any portion of such minutes, as the Board of Directors may determine appropriate, shall be circulated among the Partners as soon as practicable following each meeting.

**2.16** No Elected Partner Director, Appointed Partner Director, Lateral Partner Director, BDO International Partner Director or the Chief Executive Officer shall receive any stipend in respect of his/her service on the Board of Directors. Any member of the Board of Directors that is not one of the aforementioned Directors may receive, but shall not be entitled to, a stipend in respect of his/her service on the Board of Directors, in such amounts and at such times as the Board of Directors may determine.

**2.17** The Board of Directors shall have a permanent Compliance and Ethics Committee (the "Compliance Committee"). The number of members of the Compliance Committee shall be set by the Board of Directors; *provided, however*, that there shall be no fewer than three (3) members. The members of the Compliance Committee shall be appointed by the Board of Directors on an annual basis from among the Elected Partner Directors. The Board of Directors may remove any member of the Compliance Committee by the affirmative vote of at least seventy-five percent (75%) of the total number of Directors in office at the time; *provided, however*, that if any member of the Compliance Committee is engaged in illegal or unethical activities as determined by a majority vote of the Board of Directors, such person shall be removed from the Compliance Committee upon such determination. For purposes of calculating the vote of the Board of Directors in connection with the preceding sentence, the total number of Directors shall not include the Director with respect to whom the vote is being taken, and such Director shall not be eligible to vote. If there is a vacancy on the Compliance Committee (as a result of a resignation, removal or otherwise), then the Board of Directors shall fill such vacancy within thirty (30) days of the opening of such vacancy by the appointment of an Elected Partner Director. The Compliance Committee shall be responsible for (i) the appointment of the Partnership's Chief Compliance Officer who shall report to the Board of Directors and the Compliance Committee, with appropriate oversight as necessary by the Chief Executive Officer, the Chief Operating Officer and the General Counsel, (ii) the oversight of the development, implementation and effectiveness of, and compliance with, the Partnership's compliance and ethics program, (iii) the oversight of compliance with the Partnership's Code of Conduct, (iv) such other matters relating to compliance and ethics as shall be set forth in the Compliance and Ethics Committee Charter adopted by the Board of Directors, as such charter may be amended in accordance with its terms, and (vi) such other matters as shall be delegated to it by the Board of Directors. The Compliance Committee

may authorize the expenditure of such Partnership funds as it deems reasonably necessary or appropriate to discharge its duties and fulfill its obligations. On June 30 and December 31 of each calendar year, the Compliance Committee shall provide the Board of Directors with a written accounting of any such expenditure made during the previous six month period; *provided, however,* for the avoidance of doubt, such accounting shall be for information purposes only and shall not be deemed to require the consent of the Board of Directors.

## ARTICLE III

### Executive Management of the Partnership

**3.1** (a) The Board of Directors shall nominate a Variable Share Partner to be the Chief Executive Officer, who shall serve in such capacity subject to the ratification of the Variable Share Partners. The Chief Executive Officer shall serve for a term of four (4) years commencing on November 1 of the calendar year in which the preceding Chief Executive Officer term has expired and terminating on October 31 of the fourth succeeding calendar year or until (i) such person resigns, (ii) the October 31 preceding such person's mandatory retirement date, or (iii) such person is removed by the Board of Directors or the Partners (as described below). Such person shall be eligible to serve successive terms as Chief Executive Officer, and there shall be no limitation on the number of terms any person may serve as Chief Executive Officer. The Chief Executive Officer shall automatically be a voting member of the Board of Directors during his/her continuance in office.

(b) For any and all purposes of this Agreement, with respect to any and all terms of service of the Chief Executive Officer resulting from nomination and ratification of the Chief Executive Officer occurring after the 2016 calendar year, the references to "November 1" and "October 31" set forth in Section 3.1(a) above shall be deleted and replaced with references to "July 1" and "June 30", respectively.

**3.2** Each Variable Share Partner shall be entitled to vote once in every ratification election of the Chief Executive Officer (with the number of votes cast by each Variable Share Partner to be determined as provided in Section 4.2). All voting will be by secret ballot, and votes will be counted by an independent party appointed by the Board of Directors. Voting may take place electronically and will be conducted pursuant to procedures to be adopted by the Board of Directors in respect of each election. The outcome of each ratification election of the Chief Executive Officer shall be communicated immediately by the independent party to the General Counsel of the Partnership and to the Chairperson (or such Elected Partner Director designated by the Board of Directors if such Chairperson is running for the position of Chief Executive Officer) and then promptly to the Partners; *provided, however*, that the specific vote totals (including percentages) received by the individual nominee shall remain confidential and voting records shall be held on a confidential basis by the General Counsel of the Partnership. For each ratification election of the Chief Executive Officer, a quorum shall be deemed to exist when, in accordance with and subject to Section 16.2(b), a majority of the number of votes eligible to be cast in such election or vote (determined as provided in Section 4.2) have been cast (an "Election Quorum").

**3.3** (a) Not later than June 1 of the calendar year in which the term of office of the incumbent Chief Executive Officer expires, the Board of Directors shall nominate to the Variable Share Partners one candidate for Chief Executive Officer for the term commencing upon expiration of the incumbent Chief Executive Officer's term. The person so nominated by the Board of Directors may include

the incumbent Chief Executive Officer, any member of the Board of Directors or any Variable Share Partner. The Board of Directors shall cause there to be distributed to the Variable Share Partners such information with respect to the person so nominated as the Board of Directors may deem appropriate for purposes of enabling the Partners to vote on ratification of a Chief Executive Officer on an informed basis. The Board of Directors shall conduct the ratification election for the Chief Executive Officer in accordance with Section 3.2 no later than June 30. The Chief Executive Officer nominee shall be ratified upon receiving a majority of the votes cast in such election; provided that an Election Quorum exists with respect to the votes cast in such election. If the Chief Executive Officer is removed, resigns or otherwise ceases to hold such position prior to the end of his/her elected term in office, the Board of Directors shall appoint an acting Chief Executive Officer to serve during a period of not more than three months and shall during such period nominate a new Chief Executive Officer and conduct a ratification election in accordance with the procedures set forth above. Such person's term of office shall commence immediately upon his/her ratification by the Variable Share Partners and shall expire on the stated termination date of the predecessor elected Chief Executive Officer's term. In connection with each election of a Chief Executive Officer, the Board of Directors may develop and implement such supplemental mechanical election procedures as they may deem necessary or appropriate in order to effectuate the intentions of this Section and to ensure an open, fair and timely ratification election of a Chief Executive Officer, provided that any such supplemental mechanical procedures shall not be inconsistent with any provisions of this Agreement.

(b)     For any and all purposes of this Agreement, with respect to any and all ratification elections of the Chief Executive Officer occurring after the 2016 calendar year, the references to "June 1" and "June 30" set forth in Section 3.3(a) above shall be deleted and replaced with references to "March 1" and "March 31", respectively.

**3.4**     The Board of Directors may terminate the term in office of the Chief Executive Officer, by the affirmative vote of at least seventy-five percent (75%) of the total number of Directors then in office, excluding the Chief Executive Officer. Not less than twenty-five percent (25%) of the Variable Share Partners may at any time request the Board of Directors to terminate the Chief Executive Officer by delivery to the Board of Directors of a signed petition to such effect. If the Board of Directors does not conduct a vote of the Board of Directors on the termination of the Chief Executive Officer in accordance with this section 3.4 within the ten (10) day period following delivery of such petition, a vote of the Variable Share Partners with respect to the removal of the Chief Executive Officer shall be conducted by the Board of Directors within the next twenty (20) days. The Chief Executive Officer shall be immediately removed from such position and from the Board of Directors upon the affirmative vote in favor of such removal of at least two-thirds of the votes cast; provided that at least seventy-five percent (75%) of the number of votes eligible to be cast in such vote (determined as provided in Section 4.1) have been cast.

**3.5**     The Chief Executive Officer shall be the chief executive of the Partnership, subject at all times to the oversight of, and reporting to, the Board of Directors. The Chief Executive Officer shall ipso facto be (a) the managing partner in charge of the executive office of the Partnership, and (b) authorized to execute all documents or contracts on behalf of the Partnership even though other Partners may also be so authorized from time to time. In addition to, and not in limitation of the foregoing and to such other rights and duties set forth in this Agreement, the Chief Executive Officer shall perform the following functions:

(a)     Develop and recommend to the Board of Directors a long-term strategy and vision for the Partnership with the goal of continuously improving the quality and value of the Partnership's practices and of increasing the profitability and competitive position of the Partnership;

(b)     Develop and recommend to the Board of Directors business plans and budgets that support the Partnership's long-term strategy;

(c)     Formulate and oversee implementation of Partnership business policies;

(d)     Ensure that the day-to-day business affairs of the Partnership are properly managed and that there is a qualified and effective executive office in place;

(e)     Foster a culture within the Partnership that promotes ethical practices, encourages individual integrity and fulfills social responsibility;

(f)     Maintain a positive work climate that is conducive to attracting, retaining and motivating a diverse group of highly skilled Partners and employees at all levels; and

(g)     Serve as chief spokesperson for the Partnership in dealings with third parties.

**3.6**     The following matters of Partnership administration and operation, and such other matters as the Board of Directors may from time to time determine, shall be the responsibility of the Chief Executive Officer subject, where indicated below, to the approval of the Board of Directors:

(a)     Subject to Section 3.7, appointment of persons to leadership and management positions within the Partnership, with such titles as the Chief Executive Officer may designate;

(b)     Determination of the offices, groups of offices and geographical regions into which the Partnership may be divided for administrative purposes;

(c)     Opening and closing of Partnership offices, with the approval of the Board of Directors;

(d)     Making arrangements for international representation and operations;

(e)     Determination of the amount of profits available and the time or times for making distributions to Partners as provided in Section 5.2;

(f)     Determination of the accounting principles to be followed by the Partnership in keeping its accounts, subject to the provisions of Section 13.2;

(g)     Borrowings or loans by the Partnership under any long- or short-term borrowing facility approved by the Board of Directors, provided that such authority may be further delegated to a designee of the Chief Executive Officer;

(h)     Determination of whether any fees, commissions or other compensation received by any Partner are of the type for which he/she is to account, and which belong to the Partnership under the provisions of Section 14.3;

(i)     Leasing of real or personal property to or by the Partnership and the terms of any leases, subject to the approval of the Board of Directors if aggregate payments by the Partnership under any such lease will exceed an amount to be determined from time to time by the Board of Directors;

(j) Designation of one or more Partners to execute documents or contracts on behalf of the Partnership;

(k) Designation of persons to have signature authority on Partnership bank accounts;

(l) Designation of one or more Partners to execute any notice under this Agreement on behalf of the Partnership;

(m) Determination of the place or address where any notice to the Partnership under this Agreement is to be given and the person or persons to whom such notice is to be given;

(n) Determination of how notice is to be given to or by the Partnership under this Agreement;

(o) Requesting and obtaining credit reports and information regarding federal, state and local tax filings of individual Partners.

3.7 The Chief Executive Officer may appoint such persons from among the Partners or otherwise to assist him/her in managing the Partnership as he/she selects; *provided, however*, that all appointments of Senior Management Partners shall be subject to the prior approval of the Board of Directors.

3.8 The Board of Directors and the Chief Executive Officer shall appoint one or more individuals to the position of General Counsel of the Partnership to serve as the chief legal officer(s) of the Partnership. Each such General Counsel shall report directly to both the Chief Executive Officer and to the Board of Directors. At least one such General Counsel shall attend all meetings of the Board of Directors and the Nominating Committee. A General Counsel may be terminated only by action of the Board of Directors.

3.9 The Partnership shall have a Chief Compliance and Ethics Officer (the "Chief Compliance Officer") who shall serve as the principal compliance and ethics officer of the Partnership. The Chief Compliance Officer shall be appointed by the Compliance Committee, shall report to the Board of Directors and the Compliance Committee, with appropriate oversight as necessary by the Chief Executive Officer, the Chief Operating Officer and the General Counsel. Such committee shall have the authority to remove the Chief Compliance Officer subject to the approval or ratification of the Board of Directors. The Chief Compliance Officer shall be a Variable Share Partner, and may not be a member of the Board of Directors while serving as Chief Compliance Officer. None of the members of the Compliance Committee, the Chief Executive Officer, the General Counsel or any Variable Share Partner who becomes a member of the Executive Office (including, but not limited to, the Chief Operating Officer and the Chief Financial Officer) shall be eligible to serve as the Chief Compliance Officer while holding such other position. If the Chief Compliance Officer resigns, is removed or the position otherwise becomes vacant, then the Compliance Committee shall promptly appoint a new Chief Compliance Officer and, until such time as the new Chief Compliance Officer is appointed, the Compliance Committee or its designee shall be responsible for the duties of the Chief Compliance Officer.

