UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| BDO USA, P.C.,<br><br>        Plaintiff,<br><br>v.<br><br>ANKURA CONSULTING GROUP, LLC,<br>KEVIN LAVIN, AND PHUOC VIN PHAN,<br><br>        Defendants,<br><br>PHUOC VIN PHAN,<br><br>        Counterclaim Plaintiff,<br><br>v.<br><br>BDO USA, P.C.,<br><br>        Counterclaim Defendant. | Case No. 3:24-cv-00179-HEH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
<u>MOTION TO APPOINT SPECIAL DISCOVERY MASTER</u>**

    Defendants Ankura Consulting Group, LLC ("Ankura") and Kevin Lavin, and Defendant and Counterclaim Plaintiff Phuoc Vin Phan (collectively, "Defendants") respectfully submit this Memorandum in Support of their Motion to Appoint a Special Discovery Master.

**<u>INTRODUCTION</u>**

    Both the nature and extent of current and anticipated discovery disputes in this case warrant the appointment of a special discovery master. Unfortunately, discovery has become unnecessarily complicated and contentious, stemming from improprieties in BDO USA P.C.'s ("BDO")'s discovery practices and numerous discovery disputes. These circumstances have eroded the

integrity of the discovery process in this case despite the Court's repeated interventions. Because the stakes are high—BDO claims damages exceeding half a billion dollars—Defendants require further assistance to ensure a fair and expeditious resolution of the discovery process.

*First*, improprieties in the discovery process warrant appointment of a special master. For example, on at least one known occasion, BDO altered text messages produced in response to a Rule 45 subpoena to remove hundreds of communications without notifying Defendants. BDO's improper alterations reduced the set of produced text messages to only 9 pages when nearly 1800 pages of responsive texts exist. The texts BDO removed are unfavorable to BDO, and when pressed on why it had selectively excerpted responsive text messages, BDO's counsel claimed that was its standard practice. The only reason Defendants detected the missing messages is because Mr. Phan had produced a subset of them. Defendants are concerned that similar conduct likely has occurred throughout the discovery process but has gone undetected, thereby prejudicing Defendants' case.

As another example, BDO has on multiple occasions improperly interfered with third-party subpoenas, including by advising at least two nonparties not to produce critical responsive documents. BDO directed former employee Byron Nickens not to produce his settlement and cooperation agreement with BDO, and another nonparty—Mr. Nickens' attorney— not to produce communications with BDO about that agreement. Defendants also discovered that BDO directed Mr. Nickens to delete emails and to delete the very ShareFile account that is at the core of BDO's trade secret claims. Again, Defendants learned about this misconduct not because BDO disclosed it but instead from other sources. BDO's improper discovery practices and repeated interference with third party subpoenas has, and will continue to, jeopardize Defendants' ability to develop necessary evidence from nonparties such as Mr. Nickens. Evidence from Mr. Nickens is especially

notable here because BDO submitted an affidavit to the Court signed by Mr. Nickens as an exhibit in support of its Motion for Leave to File Amended Complaint—an affidavit that counsel for BDO drafted and that BDO required him to sign in exchange for releasing claims that Mr. Nickens characterized as threatening him with financial ruin.  ECF No. 46-1.

*Second,* appointment of a special master is warranted to ensure efficient resolution of disputes.  The Court has already resolved 20 discovery disputes, several others are pending and additional disputes are anticipated.[1]  Unfortunately, Counsel's ability to self-regulate the discovery process has deteriorated due in part to unprofessional and offensive *ad hominem* attacks levied by BDO's counsel against Defendants' counsel, further eroding the integrity of the discovery process and making it difficult for counsel to work productively to resolve disputes.  Along similar lines, the joint discovery statement process has been abused by BDO to delay and thwart efficient resolution of these disputes.  For example, Mr. Phan sent BDO his portion of the discovery dispute letter on November 16, 2025, but despite repeated requests, did not receive BDO's portion of the statement for over three weeks.  A special master is warranted to manage discovery to protect the integrity of the process while ensuring discovery can be completed fairly and professionally.

For these reasons, the Court should authorize a special discovery master to: (a) investigate the manner in which discovery has been conducted to assess BDO's discovery improprieties; (b) address and remediate these issues; and (c) manage discovery so that it can be completed fairly and expeditiously.  Getting discovery back on track will require considerable time and attention, making the appointment of a special discovery master appropriate to avoid unnecessarily burdening the Court.[2]

---

[1] Counsel for the parties met and conferred regarding nearly 20 disputed discovery issues on December 17, 2025, of which over a dozen remain unresolved.