## ARTICLE IV

### Units and Voting

**4.1**     Except as otherwise provided in this Agreement, income, profit, loss, capital and other financial items of the Partnership shall be allocated among the Partners on the basis of units.   The Board of Directors shall determine the total number of variable and fixed units to be allocated among all the Partners and shall allocate variable units to Variable Share Partners and fixed units to Fixed Share Partners in such type and amounts as it determines in its sole discretion.  The Partnership shall at least annually inform each Partner of the units allocated to him/her.  The number of Fixed Share Partners at any given time shall be subject to limitation at the discretion of the Board of Directors.  Only Variable Share Partners shall be eligible to vote on any matter pursuant to this Agreement or on any matter relating to the Partnership, unless otherwise provided by the Board of Directors, and Fixed Share Partners shall not be entitled to vote on any such matters and fixed units shall carry no voting rights.  Accordingly, the Variable Share Partners may, by a vote in accordance with this Agreement including specifically Article XVI, amend this Agreement to add, revise or remove terms that affect the Fixed Share Partners exclusively.  Each vote cast by a Variable Share Partner in respect of any matter pursuant to this Agreement or otherwise relating to the Partnership shall be expressed and measured in terms of variable units.

**4.2**     Except as otherwise provided in Section 2.13 and Section 3.4, a quorum shall be deemed to exist with respect to each vote of Variable Share Partners when, in accordance with and subject to Section 16.2(b), a majority of the number of votes eligible to be cast in such vote (determined as provided in Section 4.1) have been cast.

## ARTICLE V

### Allocation of Profits and Losses

**5.1**     Each Fixed Share Partner shall be allocated a share in the profits and the losses of the Partnership through unit earnings, subject to Sections 12.2 and 12.13 with respect to termination of a Fixed Share Partner's interest in the Partnership.  Fixed units shall have a fixed value that shall be determined from time to time by the Board of Directors.  Each Variable Share Partner shall also be allocated a share in the profits and the losses of the Partnership.  Such allocation shall be in the proportion that the number of variable units allocated to the Variable Share Partner by the Board of Directors bears to the total number of variable units allocated to all the Variable Share Partners for the period for which said items are being allocated, except as otherwise provided in Sections 12.2 and 12.13 with respect to termination of a Variable Share Partner's interest in the Partnership. For income tax purposes, the profits and losses of the partnership, and any other items required to be allocated among the Partners for a Calendar Year, including but not limited to tax exempt income and non-deductible expenses, shall be allocated in the proportion that the number of variable units allocated to a Variable Share Partner bears to the total number of variable units allocated to all Variable Share Partners for the period for which said amounts are being allocated after deducting the unit earnings allocated to all Fixed Share Partners.  In order to be entitled to an allocation of units of the Partnership, a Partner must be providing services to the Partnership, and the Board of Directors, in making decisions regarding the allocation of units of the Partnership, shall consider the value of such services.

**5.2**     The profits of the Partnership shall be distributed at such times as the Chief Executive Officer, with the approval of the Board of Directors, shall determine.  Interim distributions of profits to Partners need not be in proportion to units, but all Partners within any bracket of Partnership income and allocated the same type of units, (i.e., variable or fixed), as determined by the Chief Executive Officer, shall be treated alike, provided that the Chief Executive Officer may withhold or reduce the amount of any distribution to any Partner where deemed appropriate, subject to the review of the Board of Directors.  All charges or credits to each Partner's account, from whatever source or origin, may be taken into account and settled at the time of any such distribution.  An interim distribution of profits to a Partner, pursuant to this Section 5.2, may hereinafter be referred to as a "drawing" or "drawings".  The undrawn profits for any fiscal year of a Partner whose Partnership interest terminates at or after the end of that fiscal year shall be distributed to the Partner or his/her beneficiary at the same time and to the same extent as distributions of profits are made to the remaining Partners for that fiscal year, unless the Board of Directors directs payment at a different time.

**5.2A**     Any portion of a Partner's allocated share of the profits of the Partnership for any fiscal year beginning on or after July 1, 1998 (including the most recently completed fiscal year of a Partner whose interest in the Partnership is terminated) that is not distributed pursuant to Section 5.2 by the time of final settlement of distributions for such fiscal year will be credited to the Partner's undistributed earnings account. Each Partner will be currently vested in all amounts credited to his/her undistributed earnings account.  Each Fixed Share Partner shall receive his/her allocated share of the profits of the Partnership for any fiscal year, subject to settlement of all then current charges or credits to the Partner's account, at the time of final settlement of distributions for such fiscal year.  Accordingly, no credit shall be made to a Partner's undistributed earnings account with respect to any allocation of profits associated with fixed units.

**5.2B**     The Partnership may pay every Partner interest on the balance credited to the undistributed earnings account of such Partner, net of any reductions or offsets, if and at such times and at such rate as shall be determined annually by the Board of Directors.  Retired Partners, disabled Partners or the beneficiaries of deceased Partners may be paid such interest, if and at such times and at such rate as shall be determined annually by the Board of Directors, on the declining balance, calculated monthly, of the amount credited to the undistributed earnings account of such retired, disabled or deceased Partner, net of any reductions or offsets, as such undistributed earnings are paid out pursuant to Section 12.11.  No Partner or beneficiary thereof shall, unless the Board of Directors in its sole discretion determines otherwise, be paid interest on undistributed earnings for any time after the Partner shall have given the Partnership, or the Partnership shall have given the Partner, the notice of withdrawal or termination referred to in Sections 11.2 and 11.4, respectively.

**5.3**     A Partner's allocation of any Partnership loss for any fiscal year and any excess of drawings over profits shall be charged (a) first, against the Partner's undistributed earnings account, if applicable, and (b) second, against the Partner's capital account and, to the extent charged against the Partner's capital account, shall be treated as a capital deficiency, subject to the provisions of Section 6.2.

# ARTICLE VI

## Capital

**6.1**     Each Partner's share in the cash capital ("capital") of the Partnership shall be established by the Board of Directors, subject to any special agreements resulting from mergers or any other combination of practices, and shall be set forth in the Partnership's records.  Any capital which the Board of Directors determines to be forfeitable by a present or former Partner, in accordance with the terms of this Agreement, or otherwise, or which for any other reason reverts to the Partnership, shall be reallocated among the other Variable Share Partners, in accordance with the number of their variable units in relation to the total variable units allocated to all Variable Share Partners.  The amount which would otherwise be the capital of each such Partner who cannot be a member of the Partnership by reason of any provision of law or the principles, rules and regulations of the accounting profession shall for all purposes of this Agreement be considered a debt owing to him/her by the Partnership, and shall be paid to him/her on termination of his/her association with the Partnership in the same way as provided for payment of capital in Article XII hereof.  Neither the capital of the Partnership nor the capital of any Partner shall include any value which may be assigned to accounts receivable, work in process, Partnership name, clientele, prospects, connections, content of files, financial records, leases, stationery or supplies, all of which belong solely to the Partnership and not to any one Partner or group of Partners.

**6.2**     The Board of Directors shall determine the amount of capital to be paid in to the Partnership by each Partner.  The amount may be stated as a dollar amount or a percentage of income.  Any deficiency in the capital of a Partner shall bear interest at a rate to be determined from time to time by the Board of Directors.  The Partnership may withhold from a distribution of profits to a Partner any such capital deficiency and interest thereon, such withholding to be applied first against accrued interest and then against said capital deficiency.  Any Partner shall have the right, but not the obligation, to reduce or extinguish such capital deficiency by making additional payments to the Partnership.

**6.2A**     The Partnership may pay every Partner interest on the amount of contributed capital, net of any reductions or offsets, if and at such times and at such rate as shall be determined annually by the Board of Directors.  Partners receiving retirement or permanent disability benefits under Article VII or VIII or the beneficiaries of deceased Partners receiving benefits under Article IX may be paid such interest, if and at such times and at such rate as shall be determined annually by the Board of Directors, on the declining balance, calculated monthly, of contributed capital, net of any reductions or offsets, as such capital is paid out pursuant to Section 12.11.  No Partner or beneficiary thereof shall, unless the Board of Directors in its sole discretion determines otherwise, be paid interest on capital for any time after the Partner shall have given the Partnership, or the Partnership shall have given the Partner, the notice of withdrawal or termination referred to in Sections 11.2 and 11.4, respectively.

**6.3**     Any Partner shall have the right at any time to contribute capital to the Partnership ("voluntary contribution") in excess of the amount required by the Board of Directors under Section 6.2.  The Partnership shall pay interest to the Partner on such voluntary contribution at the rate determined by the Board of Directors, no less than annually.  Any part or all of a voluntary contribution may be withdrawn by the Partner upon thirty (30) days written notice to the Partnership.  Any balance of voluntary contributions remaining at the termination of the Partner's interest in the Partnership under Articles VII, VIII, IX or XI of this Agreement shall be paid to the Partner or his/her beneficiary within thirty (30) days

after such termination, unless the Partner or his/her beneficiary and the Partnership agree on different terms of payment.

      6.4     In the event a Partner is indebted to the Partnership (excluding from the term "indebtedness" for this purpose any deficiency in such Partner's capital), all credits to his/her account, including his/her allocable share of the Partnership profits, shall be applied first to reduce such indebtedness. The Partner shall pay any remaining indebtedness to the Partnership at such times and in such amounts and with such interest as the Board of Directors may determine. Any indebtedness of the Partnership to a Partner shall be payable to him/her by the Partnership, without interest (subject to Section 12.9), at such time as the Board of Directors determines.

      6.5     If, for any fiscal year of the Partnership, the amount in a Partner's capital account (except for voluntary capital contributions) would exceed the amount determined by the Board of Directors to be required under Section 6.2 above, because of the Board of Directors' action to decrease the number of the Partner's units, such excess amount shall be paid to the Partner within a reasonable time after the Board of Directors' action. This does not apply to a situation where there is a decrease in the Partner's units associated with a decrease in the amount of time required of a Partner, or where the Firm converts a Variable Share Partner to a Fixed Share Partner within five years preceding retirement pursuant to Article VII.

## ARTICLE VII

### Retirement

      7.1     Every Variable Share Partner shall retire at the close of business on June 30 (hereinafter referred to as the "retirement date") of the fiscal year during which he/she attains the age of sixty-two (62) years. Every Fixed Share Partner shall retire at the close of business on June 30 of the fiscal year during which he/she attains the age of sixty-five (65) years. Any retirement pursuant to this Section 7.1 is herein referred to as "mandatory retirement."

      7.2     Any Partner may, by at least six (6) months prior written notice, elect to retire on the retirement date of any fiscal year prior to the fiscal year during which his/her mandatory retirement would otherwise occur, beginning with the fiscal year in which his/her 60th birthday occurs ("voluntary retirement").

      7.3     (a)     Only eligible Partners, as provided in Sections 7.4 and 7.5, may earn an annual retirement benefit pursuant to Sections 7.3 through 7.11. The annual retirement benefit of an eligible Partner shall be based upon the retired Partner's average annual earnings from the Partnership during those three (3) fiscal years in which he/she was a Variable Share Partner which yield the highest average amount, after applicable adjustments, for (i) the "Service Adjustment" (as defined in Section 7.4) and (ii) the "Early Retirement Adjustment" (as defined in Section 7.5) (the "Average Annual Earnings"), and subject to Section 7.6 and Section 7.9. The Average Annual Earnings of a Variable Share Partner who has been in the Service with the Partnership (as defined in Section 7.7) for a period or periods aggregating at least twenty (20) years, fifteen (15) of which must be served as a Variable Share Partner, and has attained at least the age of 60 shall not be subject to either the Service Adjustment or the Early Retirement Adjustment.

(b)	For purposes of Section 7.3(a), a Partner's annual earnings from the Partnership shall equal his/her allocable share of the Partnership's profits calculated pursuant to Section 13.3, plus (a) any interest paid to such Partner on undistributed earnings, contributed capital and indebtedness as provided in Sections 5.2B, 6.2A and 12.9, respectively, and (b) any amounts paid to such Partner which are not determined on the basis of units allocated by the Board of Directors, such as bonuses, reserve awards or other forms of fixed compensation, and specifically excluding country club dues, moving expenses and other similar reimbursements.

**7.4**	A Variable Share Partner who retires in accordance with the provisions of Section 7.1, Section 7.2, or Section 7.5(a), and who has completed at least fifteen (15) years of Service with the Partnership by his/her retirement date, shall be eligible to receive an annual retirement benefit.  The Average Annual Earnings as computed pursuant to Section 7.3 shall be multiplied by a factor (the "Service Adjustment"), the numerator of which shall be the Partner's actual years of Service with the Partnership (not to exceed twenty (20)) and the denominator shall be twenty (20).

**7.5**	(a)	A Partner who: (1) is a  Variable Share Partner who has completed at least fifteen (15) years of Service with the Partnership, and who has attained the age of at least fifty (50) years, but not yet the age of sixty (60) years, or (2) was a Variable Share Partner upon reaching the age of at least fifty (50) years,  after which he/she converted to a Fixed Share Partner and who completed at least fifteen (15) years of Service with the Partnership, is eligible to elect an accelerated  retirement date of any June 30 following his/her 50th birthday ("early retirement"), and is eligible to receive an annual retirement benefit, subject to Section 7.9(b).  An eligible Partner's election of early retirement must be made by at least six (6) months prior written notice to the Partnership.