[2] In light of the Court's December 11, 2025, Memorandum Order (ECF No. 202), which,

**BACKGROUND**

**I.    IRREGULARITIES IN THE DISCOVERY PROCESS**

    **A.    Chad Rash's Text Messages**

By a Rule 45 subpoena dated June 20, 2025, Defendants sought from Chad Rash, a principal in BDO's Transaction Advisory Services ("TAS") practice and Fixed Share Partner that (like Mr. Phan) BDO failed to promote in the fall of 2022, all communications between Mr. Rash and Mr. Phan and any other BDO employee related to resignations from BDO, dissatisfaction with BDO, dissatisfaction with BDO's ESOP transaction, and several similar topics. Ex. 1. Defendants were required to proceed with a Rule 45 subpoena because BDO refused to produce text messages from its employees. BDO's counsel represented Mr. Rash in responding to the subpoena, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Rash testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2 at 116:13-117:11, 124:11-19, 128:6-16.

A copy of the 9-page initial production of Mr. Rash's texts as initially produced is attached as Exhibit 3, while the full set of nearly 1,800 pages was produced only after and only because Defendants were able to independently determine that BDO had withheld and selectively deleted a significant number of responsive text messages that Mr. Rash exchanged with Mr. Phan.[3] A

---

among other things, ordered the parties to meet and confer to resolve all pending discovery disputes and to ensure that discovery concludes by February 10, 2026, counsel held a meet and confer held on December 17, 2025. During that meet and confer session, Defendants proposed the appointment of a special discovery master. BDO did not agree. Defendants believe that a special master is further warranted in light of the Court's instruction to conclude discovery by February 10, 2026.

[3] To avoid inundating the Court with the full 1,787 pages in the production, Defendants have not included the full set of text messages as an exhibit herewith. If, however, the Court wishes to receive a full copy of those texts, Defendants will provide it upon request. Certain excerpts of those text messages, as produced by Mr. Phan, are attached as exhibits hereto.

comparison of these productions highlights three significant problems with this approach to discovery.

*First*, there is no legitimate justification for why BDO unilaterally removed responsive texts. Mr. Rash could not offer a reason during his deposition, ███████████████ ███████ Ex. 2 at 126:6-128:16. Many of the removed texts are portions of conversations that were partially produced, and all of those conversations, including the removed portions, are well within the scope of Defendants' discovery requests. The only common denominator is that the texts that were removed reflect negatively on BDO and undermine its positions in this action. *See, e.g.,* Ex. 4. For example, Mr. Rash writes ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ Ex. 4; *see also* Ex. 5, 6, 7 (Mr. Rash expressing ██████ ████████████████████████████████████████████████████████████████ ██████████████); Ex. 3 and Ex. 8-9 (reflecting BDO's exclusion of portions of Mr. Rash's response to Mr. Phan).

The texts that BDO selectively and improperly withheld support Defendants' position that Mr. Phan and his subordinates left BDO because BDO's ESOP transaction was economically disadvantageous to them, and because mass firings and reductions in force created a toxic working environment. In Mr. Rash's own words, ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 2 at 206:8-13, 207:3-4, 312:18-19; *see also* Ex. 8. This is contrary to BDO's narrative that Mr. Phan left BDO to unfairly compete and had to solicit employees to join him at Ankura.

*Second*, the text string BDO initially produced contains no indication that anything had been removed, such as a redaction mark or a stamp indicating "REDACTED." Thus, the reader comes away with the mistaken belief that the texts are a complete document and a full production of the exchanges between Mr. Rash and Mr. Phan. Thus, not only was BDO's intent to conceal responsive evidence that was detrimental to its positions, BDO further intended to do so in a manner that would make it difficult, if not impossible, to discover. This practice is highly prejudicial to Defendants and results in incomplete (and misleading) evidence being presented to the Court and the ultimate fact-finder at trial. If these improprieties—which BDO has now admitted is its standard practice—are not addressed in discovery, there is a risk that other evidence produced in this case in such fashion could be presented to the jury.