(b)	The Average Annual Earnings as computed pursuant to Section 7.3 and as adjusted pursuant to Section 7.4 shall be multiplied by the following percentage ("the Early Retirement Adjustment"):

|  **Age at Last Birthday**<br>**As a Variable Share Partner**<br>**Before Retirement** | **Percentage** |
| :---: | :---: |
| 50 | 30 |
| 51 | 35 |
| 52 | 40 |
| 53 | 50 |
| 54 | 60 |
| 55 | 70 |
| 56 | 75 |
| 57 | 80 |

| | |
|---|---|
| 58 | 86 |
| 59 | 93 |

**7.6**     (a)     The annual retirement benefit of an eligible Partner shall equal the following percentages of the retired Partner's Average Annual Earnings from the Partnership which have been adjusted, if applicable, pursuant to Sections 7.4 and/or 7.5.

| Years of Retirement | Percentage of Average Annual Earnings |
|---|---|
| First five years | 30% |
| Thereafter | 20% |

(b)     The maximum annual retirement benefit determined under Section 7.6(a) ("Maximum Annual Retirement Benefit") shall be One Hundred Fifty Thousand Dollars ($150,000) for Partners retiring on or after June 30, 2015 and before June 30, 2018, and shall be Two Hundred Thousand Dollars ($200,000) for Partners retiring on or after June 30, 2018.  For clarity, Partners retiring before June 30, 2015 are subject to the terms of the Partnership Agreement in effect at the time of their retirement, including for purposes of calculating the applicable maximum annual retirement benefit.

(c)     For any eligible Partner who, pursuant to Section 14.2, has been a Partner in, or been employed by, the Partnership on less than a full-time basis (a "Part-time Partner") and who has less than twenty (20) years of full-time Service with the Partnership (pursuant to Section 7.7), the Average Annual Earnings used in the determination of the annual retirement benefit shall be weighted to reflect the relationship between such Partner's (i) years of part-time service and the Average Annual Earnings determined for such periods of part-time service and (ii) years of full-time service to the Partnership and the Average Annual Earnings determined for such periods of full-time service (the "Weighted Average Annual Earnings")  The Weighted Average Annual Earnings shall then be subject to the Service Adjustment (pursuant to Section 7.4) and the Early Retirement Adjustment (pursuant to Section 7.5) before determining the annual retirement benefit pursuant to this Section 7.6.

(d)     An eligible Partner's annual retirement benefit shall in no event exceed the Maximum Annual Retirement Benefit, and shall be subject to reduction under the provisions of Section 10.2.

**7.7**     The term "Service with the Partnership" shall consist of ten (10) or more years of membership as a Variable Share Partner, and may also include up to a maximum combined total of five years of participation in the Partnership as a Fixed Share Partner and/or of employment in whatever capacity by the Partnership and any predecessor.  Any period during which such Partner serves in any of the Armed Forces of the United States by reason of a military draft shall not be considered an interruption of his/her Service with the Partnership or any predecessor partnership, but shall be included as Service with the Partnership, provided that he/she shall return to full-time work either as a Partner or employee of any such partnership within ninety (90) days following his/her discharge from such Armed Forces.  Any Part-time Variable Share Partner shall include in his/her Service with the Partnership the total number of years served as a Variable Share Partner with the Partnership regardless of time actually worked.

**7.8** (a) No eligible Partner shall be eligible to retire or receive a retirement benefit under Article VII, if, prior to his/her retirement date, he/she shall have given the Partnership, or the Partnership shall have given to him/her, the notice of withdrawal or termination referred to in Sections 11.2 and 11.4, respectively.

(b) Unless otherwise waived by the Board, a retired Partner who: (1) retires from the Partnership and at any point thereafter takes a position working for a competitor of the Partnership without having obtained an applicable written waiver in advance from the Board; or (2) engages in activities restricted under Section 14.5 below at any time after retiring from the Partnership, shall forfeit any unpaid retirement benefits under this Article VII. The Partnership's rights and remedies under this Section 7.8(b) are in addition to all rights and remedies reserved by the Partnership in Section 10.9 below. Should a retired Partner correct the act or omission resulting in forfeiture under Section 7.8 or 10.9 within thirty (30) days of written notice from the Firm of such forfeiture and provide evidence satisfactory to the Board of such correction, and if such act or omission has not caused irreparable harm to the Partnership, the Board may in its sole discretion reinstate the retired Partner's retirement benefit. In the event of such reinstatement of a retired Partner's retirement benefit, the Board may also in its sole discretion recommence retirement benefit payments prospectively only and may subject to forfeiture any retirement benefit payments that would have been payable between the forfeiture event and the reinstatement decision. In any event, and in addition to all other remedies the Partnership may have for the acts and omissions specified in Sections 7.8 and 10.9, the Partnership shall have the right to offset Article VII retirement benefits owing to such retired Partner to compensate the Partnership for damage resulting from his/her act or omission described in Section 7.8 or 10.9.

**7.9** (a) Payment of the annual retirement benefits provided under this Article VII for a Partner who retires in accordance with the provisions of Section 7.1, Section 7.2, or Section 7.5(a), and who has attained the age of at least fifty-five (55) years as a Variable Share Partner before or at retirement shall be made to a retired eligible Partner during his/her lifetime but in any event for a minimum period of ten (10) years following his/her retirement date, provided that, payment of such retirement benefits shall not begin until the Partner experiences a separation from service within the meaning of Section 409A of the Internal Revenue Code, as amended ("Section 409A").

(b) A Partner who is otherwise eligible to elect an early retirement pursuant to Section 7.5(a) at the age of fifty (50) through the age of fifty-four (54) must retire on or after June 30, 2018 in order to receive a retirement benefit. Payment of the annual retirement benefits provided under this Article VII to such eligible Partner described in the preceding sentence who elects early retirement effective June 30, 2018 or after, shall be made to the retired eligible Partner for a period of years as set forth below; provided that in the event of the retired Partner's death, benefits will discontinue upon the later of the month in which death occurs or ten (10) years from the commencement of such retirement benefits:

| Age at Last Birthday As a Variable Share Partner Before Retirement | Years of Payment |
|---|---|
| 50 | 10 |
| 51 | 12 |
| 52 | 14 |
| 53 | 17 |
| 54 | 20 |

Payment of such retirement benefits will commence in the month of July following the retired eligible Partner's fifty-fifth (55th) birthday, provided that, payment shall not begin until the Partner has experienced a separation from service within the meaning of Section 409A of the Internal Revenue Code, as amended ("Section 409A")

(c)     If the retired Partner dies within ten (10) years after the commencement of the payment of his/her retirement benefits, such retirement benefits provided under this Article VII shall continue to be paid by the Partnership to the beneficiary named by such Partner in accordance with Section 12.4, in the same manner and amount, and subject to the same conditions, as would have applied to such retired Partner had he/she lived throughout such ten (10) year period.  The foregoing notwithstanding, a Partner who is eligible to receive a lifetime retirement benefit  may elect at the time of his/her retirement to accept a reduced retirement benefit in exchange for which such benefits shall continue after his/her death to his/her surviving spouse on a joint and survivor basis. In such event, the joint and survivor benefit payable to the Partner and his/her spouse determined at the time of his/her retirement, shall be the actuarial equivalent of the benefit that would have otherwise been payable to the Partner in the single-life form. In the event of the death of both the retired Partner and the Partner's spouse during the ten (10) years following the Partner's retirement date, payment of said joint and survivor retirement benefits shall continue to the beneficiary designated by the Partner until the amounts paid, together with retirement benefits previously paid to the retired Partner and his/her spouse, total not less than the total retirement benefits which would have been paid if the Partner had not made this election.  Following the death of any retired Partner, the legal representatives of his/her estate shall promptly give written notice to the Partnership of his/her death.  Until such notice is actually received by the Partnership, it shall have no obligation to make any payments under the provisions of this Article VII to any beneficiary or beneficiaries or legal representatives of the deceased Partner.  The foregoing notwithstanding, an eligible Partner's election to accept a reduced retirement benefit in exchange for a joint and survivor benefit will not become effective until the first fiscal year in which the Partner renders no services to the Partnership and will only become effective if the election is made on or before December 31 of the year prior to the first year his/her retirement benefits are excludible from SECA tax under Section 1402(a)(10) of the Internal Revenue Code.

7.10     Payment of retirement benefits shall be made in equal monthly amounts in accordance with the provisions of Section 12.11.  Any overpayment by the Partnership of retirement benefits, whether by reason of the limitations set forth in Section 10.2 or otherwise, shall be deemed an indebtedness owing to the Partnership and payable to it, without interest, at such times and in such amounts as the Board of Directors may determine.  Any indebtedness of a retired Partner to the Partnership, any capital deficiency of such Partner and any negative amount of such Partner's share in the net accounts receivable and work in process of the Partnership referred to in Section 12.8 may be satisfied by the Partnership setting-off against it any payment due to such Partner from the Partnership.  The foregoing notwithstanding, any indebtedness of a Partner that is set-off against any payment due to such Partner from the Partnership shall comply with the applicable requirements of Section 409A.

7.11     The annual retirement benefits payable to an eligible Partner under this Article VII shall be adjusted on July 1 of each even numbered year following the year of retirement (the "Adjustment Year") as follows (subject to the Maximum Annual Retirement Benefit provided for in Section 7.6):

(a)     For purposes of this Section 7.11, the term "cumulative CPI differential" shall mean the percentage by which the "Consumer Price Index for All Urban Consumers: U.S. City Average -All

Items" published by the Bureau of Labor Statistics of the U.S. Department of Labor (the "CPI") for the month of March of a specified Adjustment Year exceeds the CPI for the month of March of the nearest preceding Adjustment Year in which an adjustment provided for in Section 7.11(b) was made; provided, however, that for any Adjustment Year prior to and including the first Adjustment Year in which an adjustment pursuant to Section 7.11(b) is made, the cumulative CPI differential will be the percentage by which the CPI for the month of March of such Adjustment Year exceeds (i) in the case of a Partner who retires during any of the months of April through September, the CPI for the month of March immediately preceding his/her retirement date or (ii) in the case of a Partner who retires during any of the months of October through March, the CPI for the month of March immediately following his/her retirement date, or in the case of a retirement in the month of March for such month.

(b)      If the cumulative CPI differential in any Adjustment Year equals or exceeds five percent (5%), then the annual retirement benefits payable to an eligible Partner under this Article VII will be increased by an amount equal to the product of (i) the lesser of the amount of such Partner's annual retirement benefit as calculated as of his/her retirement date (the "Base Benefit") and $10,000, multiplied by (ii) the cumulative CPI differential; *provided, however,* that no such adjustment shall be made for a negative cumulative CPI differential.

(c)      For purposes of this Section 7.11, the "average earnings of active Partners" for any period shall be calculated in such manner as shall be determined by the Board of Directors.

(d)      If the percentage increase in the average earnings of active Partners for the two-year period immediately preceding July 1 of an Adjustment Year is equal to or greater than the increase of the CPI for the month of March of that Adjustment Year over the CPI for the month of March of the immediately preceding Adjustment Year (the "periodic CPI differential"), then the annual retirement benefits payable to a Partner under this Article VII will be further increased by an amount equal to the product of (i) the lesser of (A) $10,000 and (B) an amount equal to the Base Benefit minus $10,000, multiplied by (ii) one-half the periodic CPI differential; *provided, however,* that no such adjustment shall be made for a negative periodic CPI differential.

# ARTICLE VIII

## Permanent Disability

**8.1**      In the event any Variable Share Partner, whatever his/her age or length of service with the Partnership, or any Fixed Share Partner with at least 20 years of Service with the Partnership as determined pursuant to Section 7.7 (which must include at least 15 years of Service with the Partnership as a Variable Share Partner and may include up to a maximum combined total of five (5) years of participation in the Partnership as a Fixed Share Partner and/or of employment in whatever capacity by the Partnership and any predecessor), whatever his/her age , is determined by the Board of Directors to have had a "separation from service" (within the meaning set forth in Section 409A) before his/her retirement date due to being permanently disabled (a "disabled Partner"), he/she shall be entitled to receive a disability benefit from the Partnership.  Such disabled eligible Partner shall receive his/her allocable share of Partnership profit and/or bear his/her allocable share of Partnership loss for the fiscal year during which such separation from service due to permanent disability occurs as determined in accordance with Section 12.2(a), notwithstanding that

his/her interest in the Partnership otherwise shall be deemed to have terminated on the date of determination of his/her separation from service due to permanent disability by the Board of Directors.

8.2     The disability benefit shall be equal to the retirement benefit provided in Section 7.3 for an eligible Partner eligible for mandatory retirement, as though the disabled eligible Partner had completed twenty (20) years of Service with the Partnership at the date of determination of his/her disability, regardless of his/her age or actual years of Service.  The amount of such disability benefit shall be determined by including the fiscal year during which such disability occurred as one of the years in which he/she was an eligible Partner.  Such disability benefit shall be reduced by the amount of the benefits received by said Partner under any disability insurance coverage sponsored by the Partnership, whether or not the premiums are charged to the individual Partner; *provided, however,* that the excess of any benefits under such disability insurance coverage over the maximum disability benefit otherwise payable pursuant to this Section 8.2 shall not reduce any other benefits payable to a Partner under this Agreement.  The disability benefit shall be paid in equal monthly amounts in accordance with the provisions of Section 12.11 and shall be paid to the disabled eligible Partner during his/her lifetime, but in any event it shall be paid to him/her or his/her beneficiary for a minimum period of ten (10) years commencing with the first month following the month during which he/she was determined by the Board of Directors to be permanently disabled.

8.3     The determination of whether a Partner has become permanently disabled shall be made solely by the Board of Directors, whose determination in that respect shall be final and conclusive.

8.4     No eligible Partner shall be eligible for a disability benefit if, (i) prior to the date of determination under Section 8.3, he/she shall have given to the Partnership, or the Partnership shall have given to him/her, the notice of withdrawal or termination provided in Sections 11.2 and 11.4, respectively, or (ii) prior to the Partner's request to the Partnership for a determination under Section 8.3 that he/she has become permanently disabled, the Partnership had requested the Partner to withdraw voluntarily from the Partnership.