*Third*, based on BDO's counsel's own admissions, it is likely that this practice was used to withhold other text exchanges Mr. Rash had with *other* current or former BDO employees, or even as a basis to withhold *entire* text exchanges that are otherwise responsive to the subpoena. Likewise, and again based on BDO's counsel's own statements, it is also likely this practice was employed in responding to other subpoenas (BDO has represented all of its current employees, as well as former employee, Mr. Ferrara) or document requests.

After discovering that BDO withheld evidence, defense counsel sought assurances from BDO about the foregoing concerns, requesting confirmation that they did not employ this practice with respect to Mr. Rash's texts with other individuals or as part of any other discovery in this case. When Defendants raised their concern about the way in which BDO had produced Mr. Rash's text messages, counsel reported that this selective excerpting was their standard practice. Because it is both atypical and inherently misleading, Defendants requested "that BDO [] produce all text messages in 24-hour increments, as is the norm, to avoid the selective excerpting that was

6

employed for Mr. Rash's texts." Email exchange between Oct. 16 and 29, 2025 at 2, attached as Ex. 10. BDO responded in defense of their improper discovery practices by "disagree[ing] that there is a 'standard' for producing text messages," later stating that they would produce Mr. Rash's text messages "subject to his objections." Ex. 10 at 1-2. BDO does not indicate whether they withheld anything aside from the "subject to his objections" limitation. And, BDO has not been clear as to what information has been withheld "subject to those objections," leaving Defendants with no way to know what other information may be available for their defense. The same is true with respect to texts and other documents from other custodians—given BDO's representations about their "standard" practice, this problem is likely far reaching.

### B. Deletion of ShareFile Account and Emails at BDO's Direction

Byron Nickens, a former BDO employee, 

Transcript of B. Nickens Dep. at 104:17-105:3, attached as Exhibit 11. Yet, Mr. Nickens testified that

7



Ex. 11, at 345:15-347:9.[4]

Mr. Nickens further testified that 

*Id.* at 105:11-106:5.[5]

---

[4]  But counsel's speech does not erase or override the foregoing testimony Mr. Nickens gave on direct, under oath, nor does it resolve Defendants' concerns about the prejudice they suffer as a result of BDO's directions to Mr. Nickens. Moreover, Defendants know that the Sharefile account contained data logs and information concerning when Mr. Nickens accessed files following his separation from BDO. In discovery, BDO produced a video-taped interview of Mr. Nickens with BDO's counsel, during which Mr. Nickens                                                     All of that information and all of those log entries were lost when                          This evidence is central to the trade secret claims and its permanent destruction prejudices the Defendants.

[5] Later in Mr. Nickens' deposition, after a break in which his counsel and counsel for BDO

## C. Withholding of Documents and Improper Redactions

After Defendants subpoenaed Mr. Nickens for documents related to (among other things) any agreement he reached with BDO and communications relating to the affidavit he signed and that BDO authored in this litigation, BDO conferred with Mr. Nickens' counsel about Mr. Nickens' subpoena response. As a result of those discussions, Mr. Nickens refused to produce his settlement agreement with BDO and communications related thereto. Mr. Nickens' lawyers similarly refused to produce their communications with BDO negotiating the terms of Mr. Nickens' settlement agreement. Defendants only learned of BDO's improper interference with the subpoena because Nickens' counsel volunteered that she had been in discussions with BDO.[6] It was only after defense counsel provided Mr. Nickens' counsel with legal authority that Mr. Nickens could not withhold such critical documents by claiming they were confidential that Mr. Nickens and his counsel produced the settlement agreement and certain related communications. Had Mr. Nickens' counsel succeeded in withholding those communications in consultation with BDO, Defendants never would have learned (among other things) that BDO's counsel wrote Mr.

appeared to interact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex.11 at 180:20-184:13.

[6] The federal districts consistently hold that interfering with third-party subpoenas is improper. *See Price v. Trans Union, L.L.C.*, 847 F. Supp. 2d 788, 794 (E.D. Pa. 2012) ("[n]owhere in [Rule 45] is it contemplated that the adversary of the party seeking the information may advise, no matter the reasons, the person commanded by the subpoena to produce the information to ignore the subpoena's command."); *Handloser v. HCL Am., Inc.*, 2020 WL 6505214, at *5 (N.D. Cal. Oct. 22, 2020) (a party's use of "extra-judicial means to persuade [a subpoena recipient] to withhold production of its documents . . . constitutes improper interference"); *Fox Indus., Inc. v. Gurovich*, 2006 WL 2882580, at *9 (E.D.N.Y. Oct. 6, 2006) (defendants' letters instructing non-parties not to comply with subpoena "constituted an abuse of process" meriting sanctions). Defense counsel has learned that MWS has similarly been in communication with counsel for nonparty Stephanie Giammarco about the subpoena directed to her.