8.5     The provisions of Section 7.8, Article X and Section 12.4 shall also be applicable to, govern and determine the rights of a disabled eligible Partner and his/her beneficiary to receive payment of any disability benefit provided for in this Agreement.

## ARTICLE IX

### Death of a Partner

9.1     If a Variable Share Partner, or a Fixed Share Partner with at least 20 years of Service with the Partnership as determined pursuant to Section 7.7 (which must include at least 15 years of Service with the Partnership as a Variable Share Partner and may include up to a maximum combined total of five (5) years of participation in the Partnership as a Fixed Share Partner and/or of employment in whatever capacity by the Partnership and any predecessor), dies before his/her retirement from the Partnership (a "deceased Partner"), the beneficiary designated by such deceased eligible Partner in accordance with Section 12.4 shall be entitled to receive a death benefit from the Partnership with respect to such eligible Partner.  The death benefit shall be equal to the retirement benefit provided in Section 7.3 for an eligible Partner eligible for mandatory retirement, as though the deceased eligible Partner had completed twenty (20) years of Service with the Partnership on the date of his/her death, regardless of his/her age or actual

length of service. Such death benefit shall be paid in equal monthly installments for the ten (10) year period commencing with the first month following the month in which his/her death occurred, in accordance with the provisions of Section 12.11.

     **9.2**     The beneficiary designated by a deceased Partner in accordance with Section 12.4 shall also be entitled to payment of the deceased Partner's allocable share of Partnership profit for the fiscal year during which the death occurred as determined in accordance with Section 12.2(a).

     **9.3**     If, prior to his/her death, the Board of Directors had determined that such deceased Partner was permanently disabled, but payment of disability benefits under Article VIII had not commenced, the payment of death benefits under Section 9.1 shall be in lieu of any disability benefits to which such deceased eligible Partner or his/her beneficiaries might otherwise be entitled.

     **9.4**     The beneficiaries of a deceased eligible Partner shall not be eligible for death benefits if, prior to the Partner's death, (i) the Partner shall have given to the Partnership, or the Partnership shall have given to him/her, the notice of withdrawal or termination provided in Sections 11.2 and 11.4, respectively, or (ii) the Partnership shall have requested the Partner to withdraw voluntarily from the Partnership, unless the Partner had become entitled to benefits under Sections 7.3, 7.4 or 7.5 prior to the Partnership's request that the Partner withdraw voluntarily from the Partnership.

     **9.5**     For the purpose of the determination of a deceased Partner's interest in the Partnership under Article XII, his/her interest shall be deemed to extend to the close of business on the last day of the month during which his/her death occurs.

     **9.6**     The provisions of Article X and Section 12.4 shall also be applicable to govern and determine the rights of the beneficiary of a deceased Partner to receive a death benefit under this Agreement.

## ARTICLE X

### Limitations on Benefits

     **10.1**     In order to protect the Partnership against an excessive burden for payments of benefits under Articles VII, VIII and IX and Sections 10.6, 12.1(c) and 12.1(d), the aggregate amount of such benefits paid in any fiscal year shall be limited to an amount (the "Benefit Limitation Amount") equal to sixteen and one-half percent (16.5%) of the profits of the Partnership for such fiscal year, calculated as provided in Section 13.3, provided that any amounts paid or accrued in respect of the items referred to in clauses (d) and (e) of Section 13.3 shall not be included in expenses in making such calculation.

     **10.2**     For each fiscal year of the Partnership, the aggregate benefits paid under Sections 7.3, 7.4, 7.5, 8.2, 9.1, 12.1(c) and 12.1(d) to retired or disabled Partners, to the beneficiaries of deceased Partners, or to Partners whose interest in the Partnership has otherwise been terminated plus the aggregate amount of previous reductions under this Section 10.2 of benefits otherwise payable under Sections 7.3, 7.4, 7.5, 8.2, 9.1, 12.1(c) and 12.1(d) that have not been recovered  (whether or not paid) under Section 10.6, shall be determined. If the aggregate benefits so determined exceed the Benefit Limitation Amount for that fiscal year, the benefits otherwise payable to said retired or disabled Partners, beneficiaries of deceased Partners,

or otherwise terminated Partners for such fiscal year shall be reduced in the manner set forth in Section 10.3.

**10.3**      The reductions in benefits provided for in Section 10.2 shall be made by ratably reducing benefits otherwise payable under Sections 7.3, 7.4, 7.5, 8.2, 9.1, 10.6, 12.1(c) and 12.1(d), subject to the provisions of Section 10.4 and without regard to the provisions of Sections 12.11 and 12.12.  If a reduction otherwise required under the provisions of Section 10.2, as such provisions pertain to benefits under Sections 12.1(c), 12.1(d) and 10.6, may not, for any reason, take effect with respect to any former Partners or beneficiaries thereof, then the dollar amount of such foregone reduction shall be excluded from aggregate benefits paid, for purposes of calculating all other reductions required by Section 10.2.

**10.4**      The ratable reductions in Section 10.2 of benefits payable under Sections 7.3, 7.4, 7.5, 8.2 and 9.1 shall first be made for those Partners or beneficiaries whose benefits under Sections 7.3, 7.4, 7.5, 8.2 and 9.1 exceed twelve thousand dollars ($12,000) (the "threshold level") per year.  However, no benefits under Sections 7.3, 7.4, 7.5, 8.2, and 9.1 payable to:

(a)      A Partner who has retired under the provisions of Section 7.1 or 7.2 and who by his/her retirement date had been in the service of the Partnership for a period aggregating at least twenty (20) years,

(b)      A Partner entitled to disability benefits under the provisions of Article VIII, or

(c)      The beneficiaries of a deceased Partner entitled to a death benefit under Article IX,

shall be reduced to less than twelve thousand dollars ($12,000) per annum, until after the benefits under Sections 7.3, 7.4, 7.5, 8.2 and 9.1 payable to all other Partners or beneficiaries have been reduced to the threshold level.

Only if and when the annual benefits under Sections 7.3, 7.4, 7.5, 8.2 and 9.1 of all eligible Partners or beneficiaries have been reduced to the threshold level shall such benefits be further reduced ratably to the extent necessary in the determination of the Board of Directors.  The Board of Directors shall have full authority and discretion to determine the correct application of these ratable reductions to all eligible Partners and beneficiaries.

**10.5**      If benefits subject to reduction under Section 10.2 are paid in an amount that exceeds the amount which should have been paid because of said reductions, the overpayment shall be recovered as soon as possible, but no later than the later of (a) the end of the calendar year or (b) the 15th day of the third month following the overpayment.  The overpayment may be paid by reducing the next monthly payments due the eligible Partner or beneficiary.

**10.6**      Each eligible Partner or beneficiary whose benefits otherwise payable under Sections 7.3, 7.4, 7.5, 8.2, 9.1, 12.1(c) and 12.1(d) are reduced under the provisions of Section 10.2 shall be entitled to recover the amount of said reduction from the Partnership out of profits of the earliest fiscal year of the Partnership succeeding the year of reduction in which benefits are not limited by the Benefit Limitation Amount, subject to the ratable reduction in benefits provided for in Section 10.2.

**10.7**      Until any reduction in benefits provided by Section 10.2 has been recovered, the Partnership, within four (4) months after the close of each such fiscal year, shall deliver to each affected

Partner or his/her beneficiaries an accounting showing: (1) profits or losses of the Partnership for such fiscal year; (2) the amount of benefits payable to the Partner or beneficiaries; (3) the aggregate benefits payable to all other affected Partners or beneficiaries both (i) without reference to the limitations and (ii) giving effect to such limitations; and (4) an analysis of any indebtedness account or capital deficiency of the Partner or his/her beneficiaries with the Partnership. The provisions of Article XIII (subject to the adjustments in calculating profits provided for in Section 10.1), relating to Partnership accountings generally, shall govern any accounting rendered pursuant to this Section 10.7.

     **10.8**    (intentionally omitted.)

     **10.9**    A Partner or his/her beneficiary shall forfeit any unpaid amounts due to him/her from the Partnership including, but not limited to, any unpaid benefits payable under Articles VII, VIII, IX or XII, if at any time prior or subsequent to his/her retirement date, his/her death, the date the Board of Directors determines him/her to be disabled, or at any other date prior to or following the date retirement benefits payable hereunder commence, such Partner breaches any provision of this Agreement or such Partner or beneficiary breaches any other agreement with the Partnership, or if he/she commits any act or fails to perform any act which, in the determination of the Board of Directors, (a) constitutes or would constitute, if such Code was applicable to the Partner when the act or failure to act was committed, a material deviation from the principles, rules or responsibilities set forth in the then most recent version of the Code of Professional Conduct, including the By-laws thereof, promulgated by the American Institute of Certified Public Accountants, (b) constitutes competition with the Partnership, or (c) adversely affects the independence, practice or profits of the Partnership. In addition, a retired or disabled Partner shall become ineligible for retirement or disability benefits and shall forfeit any further such benefits and any other amounts due to such Partner if, without the prior written consent of the Partnership, or on terms other than those consented to in writing by the Partnership, he/she serves as: (w) director of any corporation or company that is a client of the Partnership; (x) trustee of a trust that is a client of the Partnership; (y) executor or administrator of the estate of any individual who at the time of his/her death was a client of the Partnership or was an executive or stockholder of a client of the Partnership; or (z) trustee under any trust created during the lifetime of or by will by any individual who, at the time of the creation of the trust or at the time of his/her death, as the case may be, was a client or an executive or stockholder of a client of the Partnership. The ineligibility for and forfeiture of retirement or disability benefits and any other amounts due to a Partner or his/her beneficiary under the provisions of this Section 10. 9 shall not restrict or otherwise limit any other rights or remedies that the Partnership may have by reason of any breach, act, omission or service by any Partner. Anything to the contrary notwithstanding, a retired or disabled Partner may serve as an executor, administrator or trustee in connection with the affairs of the members of his/her immediate family even though such members are also clients of the Partnership.

     **10.10**    Any payment of retirement, disability or death benefits or any other amounts hereunder to a former Partner or his/her beneficiary, notwithstanding his/her failure to become eligible for such benefits in the first place or to remain eligible for the same, shall not constitute a waiver of any provision of this Agreement or of any other right or remedy which may be available to the Partnership, unless the Partnership expressly acknowledges a waiver thereof in writing. Any such waiver shall be limited to the matters and extent therein set forth.

# ARTICLE XI

## Termination Other Than by Reason of Retirement, Disability or Death

**11.1**     The interest of a Partner in the Partnership may terminate by reason of his/her voluntary withdrawal pursuant to Section 11.2, his/her unavailability pursuant to Section 11.3 or his/her termination for cause by vote of the Board of Directors pursuant to Section 11.4, in any of which events the provisions of this Article XI shall be applicable.

**11.2**     A Partner may withdraw from the Partnership at any time on at least six (6) months advance notice in writing to the Partnership.  The Board of Directors may waive any or all of this notice period and may, at its sole discretion, make such withdrawal effective at any time after it receives such notice up to the date six (6) months after the last day of the month in which such notice is received.  Otherwise, such period of notice shall commence to run from the close of the month in which such notice is actually received by the Partnership.

**11.3**     If a Partner is unavailable for service because of military draft or other operation of law, because of a leave of absence granted by the Chief Executive Officer, or for any other reason (other than retirement, death or disability), his/her interest in the Partnership shall terminate at the close of the month in which he/she becomes unavailable.

**11.4**     The Board of Directors, by the affirmative vote of at least seventy-five percent (75%) of the total number of its members in office at the time eligible to vote on the proposal, may for cause (as defined in Section 11.5) terminate the interest in the Partnership of any Partner at any time.  The Board of Directors shall give written notice of such termination to such Partner, whereupon such Partner's interest shall immediately terminate.  The vote of the Board of Directors on the proposal to terminate the interest of a Partner shall be on that proposal alone unlinked with other matters or any proposed termination of the interests of others.  If the Partner to whom notice of such termination is proposed to be given is then a member of the Board of Directors, he/she shall not be eligible to vote on the proposal.

**11.5**     For all purposes of this Agreement, "cause" entitling the Board of Directors to terminate a Partner's interest, shall mean, in each case in the determination of the Board of Directors: (a) such Partner's material breach of any applicable covenant under this Agreement; (b) such Partner's material breach of any written policy of the Partnership, including but not limited to the Partnership's Code of Conduct; (c) such Partner's performance of any act or failure to perform any act or render any service in any manner or of any character which, pursuant to the provisions of Section 10.9, would make an eligible Partner or his/her beneficiary ineligible to receive, or result in the forfeiture of the right to receive, benefits or other amounts due to such eligible Partner or his/her beneficiary (including, but not limited to, any personal financial circumstances of such Partner that would have a negative impact on the Partnership or such Partner's failure to provide any authorization, approval or consent required to permit the Chief Executive Officer to obtain credit reports or information about federal, state or local tax filings of such Partner pursuant to Section 3.6(o)); (d) gross negligence or willful misconduct by such Partner in the performance of his/her duties; (e) such Partner's material failure to perform his/her duties or make continued, material economic contributions to the Partnership to an extent that such Partner no longer deserves to remain a Partner; (f) the commission by such Partner of any felony or crime involving moral turpitude; (g) any theft, fraud or embezzlement by such Partner, whether or not such action constitutes a felony; (h) willful or prolonged physical absence from such Partner's designated office (other than for reason of bona-fide Partnership

business or disability due to physical or mental illness); (i) conduct by such Partner that has caused, or could reasonably be expected to cause, substantial injury, whether monetary or otherwise) to the Partnership, its business or its reputation; (j) such Partner's pursuit of activities that are materially adverse or contrary to the best interests of the Partnership or its business; (k) such Partner's illegal drug use; (l) such Partner's use of alcohol to an extent which materially impairs such Partner's performance of his duties; (m) to terminate a Partner's interest in connection with the decision by the Board of Directors to discontinue a business line or close an office/geographic location of the Partnership; or (n) to terminate a Partner's interest in connection with an overall reduction in workforce of the Partnership.