9

Nickens' affidavit.[7]

Mr. Nickens also testified that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Ex. 11 at 202:11-202:25. While Mr. Nickens has since produced unredacted versions of these texts, this is yet another example of BDO's improper and irregular discovery practices intended to prevent Defendants from obtaining discovery that a special master would be well-suited to investigate and remedy.

## II. OTHER FORTHCOMING DISCOVERY DISPUTES

The Court has already had to address no fewer than 20 discovery disputes, including in: ECF No. 108; ECF No. 159 (addressing 16 issues); ECF No. 171; ECF No. 179; and Case No. 3:25-mc-00004-HEH, ECF No. 44 (Order on Motion to Compel production from Madison Dearborn Partners) and ECF No. 202 (Memorandum Order on Phan's motion to enforce Court's discovery order and Defendants' motion to compel depositions of Wayne Berson and Catherine Moy).

Defendants additionally were forced to file a motion to compel testimony and documents from former BDO executives Stephen Ferrara and Stephanie Giammarco which are being transferred (Ferrara) or likely to be transferred (Giammarco) to be resolved by this Court. BDO's counsel represents Mr. Ferrara but initially refused to consent to have Defendants' motion to compel transferred to this court. After Defendants filed the motion to compel in the Northern District of Illinois (where Mr. Ferrara resides) and filed a transfer motion, BDO's counsel reversed course and advised that court that it now does consent to having the matter heard here. Defendants are also aware that BDO has also been in contact with counsel for Ms. Giammarco about the

---

[7] BDO filed Mr. Nickens' affidavit as part of its Motion for Leave to File Amended Complaint, presumably so that the Court would rely on the statements therein to grant the motion. *See* ECF No. 46-1.

subpoena to her, which again has resulted in the need for motion practice in another jurisdiction. All of this disputed third party discovery will require significant judicial attention and resources—costs which the parties should bear in the form of a special master rather than burdening this Court.

Furthermore, the following disputes, while not yet ripe, are anticipated: a dispute over the protocol to be used by the neutral forensic examiner previously ordered by this Court; Mr. Phan's motion to compel responses to his requests for production of documents to BDO; and Defendants' motion regarding destruction of Mr. Nickens' emails and ShareFile account. Defendants are also trying to convince BDO to identify the actual trade secrets it claims in this case (as this Court directed in the Omnibus Discovery Order), but does not have confidence BDO will do so. BDO just filed a discovery motion (ECF No. 203), recently sent Ankura its portion of a joint dispute letter concerning Rule 30(b)(6) deposition testimony, and has threatened additional discovery motions. Although the parties conferred regarding at least 18 issues in disputes during the December 17, 2025, meet and confer, they were unable to resolve the majority of them. At a minimum the following disputes remain:

- Topics for BDO's and Ankura's Rule 30(b)(6) Witness(es)
- The pertinent forensic protocols for Defendants' devices and accounts
- Process for complying with Section A.9 of the Court's September 18th Order
- Production of documents from non-party witness Steven Ferrara
- Outstanding issues regarding parties' productions from individuals' devices
- Additional search terms to be run over ESI that were proposed by BDO
- Production of documents from Moy and Donoghue
- Potential production of documents from Berson and Berson deposition
- Interrogatories on BDO partner revenue generation
- BDO's supplementation of trade secrets interrogatories

- Inspection of Nickens' Hard Drive

These disputes will likely require intervention to resolve and the special discovery master Defendants seek through this motion could aid the Court in the resolution of these and other discovery issues in this action.

## LEGAL STANDARD

The Court may appoint a special master under Rule 53(a)(1)(B)(i) to "make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by" some exceptional condition. Alternatively, under Rule 53(a)(1)(C), the Court may appoint a special master to address pretrial matters, such as complicated and contentious discovery. "Although discovery disputes usually should not require the supervision of a master, the appointment of a master may be necessary at times to resolve protracted disagreements between counsel and to alleviate the burdens on the district judge." 9C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2602.1. (3d ed. 2008). "Discovery is an area where special masters are frequently appointed either because the problems are complicated or the parties are recalcitrant." *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 560 (N.D. Cal. 1987). When called upon to aid the Court in complex discovery matters, special masters may "oversee *all* of discovery, including the negotiation of any discovery protocols, protective orders and so forth." *In re Cap. One 360 Sav. Acct. Int. Rate Litig.*, 2024 U.S. Dist. LEXIS 127382, *6 (E.D. Va. July 18, 2024) (emphasis in original).