11.6     In case a Partner is indicted for a felony, or has charges brought against him/her for revocation of his/her certificate by a board of accountancy, he/she may be immediately suspended by a vote of seventy-five percent (75%) of the Board of Directors, unless or until the Board of Directors votes to terminate such Partner's interest in the Partnership as permitted by Section 11.4. The terms of suspension, including whether or not such Partner shall be entitled to receive any allocable share in the profits of the Partnership during the period of suspension, shall be determined by the Board of Directors at that time and may be changed from time to time.

11.7     For purposes of this Agreement, the interest of a Partner in the Partnership shall be deemed to terminate for reasons other than retirement, disability or death if any such event does not occur until after he/she shall have given to the Partnership notice of withdrawal referred to in Section 11.2, or he/she has become unavailable as described in Section 11.3, or the Partnership shall have given to him/her notice of termination referred to in Section 11.4.

11.8     Upon the termination of the interest of a Partner in the Partnership for any reason other than retirement, disability or death, he/she shall not be entitled to payment of any benefit under Articles VII, VIII or IX, but he/she shall be entitled only to payment of his/her interest in the Partnership in the amount and manner provided in Article XII. If any terminated Partner subsequently rejoins the Partnership as a Partner, any payments to which he/she is then entitled under Article XII shall terminate as of the end of the month preceding his/her reinstatement as a Partner. Any remaining balance of his/her capital account, balance in his/her undistributed earnings account, if applicable, or share in the net accounts receivable and work in process of the Partnership determined under Section 12.3 shall become the beginning balances of such accounts or share for his/her new period of partnership, but he/she shall not be required to return to the Partnership any payments from such accounts or share previously made to him/her.

## ARTICLE XII

### Payment of Partnership Interest

12.1     Upon the termination of the interest of any Partner in the Partnership pursuant to any provision of this Agreement, the Partner or his/her beneficiary shall be entitled to receive, at the times specified herein, the following amounts, after making proper provision for any indebtedness of such Partner to the Partnership, any deficiency in such Partner's capital account and any negative amount of such Partner's share in the net accounts receivable and work in process of the Partnership referred to in Section 12.8:

(a)     Such Partner's allocable share of the profits (net of any losses) of the Partnership for the fiscal year in which termination occurs, as computed in Section 12.2 and as distributed pursuant to Section 12.6;

(b)     The balance standing to the credit of the Partner in his/her capital account with the Partnership as at the date of termination of his/her interest;

(c)     An amount equal to such Partner's share, if any, in the net accounts receivable and work in process of the Partnership, determined in accordance with the provisions of Section 12.3;

(d)     The balance standing to the credit of the Partner in his/her undistributed earnings account, if applicable, as at the date of termination of his/her interest, including any amounts credited pursuant to Section 12.6 for the year in which termination occurs and excluding his/her allocable share of the profits for the year in which termination occurs that is distributed by the time of final settlement of distributions for such fiscal year pursuant to Section 12.6; and

(e)     Any indebtedness of the Partnership to such Partner.

Any amounts normally charged against the Partner for items such as insurance and taxes shall be deducted first, from the Partner's allocable share of profits for the year in which termination occurs, second, from the Partner's undistributed earnings account payable to him/her under Section 12.1(d), as applicable, third, from the Partner's capital account payable to him/her under Section 12.1(b), and fourth, from any other amounts payable to him/her under this Agreement.

12.2     For the purposes of Section 12.1(a), a Partner's allocable share of profits or losses of the Partnership for the year of termination shall be the following:

(a)     If termination of a Partner occurs because of retirement, death or permanent disability, then such Partner's allocable share, based on the type of units allocated to such Partner, shall be equal to, in the case of retirement, his/her allocable share of the profits and losses for the entire fiscal year in which–, or at the close of which–, such retirement occurs and, in the case of death or disability, such amount multiplied by a fraction, the numerator of which is the full number of months of the fiscal year that elapsed prior to such event and the denominator of which is twelve (12).

(b)     Except as provided in Section 12.13, if termination of a Partner occurs for any reason other than retirement, death or permanent disability, then such Partner's allocable share, based on the type of units allocated to such Partner, shall be such Partner's allocable share of the profits or losses of the Partnership for the period ("short period") from the end of the last fiscal year of the Partnership until the date of termination.  For purposes of this Section 12.2(b): (i) the Variable Share Partner's allocable share of the profits or losses for the short period, subject to the provisions of Section 12.13, shall be deemed to be an amount equal to (A) drawings paid to him/her, up to the effective date of termination in accordance with the applicable formula employed by the Partnership on the date of the notice of withdrawal referred to in Section 11.2, the date such Partner has become unavailable as described in Section 11.3 or the date of the Partnership's notice of termination referred to in Section 11.4, as the case may be, if such termination occurs on or before March 31 or (B) that fraction of such Partner's allocable share of the profits or losses, excluding any bonus or reserve award, for the entire fiscal year in which or at the close of which such termination takes place as the number of full months during such short period bears to twelve (12), if such termination occurs after March 31; and (ii)  the Fixed Share Partner's allocable share of the profits or losses

for the short period, subject to the provisions of Section 12.13, shall be deemed to be an amount equal to that fraction of such Partner's allocable share of the profits or losses, excluding any bonus or reserve award, for the entire fiscal year in which or at the close of which such termination takes place as the number of full months during such short period bears to twelve (12).

(c)     The Partner's allocable share of profits or losses calculated pursuant to clause (a) or (b)(i)(B) above for Variable Share Partners, or pursuant to clause (a) or (b)(ii) above for Fixed Share Partners, shall be reduced by any drawings by (or payments made by the Partnership on behalf of) the Partner for such year, except to the extent that such drawings are made from the undistributed earnings account, as applicable. If, for the year of termination, the amount resulting from subtracting any drawings by (or payments made by the Partnership on behalf of) the Partner (but excluding any drawings made from the Partner's undistributed earnings account, if applicable) from the Partner's allocable share of profits or losses described in the preceding sentence for such year results in a negative amount, such negative amount (but not more than the amount of the drawings by (or payments made by the Partnership on behalf of) the Partner for such year) shall be treated as an indebtedness of the Partner to the Partnership; *provided, however*, the foregoing provision shall not apply to a Partner whose termination occurs in a fiscal year during which the interests of Partners who have been allocated (as of the beginning of such fiscal year) in the aggregate one-third (1/3) or more of the Partnership units terminated.

**12.3**   (a)     Each Partner of the Partnership on June 30, 1998 shall be credited with an amount, as such Partner's share of net accounts receivable and work in process, equal to such Partner's share of net accounts receivable and work in process of the Partnership as of June 30, 1998.

(b)     At the time a person is admitted as a Partner, whether pursuant to a merger or acquisition or combination of practices with any other firm or otherwise, his/her share, if any, in the net accounts receivable and work in process as of the date of admission shall be determined by the Board of Directors, subject to any agreement which may be entered into in connection with such merger, acquisition or combination of practices.

(c)     Any interest in net accounts receivable and work in process which is forfeited pursuant to Section 12.3(d) or otherwise, or which for any other reason reverts to the Partnership, shall be reallocated among the other Partners in accordance with the number and type of their units, provided that no such reallocation shall be made if and to the extent that the aggregate amount then credited to such Partners in respect of accounts receivable and work in process of the Partnership exceeds the net accounts receivable and work in process of the Partnership.

(d)     Notwithstanding any other provision of this Agreement, and except in the case of a Partner whose interest in the Partnership terminates because of death or disability, no payments to a Partner or a beneficiary of a deceased Partner in respect of his/her share, if any, of net accounts receivable and work in process shall commence to be made prior to (i) the later of the date on which the Partner attains (or, but for such Partner's death prior thereto, would have attained) the age of at least sixty (60) years or the date of the Partner's retirement pursuant to Article VII, or (ii) such earlier date on which a Partner's early retirement elected under Section 7.5 becomes effective, if applicable.

**12.4**     Every Partner shall have the right to designate, by written notice to the Partnership, a beneficiary or beneficiaries to which any benefits or other interest in the Partnership shall be paid in the event of the Partner's death, whether before or after retirement or other termination of his/her interest in

the Partnership. The Partner may designate the same beneficiary or different beneficiaries for the benefits that are or may be payable under Section 5.2, Articles VII, VIII and IX and Section 12.1. To the extent that a Partner does not name a beneficiary for any or all of such benefits he/she may be eligible to receive, or upon the death of any such beneficiary or beneficiaries prior to the completion of payment of such benefits, payment shall be made to the legal representatives of the Partner's estate. Where used elsewhere in this Agreement, the term "beneficiary" shall mean the plural ("beneficiaries") where appropriate, and the term "beneficiary" or "beneficiaries" shall mean the legal representatives of the Partner's estate if the Partner has not named a beneficiary. Each Partner, prior to and following his/her retirement, shall have the right at any time, and from time to time, to change the designation of his/her beneficiary or beneficiaries under this Section by written notice to the Partnership.

12.5    Unless the Partner designates otherwise in writing, his/her successor in interest for the purpose of reporting taxable income under Section 706 of the Internal Revenue Code shall be the following persons, in the following order:

(a)    The beneficiary to whom the benefits provided in Section 12.1(a) are payable.

(b)    The beneficiary to whom the benefits provided in Section 12.1(b) are payable.

(c)    The beneficiary to whom the Partner's share in net accounts receivable and work in process provided in Section 12.1(c) is payable.

(d)    The beneficiary to whom the Partner's undistributed earnings provided in Section 12.1(d) are payable (as applicable).

(e)    The beneficiary or beneficiaries named to receive the payments due under Article VII, VIII or IX (as applicable).

12.6    Except as provided in Section 12.13, the Partner's allocable share of the profits of the Partnership determined under Section 12.2 shall be distributed to the Partner or his/her beneficiary at the same time and to the same extent as distributions of profits are made to the remaining Partners for that fiscal year, unless the Board of Directors directs payment at a different time. Any portion of a Variable Share Partner's allocable share of the profits of the Partnership for such fiscal year that is not distributed by the time of final settlement of distributions for such fiscal year will be credited to the Partner's undistributed earnings account.

12.7    The balance in the Partner's capital account under Section 12.1(b), excluding any voluntary contribution payable as provided in Section 6.3, shall be paid to him/her or his/her beneficiary in sixty (60) equal consecutive monthly installments, in accordance with Sections 6.2A, 12.11, 12.11A and 12.13, *provided, however*, that, if termination occurs because of death or permanent disability, or if death or permanent disability occurs within such sixty (60) months, the Board of Directors may accelerate such payments.

12.8    If, at the date of the termination of a Partner's interest in the Partnership, his/her share, if any, of the net accounts receivable and work in process allocated in accordance with Section 12.3 is a positive amount, said amount shall be paid (subject to Section 12.11A) to him/her or his/her beneficiary in one hundred and twenty (120) equal consecutive monthly installments, without interest, in accordance with the provisions of Sections 12.11 and 12.13, subject to reduction under the provisions of Section 10.2. If his/her share, if any, in the net accounts receivable and work in process of the Partnership allocated in

accordance with Section 12.3 is a negative amount, such amount shall be satisfied by the Partnership setting off against it any payment due to such Partner from the Partnership.

**12.8A**   If applicable, the balance in the Partner's undistributed earnings account (after deducting any distributions of his/her allocable share of the profits for the year in which termination occurs made by the time of final settlement of distributions for such fiscal year) shall be paid to him/her or his/her beneficiary (i) in one hundred and twenty (120) equal consecutive monthly installments, beginning with his/her date of termination, if termination occurs because of retirement, death or permanent disability, in each case, with interest, if any, payable at such times and at such rates as shall be determined pursuant to Section 5.2B, as such undistributed earnings are paid out pursuant to this Section 12.8A, and (ii) in one hundred and twenty (120) equal consecutive monthly installments, without interest, beginning with the second anniversary of his/her date of termination, if termination occurs for any other reason, provided, that if death or permanent disability occurs within the twelve (12) year period following such termination, the Board of Directors may accelerate such payments.

**12.9**   Any indebtedness, other than his/her capital, undistributed earnings, as applicable, or allocable share of profits, of the Partnership to the Partner whose interest terminates shall be paid to him/her or his/her beneficiary (a) in sixty (60) equal consecutive monthly installments if termination is due to death, permanent disability or retirement of an eligible, with interest, if any, payable at such times and at such rates as shall be determined annually by the Board of Directors, on the declining balance, calculated monthly, of the indebtedness, net of any reductions or offsets, as such indebtedness is paid out pursuant to this Section 12.9, and (b) in sixty (60) consecutive monthly installments without interest if termination occurs for any other reason, subject in all cases to possible forfeitures and the Partnership's right of offset under Section 14.5 or any other part of this Agreement. The Board of Directors may accelerate the time of such payment at its sole discretion.