## ARGUMENT

This Court has previously appointed a special discovery master where discovery has become complicated, continues to grow, and has become unnecessarily contentious. *See, e.g., Brink's Co. v. Chubb European Group*, 2021 U.S. Dist. LEXIS 217767, at *7 (E.D. Va. Jan. 12, 2021) (appointing special master because of "numerous discovery issues still pending"). Here, the

justification for appointing a special discovery master is even stronger due to prejudicial irregularities in the discovery process, the complexity of disputes, and the fact that disputes continue to grow and have become contentious. Indeed, the Court recently recognized that "[t]he reliance on the Court to routinely play referee in the minutiae of discovery is atypical; discovery would ideally be moving at a quicker pace than is currently taking place." ECF No. 202 at 3. Given the current state of discovery, Defendants respectfully submit that such a "referee" is necessary in the form of a special master to expeditiously resolve all remaining discovery issues to permit timely completion of discovery.

### I. IRREGULARITIES IN THE DISCOVERY PROCESS JUSTIFY THE APPOINTMENT OF A SPECIAL DISCOVERY MASTER

BDO's multiple improprieties that have arisen during discovery justify the appointment of a special discovery master. *Turnage* is instructive. There, the court appointed a special discovery master because of "discovery abuses . . . includ[ing] destruction of documents, incorrect or false responses to discovery requests, and a failure to divulge information and produce documents." 115 F.R.D. at 560. The appointment of a special master at the time *Turnage* was issued was particularly noteworthy because Rule 53 has since been modified to relax the threshold standard to appoint a discovery master for pretrial matters. *See Seggos v. Datre*, No. 17-cv-2684, 2017 U.S. Dist. LEXIS 236991, at *11-14 (E.D.N.Y. Dec. 19, 2017) (noting that "whether exceptional conditions exist is no longer a factor that a court need consider in deciding whether to appoint a master to handle pretrial matters."). Even under the stricter, pre-2003 standards, the *Turnage* court surveyed "[n]umerous other cases," finding that they had "approved the appointment of special masters where parties have failed to comply with court orders, displayed intransigence in the litigation, or required close supervision." 115 F.R.D. at 560 (citing *Ruiz v. Estelle*, 679 F.2d 1115,

13

1159-63 (5th Cir. 1982), *modified on other grounds*, 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042 (1983); *Gary W. v. Louisiana*, 601 F.2d 240, 244-45 (5th Cir. 1979)).

Here, BDO's counsel's removal of relevant texts from Chad Rash, and producing them in a manner suggesting that nothing had been withheld despite the requirements of Rule 34(b)(2)(c), alone justifies the appointment. Moreover, even after Defendants sought assurances that BDO would produce the full version of all text messages response to the Rule 45 subpoena, BDO's counsel continued to assert that they will only produce Mr. Rash's text messages "subject to his objections"—a practice courts reject because it avoids clearly communicating whether information is withheld. *See, e.g., Turnage v. Clarity Servs.*, No. 3:14-cv-760, 2015 U.S. Dist. LEXIS 106553, at *5 (E.D. Va. July 22, 2015) (citations and internal quotation marks omitted) (finding the practice of responding to discovery "subject to and without waiving" objections to be "confusing and misleading. Moreover, it has no basis in the Federal Rules of Civil Procedure."). Importantly, Defendants' concern about BDO's representation of this "standard" practice of selectively excerpting text messages extends beyond discovery involving Mr. Rash—Defendants have grave concerns that this or a similar practice has pervaded other aspects of BDO's responses to discovery. And that concern is heightened by BDO's interference with Defendants' Rule 45 subpoenas and its instructions to Mr. Nickens to delete email files and his ShareFile account.