**12.10**   If the computation of the interest in the Partnership of any Partner whose interest terminates, excluding his/her share, if any, in net accounts receivable and work in process of the Partnership allocated in accordance with Section 12.3 and including any capital deficiency of such Partner to the extent treated as indebtedness to the Partnership pursuant to the last sentence of Section 12.2, results in a balance of indebtedness due to the Partnership, such Partner, or the legal representatives of his/her estate, shall pay such indebtedness in full to the Partnership within ninety (90) days after receipt by him/her or them from the Partnership of a written copy of the computation of such indebtedness.

**12.11**   Subject to the provisions of Section 12.3(d), if a Partner's interest in the Partnership terminates because of retirement, any monthly payment under Article VII, if applicable, and this Article XII shall begin in the month following the close of the fiscal year in which the Partner's interest terminates. Subject to the provisions of Section 12.3(d), if an eligible Partner's interest in the Partnership terminates because of death or permanent disability, any monthly payment for which such Partner is eligible under Articles VIII, IX and this Article XII shall begin no later than the close of the first (1st) calendar month following death or permanent disability.  The initial payments may be based on reasonable estimates, in which case the final amount shall be determined no later than the third (3rd) month following the close of the fiscal year following the date of termination, and any difference between the estimated amount and the final amount, adjusted in the next monthly payment following the determination of the final amount.  Except as otherwise provided in Sections 12.3(d), 12.8A and 12.13, if a Partner's interest terminates for any reason other than retirement, permanent disability or death, payment of any part of his/her interest

in the Partnership which is to be paid in monthly installments shall begin no later than the close of the third (3rd) calendar month following termination.

Except for payments made after the death of a Partner, said monthly amounts shall be totaled and paid to the Partner in a single payment for the periods for which they are payable. The payment shall be treated as coming from the following sources and in the following order:

       (a)     First, out of the Partner's capital account until that item is paid in full.

       (b)     Second, out of the Partner's interest in net accounts receivable and work in process, if applicable, until that item is paid in full.

       (c)     Third, out of the Partner's undistributed earnings account, if applicable, until that item is paid in full.

       (d)     Fourth, as a retirement, disability or death benefit, if applicable.

The amount of each total monthly payment, and the total amount of all payments during any ten (10) year minimum period referred to in Articles VII and VIII, shall be equal to the aggregate of the individual payments that would be due if this Section 12.11 did not apply.

Payments to a beneficiary of a deceased Partner shall be made in the same manner and order as provided in this Section 12.11, except that if different beneficiaries have been named for different benefits or interests, separate checks will be issued, always observing the sourcing and ordering process set forth above.

**12.11A** For purposes of Section 12.11, (i) distributions to a Partner that relate to cash received by the Partnership after the end of a fiscal year shall, for an eligible Partner who retires under the provisions of Article VII during such fiscal year, be deemed a return of, and shall reduce, such Partner's capital account to the extent of such capital account or the amount of such distributions, whichever is less, and (ii) such Partner's undistributed earnings account, if applicable, shall be increased by the amount of the foregoing reduction in such Partner's capital account.

Notwithstanding the provisions of Sections 12.8A and 12.12, to the extent a retired Partner's undistributed earnings account is increased pursuant to the preceding sentence, such undistributed earnings shall, to the extent of such increase, be paid to such retired Partner in sixty (60) equal consecutive monthly installments, rather than in one hundred and twenty (120) installments.

**12.12** A Partner who retires and is eligible to receive a benefit under the provisions of Article VII or VIII of this Agreement shall be deemed to have waived his/her interest in the net accounts receivable and work in process of the Partnership allocated in accordance with Section 12.3 and in his/her undistributed earnings account, shall have no interest in the net accounts receivable and work in process of the Partnership and in the undistributed earnings of the Partnership, and shall not receive any payments under Section 12.1 (c), 12.1 (d) or any other provisions of this Agreement relating to such payments of net accounts receivable or work in process or undistributed earnings.

In lieu of such interest in the net accounts receivable and work in process of the Partnership, if applicable, and in his/her undistributed earnings account, if applicable, the Partnership shall establish an additional pension or disability benefit, as the case may be, for any eligible Partner who is deemed to have made such

waiver. This benefit shall be equal in amount, on such Partner's retirement date, to what such eligible Partner's interest in the net accounts receivable and work in process of the Partnership and in his/her undistributed earnings account would otherwise have been on such date. Such additional benefit shall be paid (subject to Section 12.11A) in one hundred and twenty (120) equal consecutive monthly installments, in the same manner as other pension or disability benefits, in accordance with the applicable provisions of Section 12.11. Any such deemed waiver by any eligible Partner shall not confer on any other eligible Partners any greater interest in the net accounts receivable and work in process of the Partnership or in the undistributed earnings of the Partnership than they otherwise would have.

If a Partner forfeits, at any time, his/her rights to benefits under Section 7.8(b) or 10.9 hereof, such forfeiture shall also apply to the payments with respect to such Partner under this Section 12.12.

**12.13** In the view of the Partnership, it is undesirable for a Partner to withdraw from the Partnership as of any day other than the last day of the fiscal year. If a Partner gives notice of his/her withdrawal for a day other than the last day of the fiscal year, and the Board of Directors determines that withdrawal at that time would be harmful to the Partnership, then, at the discretion of the Board of Directors and regardless of the other provisions of this Agreement:

   (a) such Partner shall, for the fiscal year in which such termination occurs, be entitled only to the allocable share of Partnership profits equal to the drawings paid to him/her, up to the effective date of termination, in accordance with the applicable formula employed by the Partnership on the date of such notice for the applicable type of units allocated to the Partner;

   (b) the first payment of the interest in the Partnership of such Partner, pursuant to this Article XII, but notwithstanding the provisions of Sections 12.2, 12.6 and 12.11, shall be made to the Partner on the date six (6) months following the last day of the month in which notice of withdrawal is received by the Partnership, or the 15th day of the third month after the close of the fiscal year, whichever date is later. In any given case, the Board of Directors may authorize payment at an earlier time, to the extent it feels the circumstances warrant. The provisions of this paragraph shall control over any other provisions of this Agreement inconsistent with it.

## ARTICLE XIII

### Accounting Provisions

**13.1** The fiscal year of the Partnership shall be the twelve (12) month period ending on June 30, unless otherwise determined by the Board of Directors. In the event of any change in the fiscal year of the Partnership, all references in this Agreement to, and all computations based on, the June 30 date shall be deemed correspondingly changed and adjusted.

**13.2** Regardless of the method by which the Partnership keeps its books, the accrual basis of accounting, with such modifications to generally accepted accounting principles as may be permitted from time to time by the Partnership's applicable lenders, shall be used for all computations required by this Agreement; *provided, however*, that the cash basis of accounting using a twelve (12) month period ending December 31 shall be used for tax purposes, unless otherwise required by the Internal Revenue Code.

**13.3**	Except as otherwise expressly provided in Sections 7.3, 10.1 or 10.7, for purposes of determination of profits and losses of the Partnership, income shall include the amount of interest received from a Partner provided for in Sections 6.2 and 6.4, and expenses shall include:

(a)	depreciation and amortization;

(b)	the amounts paid as retirement benefits, disability benefits or death benefits pursuant to Articles VII, VIII, IX, and Section 12.12;

(c)	amounts paid to retired Partners for services as provided in Section 14.6;

(d)	amounts paid to Partners which are not determined on the basis of variable units allocated by the Board of Directors, such as bonuses, reserve awards or other forms of fixed compensation;

(e)	interest paid to Partners on undistributed earnings, contributed capital and indebtedness as provided in Sections 5.2B, 6.2A and 12.9, respectively; and

(f)	adequate provisions for reserves, as shall be determined by the Board of Directors.

Expenses shall not include the allocable share, whether drawn or not, in the profits or losses of the Partnership of any Partner which is based on variable units allocated to such Partner by the Board of Directors.  Any contribution made by the Partnership on behalf of any Partner to any pension or profit sharing plan qualified under Internal Revenue Code Section 401 shall be charged to the respective Partner's undrawn profits, or his/her capital or undistributed earnings, if applicable, and shall not be included in expenses.

**13.4**	The Partnership shall make an accounting to each of the Partners within four (4) months after the close of each fiscal year, showing the financial position of the Partnership at the end of the fiscal year, the results of its operations for the fiscal year, and such other information as may be appropriate.

**13.5**	Each Partner or his/her legal representatives shall have the right to examine the books and records of the Partnership pertaining only to the accounting referred to in Section 13.4.  Such accounting, when approved in writing by a Partner or his/her legal representatives, shall be deemed to be conclusive and final and to constitute an accord as to all its aspects.  If the Partnership does not receive a written objection to an accounting given to any Partner or former Partner or the legal representatives of any deceased Partner within two (2) months after such accounting is rendered to him/her or them, then such Partner or legal representatives shall be deemed to have approved such accounting with the same force and effect as if he/she or they had approved it in writing.

**13.6**	All payments made by the Partnership to a former Partner pursuant to the provisions of this Agreement, except for payments permitted under Section 14.6, the amount of his/her capital contribution and any indebtedness for undrawn profits or other amounts previously taxed, are in liquidation of his/her interest in the Partnership and shall be reported in the income tax returns filed by the Partnership and such Partner, his/her beneficiaries and/or his/her legal representatives, and shall be treated for all purposes as ordinary income to the Partner and as deductible by the Partnership, in accordance with Section 736(a) of the 1986 Internal Revenue Code as it existed on April 1, 2000, or any future provision of the Code which provides for similar treatment of such payments. The parties hereto expressly acknowledge that no part of any payment to a Partner pursuant to this Agreement is for goodwill of the Partnership.

# ARTICLE XIV

## Dealings Among Partners

**14.1**     For purposes of this Agreement only, the term "client" shall include any person, company, partnership or other entity for whom the Partnership performs accounting, auditing, tax and/or consulting services, or related services, or any other services which the Partnership then offers directly or through an affiliate, and the term "prospective client" shall include any person, company, partnership or other entity to whom the Partnership has made an oral or written proposal to perform such services.

**14.2**     Each Partner shall devote his/her full time and attention to the business of the Partnership and shall exert his/her efforts to the development of the quality, scope and size of the professional practice of the Partnership, except as may otherwise be approved by the Chief Executive Officer.  Each Partner is expected to and agrees to incur (without reimbursement from the Partnership) a reasonable amount of expenses for furtherance of the Partnership business.

**14.3**     Each Partner agrees that all income earned by him/her in connection with the practice of public accounting, or the provision of auditing, tax and/or consulting services, or related services, or any other services of the type at the time provided by the Partnership, or derived out of his/her activities in any such areas, shall belong to the Partnership.  Without limiting the foregoing, each Partner or retired Partner shall turn over to the Partnership any amounts received by him/her or his/her legal representatives, less expenses paid, in connection with any services rendered by such Partner, if such services are determined by the Chief Executive Officer to have arisen out of, or to be related to, his/her association with the Partnership or its practice, or to have originated or been derived as aforesaid.  Illustrative of such services, but not limited thereto, are services as a director, receiver, executor, administrator, trustee or other fiduciary, consultant, arbitrator, lecturer, author, instructor and services for any governmental, public, quasi-public or charitable or other organization or authority.

**14.4**     Each Partner, and former Partner, after retirement or other termination of his/her Partner status, shall conduct himself/herself in accordance with the recognized ethical standards applicable to certified public accountants, including the standards of the organized certified public accounting profession (the American Institute of Certified Public Accountants and the various state societies) and the standards applicable to certified public accountants entitled to practice before the United States General Accounting Office, Securities and Exchange Commission and Treasury Department. Each Partner shall also observe the professional principles set forth in the written Code of Conduct of the Partnership to the same extent as if he/she were an employee of the Partnership.  Each Partner hereby acknowledges receipt from the Partnership of a copy of the Code of Conduct in effect as of the effective date of this Agreement.  All of these professional standards and principles are an integral part of this Agreement and shall be applicable to and binding upon each Partner, with the same force and effect as if set forth at length in this Agreement. Each Partner and former Partner shall timely file all federal, state and local personal income tax returns required under applicable laws, rules and regulations, which tax returns shall be complete and accurate in all material respects.  No Partner or former Partner shall take a position in any such personal income tax return that is inconsistent with any position taken by the Partnership in its tax returns or otherwise maintained by the Partnership with respect to tax matters.  Any Partner or former Partner who exercises any right to obtain any Partnership tax return information, including but not limited to any information in associated tax return schedules, shall hold all such information in strict confidence (subject to the

requirements of applicable law) and shall not use any such information in any manner or for any purpose adverse to the interests of the Partnership.