Justice requires a fair discovery process so that Defendants (including two individuals) can develop admissible evidence to defend themselves. The circumstances presented here erode the integrity of the discovery process. Without the benefit of an investigation by a special discovery master, Defendants have no way to determine whether BDO's standard practice of preparing documents for production has resulted in other communications being withheld in other instances. The need for a special discovery master to investigate the circumstances of BDO's and other

14

nonparty's productions, determine whether any other productions suffered from irregularities like those identified here, and help avoid the creation of incomplete documents is acute here.

## II. THE EXTENT OF FUTURE DISCOVERY DISPUTES FURTHER JUSTIFIES THE APPOINTMENT OF A SPECIAL DISCOVERY MASTER

Although the Court is certainly capable of presiding over discovery in this case, the extent of irregularities and the number of other discovery disputes counsels in favor of appointing a special master to oversee discovery. The joint dispute process has not been functioning consistent with the Court's expectations. Most recently, counsel for Mr. Phan provided his portion of a joint dispute statement to BDO on November 16, requesting that BDO provide its portion of the letter after 5 business days. Despite repeated requests, Mr. Phan did not receive BDO's portion of the joint dispute statement for three weeks—being told at one point (after two weeks had already passed) that BDO is delayed because its client is "out of town." While unable to complete its portion of Mr. Phan's joint statement, BDO found sufficient time to initiate its own discovery dispute, sending its portion of a joint dispute statement to Ankura on December 7, 2025, and then insisting that Ankura provide its portion within 3 business days. The fact that this process is not functioning as expected further demonstrates how this case would benefit from oversight by a special discovery master.

In similarly complex cases, this Court has appointed special discovery masters when there are "issues that the Court expects to be both 'tough and hotly disputed.'" *In re Cap. One 360 Sav. Acct. Int. Rate Litig.*, No. 1:24-md-3111, 2024 U.S. Dist. LEXIS 127382, at *7 (E.D. Va. July 18, 2024) (quoting *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 729 (2d Cir. 2023)). Stated another way, "district courts with loaded dockets may rely on special masters to decide thorny things." *Id.* (citation and internal quotation marks omitted). Here, this Court has already resolved at least 20 discovery disputes discovery disputes. ECF Nos. 108, 159, 171, 179, 202; *see*

15

*also* Case No. 3:25-mc-00004-HEH, ECF No. 44. And, as noted, there are an increasing number of discovery disputes that the parties cannot resolve by themselves, such that this case would benefit from the attention a special master could provide.

Ordinarily, opposing counsel should be able to cooperate to efficiently present their disputes to the Court for decision. Unfortunately, however, animosity has reached a level that impedes such cooperation. Counsel for BDO has made a series of personal attacks on defense counsel which impede the discovery process, such that the parties would benefit from appointment of a special master. *See Turnage*, 115 F.R.D. at 560 (citation omitted). In addition to threatening the law license of Ankura's counsel, BDO has mocked associates who work for Ankura. In an email, one BDO attorney, copying numerous attorneys in the case, demeans Proskauer associate Kramer Rice, saying "given your vast experience and lengthy tenure perhaps you know something we don't." Another BDO attorney then doubles down on the insult, "replying all" to the prior email, stating "[h]e's Winthorp [sic] III"—further insulting Mr. Rice.

The contentious nature of counsel's interactions has impeded the parties' ability to effectively and expeditiously utilize the Court's joint discovery statement procedure. The parties have conducted countless meet-and-confer sessions, most of which fail to resolve any of the issues in dispute.

## III. SCOPE OF SPECIAL MASTER'S AUTHORITY AND PROPOSED SPECIAL MASTERS FOR CONSIDERATION

A Proposed Order appointing the special master has been filed herewith, providing the recommended scope of the special master's authority. The special master should be granted all authority under Rule 53(c) necessary to investigate the improprieties described herein and to issue a report and recommendation to address those issues. The special master should also be granted

all necessary authority to preside over pending and future discovery disputes in this case, issuing orders resolving those disputes.

An order appointing a special master may contain special circumstances for when the special master is permitted to communicate *ex parte* with the court or a party to the case. FED. R. CIV. P. 53(b)(2)(B). Here, the Proposed Order provides that the special master may communicate *ex parte* with the Court concerning the administration of his or her appointment and the means of implementing it. The Proposed Order also provides that the special master may have *ex parte* communications with counsel provided that the special master first informs other parties and describe the reasons for the communication. *Ex parte* communications of this type may be necessary to investigate the way discovery has been conducted to date—particularly with respect to the productions of text messages and third-party deletion of critical forensic information at the direction of BDO's counsel.