**14.5**     Regardless of the other provisions of this Agreement, if, without the specific consent of the Board of Directors, a Partner at, prior to, or within two years after, his/her termination from the Partnership:

(a)     Directly or indirectly solicits or obtains for himself/herself, or for a firm with which he/she is or becomes associated, engagements to perform, or if he/she or a firm with which he/she is associated does perform, accounting, auditing, tax and/or consulting services, or related services, or any other services which the Partnership then offers directly or through an affiliate, for a client of the Partnership for whom such Partner directly provided substantive services during his/her employment by or membership with the Partnership (other than personal clients developed by such Partner only as a result of his/her independent recruitment efforts which the Partnership neither subsidized nor otherwise financially supported as part a program of client development) (a "Direct Client"), or a prospective client that such Partner directly recruited or solicited during such Partner's employment by or membership with the Partnership (a "Direct Prospective Client"), or causes a Direct Client or any person, company, partnership or other entity who provides, has provided or would reasonably be expected to provide referrals of clients or prospective clients to the Partnership to terminate that relationship;

(b)     Lures away or causes an employee or Partner of the Partnership to leave its employ;

(c)     In the judgment of the Board of Directors, improperly removes, copies or uses any files, business records, confidential information, trade secrets, intellectual property or other property of the Partnership; or

(d)     Otherwise causes the Partnership financial loss or damage, the said Partner shall compensate the Partnership for any loss, damage and expense suffered by the Partnership (the "Damages"), as follows:

(i)     For any engagements lost by the Partnership under (a) above an amount equal to one hundred fifty percent (150%) of the fees charged by the Partnership during the last full fiscal year during which the Direct Client was a client of the Partnership;

(ii)     For Direct Prospective Clients, one hundred fifty percent (150%) of the proposed fee;

(iii)     Under (b) above, an amount equal to thirty percent (30%) of the annual earnings of each employee or Partner who leaves, to cover recruiting replacements, plus an additional ten percent (10%) for each year of service of the employee to cover training costs; or

(iv)     The damages resulting from the activity referred to in (c) and (d) above, as reasonably determined by the Board of Directors.

The Partnership may apply to the satisfaction of such Damages any and all amounts otherwise payable, or to become payable, to such Partner under this Agreement and such payments to the Partner may be deferred until all such Damages have been assessed and satisfied.  If such payments are or will be insufficient to satisfy the Damages assessed, it is agreed the Partner will pay to the Partnership the balance

of such Damages, with interest at the prime rate as charged from time to time by leading New York City banks, over a period of five (5) years from the date of notice from the Board of Directors of any deficiency, unless the Board of Directors shall agree to other terms. These provisions shall not limit the Partnership's legal remedies. The term "Partner" herein includes "former Partner."

14.6    The parties recognize that there may exist matters in which a former Partner may have been involved or of which he/she may have information regarding the affairs of the Partnership or any predecessor partnership or clients or former clients that may require the time and services of such former Partner after his/her interest in the Partnership terminates. Each Partner whose interest in the Partnership shall have terminated shall devote such reasonable time and render such services to the Partnership following his/her termination as the Chief Executive Officer or his/her delegate may determine to be necessary. In such event the former Partner shall be compensated for his/her time and services at a rate to be negotiated by the former Partner and the Chief Executive Officer or his/her delegate. If such service requires travel, such former Partner shall also be reimbursed for his/her traveling expenses on the same basis as the Partnership then reimburses its Partners for traveling.

14.7    Any controversy or dispute relating to this Agreement or the Partnership and its affairs or otherwise arising between a Partner and the Partnership, including but not limited to all common law or statutory claims, shall be resolved and disposed of in accordance with this section, except that (i) the Partnership and any Partner may seek provisional remedies from a court and (ii) any accounting provided for in this Agreement, to be conclusive, shall not be subject to this procedure, but shall be conclusive upon the Partners and the Partners agree and accept to be bound by any such accounting. Any dispute or controversy shall be considered and decided by an arbitration panel consisting of two (2) members of the Board of Directors (other than the Chief Executive Officer) selected by the Board of Directors and three (3) Partners from the Partnership's practice offices who are not members of the Board of Directors. The members of the arbitration panel shall be mutually agreed to by the Board of Directors and the parties to the controversy or dispute, provided that no member of the panel shall be from an office in which any complaining Partner was located at the time of the filing of the complaint, nor be otherwise involved in the controversy or dispute. The arbitration panel shall be selected as soon as possible after notice to the Partnership by any Partner that such a controversy or dispute exists. The conduct of the arbitration shall be in accordance with such procedures as the Board of Directors adopts and communicates to the Partners. The vote of a majority of the arbitration panel shall determine the resolution and disposition of any such dispute or controversy. The determination of such arbitration panel shall be conclusive and binding on all the Partners, and shall not be subject to further determination in any type of proceeding within or without the Partnership.

14.8    A Partner may not, without written approval of the Board of Directors, sell, assign, or otherwise convey or encumber his/her Partnership interest, including his/her interest in the assets, revenues and receivables of the Partnership, and any such attempted sale, assignment, conveyance or encumbrance, without such approval, shall be invalid and without effect as to the Partnership.

14.9    Except as otherwise authorized by the Board of Directors or by the Chief Executive Officer, no Partner shall:

(a)    Pledge the credit of the Partnership;

(b)      Enter into any agreement, lease or commitment on behalf of or in the name of the Partnership;

(c)      Subscribe to any bonds or undertakings or otherwise become surety or guarantor or bondsman for any other person, firm or other entity in his/her name or on behalf of the Partnership; or

(d)      Sign or endorse any promissory note, accept, sign or endorse any bill of exchange, or assume any other liability, in each case in his/her own name or in the name of the Partnership, for the accommodation of any person, firm or other entity, provided that he/she may undertake the acts described in paragraphs (c) and (d) of this Section 14.9 in his/her own name, without authorization, for the accommodation of a member of his/her family, if the subject family member(s), firm or entity is not a client of the Partnership, and provided that the Partnership will have no liability with respect to any such bond, promissory note, bill of exchange or otherwise and that the Partner will indemnify the Partnership, if necessary, to prevent it from having any such liability.

**14.10**      It is important to the professional practice of the Partnership that its clients, prospective clients and business connections not be involved in any litigation or controversy among the Partners. Therefore, neither the Partnership nor any of its Partners nor their legal representatives shall, except upon order of a court of competent jurisdiction: (a) discuss any such controversy or possibility of the same with any present or past client, or any prospective client or any business connection of the Partnership or of any predecessor partnership; or (b) seek or solicit any documents, instruments or other writings or voluntary or involuntary testimony from any of them in connection with any such litigation or controversy. Any such documents, instruments or testimony shall be inadmissible in any such proceeding and neither the Partner nor the Partnership shall attempt to introduce the same in evidence or otherwise to utilize the same. Because of the foregoing restrictions, the parties hereto agree and consent that in any such proceeding any party shall be permitted to introduce secondary evidence.

**14.11**      A former Partner, following his/her retirement date, his/her permanent disability or his/her withdrawal or expulsion from the Partnership, shall no longer be a member of the Partnership and shall have no voice or vote in the administration or management of the Partnership or any other rights, privileges or authorities of a Partner.

**14.12**      There shall be an annual meeting of the Partners (the "Annual Meeting") to be held each year no later than November 30 on such specific dates and at such location as shall be determined by the Chief Executive Officer and approved by the Board of Directors.  The agenda for the Annual Meeting shall be determined by the Chief Executive Officer, provided that such agenda shall always include a presentation and discussion of the state of the Partnership where matters relating to the strategy, business and operations of the Partnership may be discussed and, as applicable, voted on by the Variable Share Partners.  Notwithstanding the foregoing, in any year, the Board of Directors may recommend to the Partners that the Annual Meeting be cancelled or, as provided below, held by means of remote communication; *provided, however*, that upon making such a recommendation, the Board of Directors shall conduct a referendum vote of the Variable Share Partners to accept or reject such recommendation.  If a majority of the votes cast in such referendum reject the Board of Directors' recommendation, then the Annual Meeting shall nonetheless be convened that year in accordance with the provisions of the first sentence of this paragraph, provided that an Election Quorum is satisfied with respect to such referendum vote.

Subject to the provisions of the first paragraph of this Section with respect to the Annual Meeting, any meeting of the Partners, the Board of Directors or any committee created by the Board of Directors may be held at such places as may be fixed from time to time by the Board of Directors.

Subject to the provisions of the first paragraph of this Section with respect to the Annual Meeting, the Board of Directors may, in its sole discretion, determine that any such meeting shall not be held at any place, but may instead be held by means of remote communication (including ISDN network, telephone conferencing, video conferencing, Internet, web-cast, satellite or any other form of electronic delivery system). If so authorized, and subject to such guidelines and procedures as the Board of Directors may adopt, those persons entitled to vote at such meeting not physically present at such meeting may, by means of remote communication, participate in such meeting and be deemed present in person and vote at such meeting, provided that the Board of Directors shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is the person so identified and is entitled to vote at such meeting.

Any action which may be taken at any meeting may be taken without a meeting, if a consent in writing, setting forth the action so taken, shall be signed by those persons having the minimum number of votes that would be necessary to authorize or take such action at such a meeting; provided that written consents, ballots or other evidences of voting submitted in respect of the applicable action (whether pro or con) represent a number of votes sufficient to constitute a quorum for such a meeting. A telegram, e-mail or other electronic transmission consenting to an action to be taken and transmitted by the person entitled to vote thereon, shall be deemed to be written, signed and dated for the purposes herein, provided that any such telegram, e-mail or other electronic transmission sets forth or is delivered with information from which the Board of Directors can determine that the telegram, e-mail or other electronic transmission was transmitted by the person entitled to vote thereon.

**14.13**    In connection with the distribution to the Partners of the financial statements of the Partnership with respect to any applicable fiscal year, the Board of Directors also shall distribute to all Variable Share Partners (a) a disclosure statement setting forth the total compensation (including bonuses) of and units allocated to each member of the Board of Directors (whether or not an Elected Partner Director), the Chief Executive Officer and each other Partner then holding a Senior Management Partner position (the "Management Compensation Disclosure Statement") for the fiscal year to which such financial statements relate and as projected for the then-current fiscal year, and (b) a tabular information statement (which shall not identify individual Partners by name, region or business line) setting forth ranges of total compensation (including bonuses) and unit allocations for the Partnership as a whole and identifying the number of Partners in each applicable range for the fiscal year to which such financial statements relate.

**14.14**    (a)    The Partnership shall indemnify any person who, from and after the Board of Directors meeting of October 19, 2003 (the "Indemnity Applicability Time"), is a member of the Board of Directors or a Senior Management Partner of the Partnership or who otherwise has management responsibilities in the Partnership, or who serves in a similar capacity in any other entity at the request of the Board of Directors or Chief Executive Officer (each such person a "Covered Person"), from and against all claims, costs, charges, expenses, liabilities and losses made or assessed against such Covered Person (including attorneys' fees, judgments, arbitration awards, fines and amounts paid or to be paid or settlement) (collectively, "Liabilities") by reason of the fact that such person is the holder of one of the aforesaid positions from and after the Indemnity Applicability Time or by reason of any action taken or

omitted from and after the Indemnity Applicability Time or alleged or to have been taken or omitted from and after the Indemnity Applicability Time in such capacity if, in connection with the matter out of which the Liabilities arise such person acted in good faith and in a manner he/she reasonably believed to be in, or not opposed to, the best interests of the Partnership, and, with respect to any criminal action or proceeding, such person had no reasonable cause to believe his/her conduct was unlawful.  No Covered Person shall be liable, responsible or accountable in damages or otherwise to the Partnership or any Partner for any act or failure to act on behalf of the Partnership or with respect to the business and affairs of the Partnership, except that this limitation shall not apply to any act or failure to act that resulted from the Covered Person's fraud, bad faith or willful misconduct.

(b)     The termination of any action, suit, arbitration or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that a person seeking indemnification did not act in good faith and in a manner which he/she reasonably believed to be in or not opposed to the best interests of the Partnership or, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was unlawful.

(c)     A person who has been successful, on the merits or otherwise, in the defense of a civil or criminal action or proceeding or an arbitration of the character described in paragraph (a) of this Section or in defense of any claim, issue or matter therein, shall be entitled to indemnification as described in paragraph (a).  In all other cases, indemnification pursuant to paragraph (a) of this Section shall, unless ordered by a court or arbitrator, be made by the Partnership, only if authorized in a specific case:  (i) by the Board of Directors acting by a quorum consisting of Directors who are not parties to such action or proceeding, upon a finding that the person seeking indemnification has met the standard of conduct set forth in paragraph (a) of this Section, or (ii) if such a quorum is not obtainable or, even if obtainable, a quorum of disinterested Directors so directs (A) by the Board of Directors following receipt of a written opinion of independent legal counsel that indemnification is proper in the circumstances because the applicable standard of conduct set forth in paragraph (a) of this Section has been met by such person or (B) by the Partners in a vote in which an Election Quorum exists.

(d)     The indemnification provided by this Section shall not limit any other rights to which a person entitled to indemnification under this Section (or any other Partner or former Partner) may be entitled under the Delaware Revised Uniform Partnership Act (the "DRUPA"), this Agreement or otherwise in respect of Liabilities arising in connection with the provision of services or products to clients of the Partnership and not in connection with any such person's exercise of management responsibilities.

(e)     In the event of payment of indemnification to any person pursuant to this Section, the Partnership shall be subrogated to the extent of such payment to any right of recovery such person may have, and such person as a condition of receiving indemnification from the Partnership, shall execute all documents and do all things that the Partnership may deem necessary or desirable to perfect such right of recovery, including the execution of such documents necessary to enable the Partnership effectively to enforce any such recovery.

(f)     Notwithstanding the foregoing, nothing herein shall operate to create any right that would make other Partners liable for obligations for which they are not personally liable under the DRUPA.

(g)     Nothing set forth in this Section is intended to limit or supersede in any respect the provisions of Section 14.7 with respect to the resolution of any controversy or dispute relating to this Agreement or the Partnership by arbitration.