The Proposed Order directs the special master to make recommendations as to how his or her costs should be apportioned between the parties at the time that any report or order issues for which the special master is entitled to compensation. *See RLI Ins. Co. v. Nexus Servs.*, 2018 U.S. Dist. LEXIS 110609, *43 (W.D. Va. July 2, 2018) ("The special master shall be compensated at his [or her] standard hourly rate, plus reasonable expenses."). The costs associated with the special master may presumptively be equally borne by the parties, but the court may also reapportion fees based on the unreasonable behavior of a single party. FED. R. CIV. P. 53(g)(3) advisory committee's note to 2003 amendment. Defendants believe it appropriate to presume the parties will equally share the cost of the special master with provision for the special master to make adjustments based on the parties' conduct and relative fault in resolving each dispute.

Defendants defer to the Court's judgment with respect to who should be appointed as special master, but respectfully suggest Craig T. Merritt, Esq., who practices at Merritt Law, PLLC. This Court has appointed Mr. Merritt to serve as a special master on several previous occasions. *See, e.g., Brink's Co.*, 2021 U.S. Dist. LEXIS 217767, at *7, *supra* at 13.

## CONCLUSION

The multitude of irregularities and improprieties raise serious concerns about whether the discovery process has broken down to a point that prejudices the Defendants. The circumstances described herein cast doubt on the integrity of the discovery process, which is a cornerstone of modern civil justice under the Federal Rules of Civil Procedure. In light of the unfortunate inability of counsel to resolve disputes among themselves and the growing number of complicated discovery disputes that require Court intervention, the Court should exercise its authority under Rule 53 to appoint a special discovery master to investigate the irregularities, recommend remedial measures, and oversee the expeditious conclusion of a fair and just discovery process in this case.

Defendants reserve the right to seek any available remedy stemming from the discovery disputes described herein.

| | |
|---|---|
| Dated: December 18, 2025 | Respectfully submitted,<br><br>ANKURA CONSULTING GROUP, LLC,<br>PHUOC VIN PHAN, AND KEVIN LAVIN<br><br>By Counsel<br><br> /s/ Elizabeth Scott Turner<br>James C. Cosby, Esq. (VSB No. 25992)<br>J. Brandon Sieg, Esq. (VSB No. 84446)<br>Elizabeth Scott Turner, Esq. (VSB No. 88056)<br>O'HAGAN MEYER<br>411 East Franklin Street, Suite 500<br>Richmond, Virginia 23219<br>Telephone: (804) 403-7100<br>Facsimile:  (804) 403-7110<br>Email:  jcosby@ohaganmeyer.com<br>Email:  bsieg@ohaganmeyer.com<br>Email:  eturner@ohaganmeyer.com<br><br>*Counsel for Ankura Consulting Group, LLC, Phuoc Vin Phan, and Kevin Lavin*<br><br><br>David L. Schwarz, Esq.  (admitted *pro hac vice*)<br>James M. Webster, III, Esq. (admitted *pro hac vice*)<br>Rachel T. Anderson, Esq. (admitted *pro hac vice*)<br>Ryan M. Folio, Esq. (admitted *pro hac vice*)<br>KELLOGG, HANSEN, TODD,<br>FIGEL & FREDERICK, P.L.L.C.<br>1615 M Street, N.W., Suite 400<br>Washington, D.C.  20036<br>Telephone: (202) 326-7900<br>Facsimile:  (202) 326-7999<br>Email:  dschwarz@kellogghansen.com<br>Email:  jwebster@kellogghansen.com<br>Email:  randerson@kellogghansen.com<br>Email:  rfolio@kellogghansen.com<br><br>*Counsel for Phuoc Vin Phan* |

Steven J. Pearlman, Esq. (admitted *pro hac vice*)
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, Illinois 60602
Telephone: (312) 962-3545
Facsimile: (312) 962-3551
Email: spearlman@proskauer.com

Mark W. Batten, Esq. (admitted *pro hac vice*)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
Telephone: (617) 526-9850
Facsimile: (617) 526-9899
Email: mbatten@proskauer.com

P. Kramer Rice, Esq. (admitted *pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3406
Facsimile: (212) 969-2900
Email: krice@proskauer.com

*Counsel for Ankura Consulting Group, LLC and Kevin Lavin*

20