(h)     Unless the Board of Directors otherwise determines in a specific case, expenses incurred by a person in defending a civil or criminal action or proceeding or an arbitration in respect of which indemnification may be available pursuant to paragraph (a) of this Section shall be paid by the Partnership in advance of final disposition of such action, proceeding or arbitration.

14.15   (a)     Each Partner, due to his/her position as a Partner, may have acquired or may in the future develop or acquire knowledge of Confidential Information (as defined below).  Each Partner agrees that he/she shall, at all times during the term of his/her Partnership and thereafter, keep all Confidential Information in strictest confidence and trust.  No Partner shall disclose any Confidential Information at any time except to authorized Partnership personnel or as necessary in connection with the business of the Partnership, its subsidiaries, affiliates or clients, unless the Partnership, acting through its Chief Executive Officer, consents to such disclosure in advance in writing or the Partner establishes by written evidence that such information was publicly known or entered the public domain (other than as a result of disclosure by the Partner or any of his/her representatives in violation of this Section 14.15) prior to disclosure thereof by the Partner.

(b)     "Confidential Information" means information or materials disclosed to, or acquired, developed, originated or discovered by, a Partner during the course or as a result of the Partner's position with the Partnership about or relating to the Partnership, its subsidiaries, affiliates or clients, including, without limitation, (i) information or materials concerning the contractual or financial arrangements (including, without limitation, this Agreement) between the Partnership and any of the Partnership's employees, directors, officers or Partners (including, without limitation, the Partner) or any other individual, corporation or other entity with whom the Partnership does business (including, without limitation, clients, customers, vendors, suppliers and independent contractors) and (ii) information or materials relating to the financial condition, operations, business plans, billing practices, marketing strategies or performance of the Partnership (including, without limitation, any and all financial statements, client lists, billing records, client or customer service plans, general ledgers, and income and other tax returns).

(c)     If another party seeks legally to compel a Partner to disclose any Confidential Information, promptly upon receipt of such request for disclosure, the Partner shall provide the Partnership with written notice of such request so that the Partnership may seek a protective order or other appropriate remedy and/or, acting through its Chief Executive Officer, waive compliance with the provisions of this Section 14.15.  If a protective order or other remedy is not obtained, or the Partnership waives compliance with the provisions of this Section 14.15, the Partner will furnish only that portion of the Confidential Information that is legally required to be disclosed and use his/her best efforts to obtain reliable assurance that confidential treatment will be accorded to that portion of the Confidential Information that is disclosed. The Partner shall take all reasonable precautions to prevent unauthorized disclosure, use or transfer of Confidential Information.

(d)     Each Partner hereby acknowledges and agrees that Confidential Information: (i) has been or will be developed at considerable time, expense and effort by or on behalf of the Partnership;

(ii) is, or likely will be, unique and constitutes valuable property of the Partnership; and (iii) provides or likely will provide the Partnership with a very valuable competitive advantage.

(e)     Each Partner hereby acknowledges and agrees that the breach or threatened breach of this Section 14.15 by the Partner or his/her representatives will result in irreparable and continuing damage to the Partnership, for which there will be no adequate remedy at law. Accordingly, notwithstanding anything to the contrary or that may be construed to the contrary in this Agreement, in the event of any breach or threatened breach of this Section 14.15, the Partnership shall be entitled to an injunction, specific performance or other equitable relief from a court of proper jurisdiction to prevent such breach or any continuation thereof. Nothing contained herein shall be construed to limit in any way the Partnership's rights to any other remedies to which the Partnership may be entitled at law, in equity, pursuant to this Agreement (including, without limitation, pursuant to Sections 7.8(b), 10.9 and 14.7) or otherwise, including the Partnership's right to recover damages from the Partner for breach of this Section 14.15.

**14.16**     Each Partner, at the time he/she becomes a Partner, by executing this Agreement affirms that he/she is not aware of any facts or circumstances not disclosed to the Partnership involving his/her actions, advice, services or statements prior to becoming a Partner, that could have a foreseeable adverse impact on the Partnership, its reputation or its business relationships.

## ARTICLE XV

### Other Agreements

**15.1**     The Partnership has entered into and will enter into certain charters, contracts, agreements and other instruments with and among other member firms of BDO International, subsidiary firms and correspondents, and otherwise resulting from or relating to the organization or operation of BDO International or its predecessors.

**15.2**     The Partnership and its predecessors have entered into and will in the future enter into a number of agreements ("Supplemental Agreements") in connection with the acquisition of the practices of other accounting or non-accounting firms or other expansions of the Partnership's business, pursuant to which such acquisitions or combinations of practices or other expansions were accomplished and members and/or employees of such firms became members and/or employees of the Partnership, and certain other agreements and contracts pertaining to the business of the Partnership.

**15.3**     The provisions of this Agreement are subject in all respects to the provisions of the other agreements referred to in Sections 15.1 and 15.2, which shall continue in full force and effect during their respective terms and shall during such respective terms govern and prevail in the event of any inconsistency with this Agreement.

**15.4**     Except as otherwise provided in this Article XV, this Agreement supersedes all prior partnership agreements of BDO USA, LLP and its predecessors, to the extent that the same would otherwise apply to periods from and after the Effective Date. However, such prior partnership agreements shall continue to govern payments to Partners whose interests in the Partnership terminated prior to the effective date of this Agreement, except as otherwise provided in this Agreement.

**15.5**     Nothing in this Agreement or any prior partnership agreements of BDO USA, LLP and its predecessors is intended to or shall be construed as modifying or limiting in any way the provisions of Section 15-306(c) of the DRUPA.

**ARTICLE XVI**

**Execution and Amendment**

**16.1**     This Agreement, subject to the other agreements referred to in Article XV, embodies the entire understanding and agreement of the Partners in relation to the subject matter hereof and supersedes any and all prior negotiations, understanding and agreements of the parties hereto.  None of the terms or conditions of this Agreement may be changed, modified, waived or canceled orally, through a course of conduct or practice of the parties or otherwise, except in the manner set forth in Sections 16.2, 16.3 and 16.4.  A waiver at any time of compliance with any of the terms and conditions of this Agreement shall not be considered a modification, cancellation or waiver of such terms or conditions or of any preceding or succeeding breach thereof unless expressly so stated.

**16.2**     (a)     Subject to the limitations of Section 16.3, this Agreement may be amended in any respect by the affirmative vote of both (a) at least two-thirds (2/3) of the total number of the members of the Board of Directors in office at the time and (b) Variable Share Partners holding at least two-thirds (2/3) of the total number of variable units voted on such matter, provided that any such amendment shall apply by its terms to all the Partners.  A change in the name under which the Partnership does business shall be treated as an amendment; *provided, however*, that notwithstanding anything to the contrary contained herein, the Board of Directors, by a vote of at least two-thirds (2/3) of the total number of the members of the Board of Directors in office at the time, may amend this Agreement to change the name under which the Partnership does business to any variant that begins with "BDO" and no vote of the Partners shall be required for such amendment.  Notwithstanding the foregoing, pursuant to Section 15-306(e) of the DRUPA, the limitations on the liabilities of Partners contained in Section 15-306(c) of the DRUPA may be varied or waived with respect to all or certain specified debts, obligations or liabilities of the Partnership by the affirmative vote of Variable Share Partners holding at least a seventy-five percent (75%) of the total number of variable units voted on such matter.  Any such variation or waiver shall not be deemed to be or require an amendment of this Agreement and may be revoked or modified by the affirmative vote of Variable Share Partners holding at least a majority of the total number of variable units voted on such matter.  The Partnership may be liquidated or dissolved only by the affirmative vote of Variable Share Partners holding more than seventy-five percent (75%) of the total number of variable units voted on such matter.

(b)     For the purposes of measuring the vote of Variable Share Partners (whether at a meeting of the Partners or without a meeting), the number of votes which have not actually been cast, either in person or by proxy, by submission of a ballot or other evidence of voting provided by the Partnership by the close of voting at the meeting or the tabulation of the vote without a meeting, as the case may be, shall not be included in the number of votes cast on such matter, provided that ballots or other evidence of voting provided by the Partnership to cast votes on such matter (whether in person, by proxy or by absentee vote) were distributed to the Variable Share Partners not less than fifteen (15) days prior to the date of the meeting or the tabulation of the votes (where action is proposed to be taken without a meeting).  In any circumstance where Article II or Article III provides for successive rounds of balloting or run-off elections

with respect to the election of Directors , the aforesaid fifteen (15) day period shall be measured by reference to the initial date of meeting or tabulation of votes in such election and the proviso set forth in the preceding sentence shall not be applicable to any succeeding rounds of balloting or run-off elections if the fifteen (15) day requirement of such proviso was satisfied in respect of the initial meeting date or tabulation of votes.

(c)     Notwithstanding any other provision of this Agreement, no approval of any of the matters described in Section 2.12 or Section 16.2(a) will be effective unless votes of Variable Share Partners holding at least a majority of the total number of variable units allocated to all the Variable Share Partners at the time of such vote have been cast on the matter (whether for or against the matter).

**16.3**     No amendment of this Agreement shall deprive a Partner of his/her right to receive his/her interest in the Partnership, including his/her interest in net accounts receivable and work in process as allocated in accordance with Section 12.3 and as valued by the Board of Directors and his/her interest in his/her undistributed earnings account, if applicable, as such interests exist upon the termination of his/her interest in the Partnership as provided herein. Any modification of this Agreement applying in terms solely to an individual Partner or several individual Partners (but not all the Partners) shall be effective only if in writing, signed by such Partner or Partners or his/her or their legal representatives, as the case may be, and by the Partnership. Any rights of any Partner under this Agreement upon and after his/her retirement, disability, death or termination of interest in the Partnership for any other reason, to receive the benefits for which the Partner is eligible as provided for in this Agreement in effect at such time shall be deemed vested upon the happening of such event and may not thereafter be impaired or reduced.

**16.4**     The provisions of this Agreement shall be subject to any agreement hereafter authorized by the Board of Directors, in accordance with the provisions of this Agreement and executed by the Partnership in connection with the merger, combination or other acquisition of the practice of any other firm or firms by the Partnership.

**16.5**     This Agreement may be executed by the various parties hereto separately on several writings of identical content, and all such writings to which are separately appended the signatures of all the parties hereto as evidence of their agreement hereto shall constitute one agreement. Any Partner newly admitted to membership in the Partnership shall become a party hereto, subject to the provisions of any Supplemental Agreement or other special agreement authorized by the Board of Directors, pursuant to power granted to it hereunder, by signing an identical copy of this Agreement, whereupon such copy shall become an element of the effective counterpart of this Agreement. No single counterpart hereinabove referred to shall be an agreement effective and binding on the Partnership or the Partners or Partner signatory thereto unless it is identified as such by execution in the name of the Partnership by the Chief Executive Officer or his/her designee. The effective date subsequent to the date hereof of the admission of any Partner newly admitted to the Partnership pursuant to and subject to this Agreement shall be indicated by statement of such effective date immediately following his/her signature placed upon an identical copy of this Agreement as above provided.

**16.6**     The specifics of the application of this Agreement to each Partner from time to time shall be set forth in separate writings executed from time to time by the Partnership and by the particular Partner.

**16.7**     All notices, other communications and payments to a Partner or his/her legal representatives shall be addressed to such Partner at the address last provided in writing to the Partnership for such purposes by such Partner or his/her legal representatives or if no such address has been provided,

then to the address last known to the Partnership.  Whenever any notice or other communication is required or permitted to be given to a Partner or the Partnership, such notice or other communication shall be in writing and shall be delivered personally or mailed by certified mail, return receipt requested, addressed to such Partner or his/her legal representatives at the address referred to above, or, if to the Partnership, then addressed to its Chief Executive Officer at the executive office.  If such notice or other communication is so mailed, it shall, unless otherwise specifically provided in this Agreement, be effective from the time of mailing in any regular United States post office with postage prepaid.

**16.8**    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

**16.9**    This Agreement, its validity, construction, administration and effect, shall be governed by and construed in accordance with the laws of the State of Delaware; *provided, however*, that Section 14.7 of this Agreement and the validity, construction, administration and effect of the provisions of Section 14.7 of this Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**16.10**    This Agreement shall be interpreted to comply with, and to avoid adverse tax consequences under, Section 409A.  If any payment or benefit cannot be provided or made at the time specified herein without incurring penalty sanctions or adverse tax consequences under Section 409A, then such benefit or payment shall be provided in full at the earliest time thereafter when such adverse tax consequences will not be imposed.  Further, for purposes of applying the rules under section 409A regarding permissible time of payment, the designated time for each payment under Articles VII, VIII and IX shall be the calendar year of such scheduled payment.

# Signatures Appendix

Annexed to and part of the BDO USA, LLP Partnership Agreement made as of _____, 20___.

BDO USA, LLP

[Variable/Fixed] Partner's Signature:                    By:

_____          _____

_____          _____
                    (Print)                                                        (Print)

___/___/___  Effective Date

## Signatures Appendix

Annexed to and part of the BDO USA, LLP Partnership Agreement made as of ~~April 9~~, ~~2018~~. **11-4-17**

BDO USA, LLP

[Variable/Fixed] Partner's Signature:

_Phuoc Vinh Phan_
(Print)

By: _Stephen R. Ferrara_

Stephen R. Ferrara
(Print)

4 / 9 /2017 Effective Date