IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| BDO USA, P.C., <br><br>    Plaintiff, <br><br> v. <br><br> Ankura Consulting Group, LLC, Kevin Lavin, and Phuoc Vin Phan, <br><br>    Defendants. | Case No.: 3:24-cv-00179-HEH <br><br> Jury Trial Demanded |

**BDO USA, P.C.'S OPPOSITION TO DEFENDANTS'
MOTION TO APPOINT SPECIAL DISCOVERY MASTER**

**I.  Introduction**

On December 11, 2025, this Court issued an Order admonishing *all* parties for the "unnecessarily slow pace of discovery," and further cautioned that the Court was "not inclined to render any decisions which slow down the fact-finding process . . . except where absolutely necessary." (*ECF 202 at 3, 9*).  The Court then directed the parties to meet and confer "as soon as possible to resolve any remaining discovery disputes" so that all remaining fact discovery could be completed within sixty (60) days. (*Id.* at 9-10).  In response to this directive, on December 17, 2025, the Parties met and conferred on all remaining discovery issues.

Defendants' Motion to Appoint a Special Master correctly notes that when that meeting occurred, approximately 20 disputes remained between the Parties.  What Defendants fail to tell the Court is that during that meeting, and in the 10-day period thereafter, BDO proposed reciprocal compromises that would resolve every one of these disputes.  The majority of these disputes are nearing resolution; in fact, six have been fully resolved.  As to the remainder, Defendants have either: (1) simply failed to respond to proposals; or (2) stated they will accept BDO's proposed

concessions, without making the reciprocal concessions upon which the offer was predicated. In short, Defendants failed to confer in good faith to resolve these remaining disputes. Instead, Defendants filed a 20-page Motion asking the Court to appoint a special master, supported by a false narrative that they have been angels who bear no fault for any pending disputes and every remaining dispute is the byproduct of BDO's bad faith conduct.

Defendants' Motion is the antithesis of what the Court directed the Parties to do. First, Defendants are seeking a license to continue litigating every dispute without having to compromise. Second, the appointment of a special master will result in more, not less, delay. Federal Rule of Civil Procedure 53 requires the special master to issue findings via written report, which the Parties may appeal as a matter of right to this Court, who must generally review them *de novo*. Imposing this process now guarantees that the February 10, 2025 deadline to complete discovery set by the Court will not be met.

Defendants' Motion should be denied. Rather than build in another layer of review to slow the process down, Defendants should be directed again to meet and confer in good faith, including making concessions to resolve the outstanding discovery disputes. BDO requests instead that the Court direct the Parties to prepare a joint summary of the pending disputes as of January 9 and set a status for the following week to orally resolve any remaining disputes, with the following caveat—each party is limited to raising three issues for the Court to resolve.

## II.     Defendants' Request Will Add Delay

Rule 53(a)(1)(B)(i) provides that the Court may appoint a special master only to "make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by some ***exceptional*** condition" (emphasis added). "This restrictive language carries forward the traditional notion that masters are the exception, not the usual or common practice." 9C Arthur R.

2

Miller, Federal Practice & Procedure § 2602.1 (3d ed. 2008); *see Borom v. Town of Merrillville*, 2008 WL 155018, at *3 (N.D. Ind. 2008) ("The rule begins with a presumption against the appointment of special masters."). "In appointing a master, the court must consider the fairness of imposing the likely expenses on the parties ***and must protect against unreasonable expense or delay***." Fed. R. Civ. P. 53(a)(3) (emphasis added). That is because Rule 53 embeds additional process which frequently causes delay:

- After selection, the special master must file an affidavit disclosing whether they have a relationship to the parties, attorneys, action, or court that would require disqualification, after which time the parties are entitled to dispute the appointment of that specific master. Fed. R. Civ. P. 53(a)(2), (b)(3).

- Upon appointment, the special master will order briefing on the disputes and must issue written reports for all disputes. Fed. R. Civ. P. 53(d)-(e).

- The special master's report may be appealed to the trial court, which must give the parties notice and an opportunity to be heard. Thereafter, the court must generally review the dispute *de novo*. Fed. R. Civ. P. 53(f)(2)-(4).

As the Supreme Court has noted, "***[t]here is no more effective way of putting a case to sleep for an indefinite period than to permit it to go to reference with a busy lawyer as a referee***." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 253 n.5 (1957) (quoting Vanderbilt, *Cases and Materials on Modern Procedure and Judicial Administration* 1240-41 (1952) (emphasis added)).

### III.    Defendants Are Using the Special Master To Litigate Rather Than Resolve Disputes

Defendants' Motion suggests that a special master is necessary to curb alleged discovery "abuses" by BDO. In reality, the Parties' remaining discovery disputes can and should be resolved if *Defendants* would be responsive and refrain from taking narrow, myopic views of discovery or standing on principle. While BDO does not wish to litigate each of these disputes through briefing on this Motion, some explanation of the status of these disputes is necessary to outline why appointment of a special master is unnecessary and would only further delay the proceedings. BDO attaches as Appendix A a chart fully describing the nature and status of the remaining

disputes, which clearly reflect this is not a one-sided affair—both sides have raised objections and seek to compel information. (*Ex. 1*). However, below are a few examples that shed light on the Parties' ability to resolve the disputes by simply continuing to meet and compromise in good faith:

>    A.   **The Forensic Protocols**

On September 18, 2025, this Court granted BDO's request to appoint a third-party neutral to inspect the personal laptops, cell phones, cloud accounts, and other devices belonging to certain former BDO employees now employed by Ankura—pursuant forensic protocols—to ascertain if Defendants remained in possession of BDO's trade secret or confidential information, and the extent to which Ankura has used it. (*ECF 159 at 6-7*). For months, Defendants insisted they were permitted to negotiate the protocols attached to BDO's request, even though the Order adopted the protocols that BDO attached to its motion. (*Id.*; *ECF 138-11; ECF 138-15*). Defendants further delayed the appointment of the third-party neutral over nonsensical issues, even quibbling for weeks over how to describe the assignment in emails to prospective forensic experts. As of the December 17 conference, the Parties had worked through all but one issue.

The devices to be searched had been imaged by Defendants in May 2025. BDO requested the devices be reimaged by the neutral contemporaneous with the inspection because if any device contained BDO's information, the images would have no metadata showing whether that information had been accessed during the 7 months that had passed since they were returned. Defendants objected, claiming it was a nuisance for the individuals to go a full day without their phones and reimaging would result in unnecessary expense. During the December meeting, the Parties reached a compromise: the neutral would inspect the May images and reimage devices that contained BDO confidential information. At Defendants' request, BDO provided revised protocols incorporating this agreement on December 19. (*Ex. 2, 3*). As of the filing of this brief,

Defendants have not responded to the redlined protocols, and this process ordered in September remains stymied by their inaction. If Defendants would merely execute the proposed protocols that offered the compromise they proposed, the inspections could proceed.

### B.     30(b)(6) Depositions

On July 17, 2025, BDO issued a 30(b)(6) deposition notice to Ankura seeking a witness to testify to topics relating to, *inter alia*, Ankura's Transactional Advisory Services ("TAS") practice, its recruitment of the former members of BDO's Healthcare TAS group, its relationship with BDO clients and prospective clients, and Ankura's misappropriation of BDO's trade secrets. (*Ex. 4*). Ankura objected to designating a witness for *any* topic, asserting that the Court's September 18 Order preordained any 30(b)(6) depositions as inappropriate in this case, and that the Parties must rely exclusively upon interrogatories. (*Ex. 5*). Defendants took this position notwithstanding their own service of a 30(b)(6) notice to BDO that included 17 topics. (*Ex. 6*). During the December meet and confer, BDO proposed that <u>each</u> party go back through their notices and withdraw some topics and serve them as interrogatories to be answered on an accelerated basis. Counsel for Ankura thanked BDO's counsel for this pragmatic proposal and agreed to confer with Ankura on whether that would be an acceptable solution. As of December 31, Ankura had not responded as to whether they would agree to such approach.

Rather than allow the issue to languish, BDO sent a proposal on December 31, which identified <u>both</u> Parties' topics from the Notices that it believed were amenable to interrogatories, and served the proposed interrogatories for the topics BDO offered to withdraw. Just a few hours ago, Ankura's counsel responded to BDO's proposal, indicating that they had reviewed and had a question about it. This supposed "dispute" is being actively negotiated by the Parties and it is premature to suggest that a special master is needed to resolve it. (*Ex. 7*).

###### C.     CEO Depositions

####### 1.     *Deposition of Individual Defendant and Ankura CEO Kevin Lavin*

On March 18, 2025, BDO noticed Defendant Lavin's deposition for May 6, 2025. In April, Lavin's counsel stated that he was unavailable. On April 28, BDO re-noticed Lavin's deposition for August 21. On July 28, Lavin's counsel cancelled the deposition, stating that Lavin would not be available until late October. On August 11, BDO sent a third deposition notice for October 23, 2025. Unfortunately, shortly before that deposition, BDO's lead counsel scheduled to take the deposition had a medical emergency that precluded him from traveling.[1] BDO notified Lavin's counsel that the deposition would need to be rescheduled. On October 31, and again on November 14, BDO requested dates in December for Lavin's deposition. On November 15, Lavin's counsel stated they would look for dates in January but then failed to provide the promised dates. On November 21, BDO inquired about the promised January dates. When another 10 days passed with no response from Lavin's counsel, on December 2, BDO noticed Lavin's deposition for January 22.

When the Parties conferred on December 17, Lavin's counsel stated that he was not available on January 22. Further, Lavin's counsel represented that Lavin could testify on February 10, 2026, but that they nonetheless intended to petition this Court for relief to produce Lavin on February 26—*after* the Court's February 10 deadline. They requested BDO consent to such motion. BDO declined their request because it conflicted with this Court's warning that inconvenience would not be grounds for relief from the February 10 deadline. (*Ex. 8*).

---

[1] For privacy reasons, BDO's counsel did not disclose his medical issues to opposing counsel, but does so now only because of the *ad hominem* attacks raised in Defendants' Motion.

### 2. *Deposition of BDO's CEO Wayne Berson*

BDO has filed this action alleging that Defendants conspired to raid BDO's Healthcare TAS practice in violation of Phan's contractual and fiduciary duties. Phan filed a counterclaim asserting that he did so only after BDO had breached a promise to make him an equity partner.[2] Phan further alleged that BDO's motive for breaching this promise is that when BDO transitioned from a partnership to a professional corporation in 2023, an ancillary Employee Stock Ownership Plan ("ESOP") transaction resulted in a liquidity event for the equity partners. According to Phan, BDO did not want to promote anyone to equity partnership before this transaction because that would dilute the payments to the existing partners. (*Phan Counterclaims ¶¶ 1-12, 56, 61*). This Court previously ruled on September 18, 2025 that broad sweeping discovery into the ESOP transaction was overbroad and limited Defendants to discrete discovery inquiries that are specifically tailored to adducing information regarding Phan's promissory estoppel counterclaim. (*ECF 159 at 9*).

Phan has since noticed the depositions of Wayne Berson (BDO's Chief Executive Officer), Steven Ferrara (BDO's former Chief Operating Officer), Catherine Moy (BDO's Chief People Officer) and Stephanie Giammarco (BDO's former Head of Advisory Practices), claiming that all these witnesses can speak to whether Phan was promised partnership and under what conditions, whether that promise was breached, and if so why. BDO objected to producing Berson under the *Apex* doctrine because any testimony Berson could provide would be cumulative of other witnesses' testimony. (*ECF 179 at 6-10*). In its December 11 Order, the Court deferred ruling on Defendant Phan's motion to compel Berson's deposition until the deposition of Ferrara had occurred. (*ECF 202 at 3*).

---

[2] BDO referred to equity partners as variable share partners or "VSPs."

Defendants took Ferrara's deposition on December 18, and the Parties are coordinating on scheduling the depositions of Moy and Giammarco. Defendants took 7 hours on the record with Ferrara during which time he fully explained ███████████████████████████████████████████████████████████████ (*Ex. 9 at* 113:22-117:11, 142:1-144:24). BDO expects that Defendants will take another 14 hours with Moy and Giammarco (they have taken the full 7 hours on the record for nearly every deponent so far, at times sounding a congressional filibuster). Ferrara answered Phan's questions as to why he was not converted. To the extent Phan has follow-up questions, he has yet to pose them to Moy. Similarly, he has yet to pose any questions to Giammarco about alleged promises of partnership. Nor have Defendants taken a 30(b)(6) deposition on these topics. Yet, Defendants have renewed their request to depose Berson without time limits, claiming that his testimony remains essential and is non-cumulative testimony which they are unable to be procure through a 30(b)(6) witness, and further they are incapable of completing this inquiry in under 7 hours.

BDO views Defendants' request as specious. Nevertheless, in the spirit of the Court's request, BDO did not stand on principle but rather offered a compromise: BDO would offer Berson for a full day of deposition on February 9, if Defendants would produce Lavin on February 10 so the Parties could meet the Court's discovery deadline. (*Ex. 8*). Defendants responded that they would happily depose Berson on February 9 but would make zero concessions on Lavin— they would only produce him on February 10 upon *another* Court Order. (*Id.*).

### D. The Prior, Moot Chad Rash Dispute

Defendants spill much ink alleging that BDO improperly withheld text message exchanges between a BDO principal, Chad Rash, and Defendant Phan. Defendants concede there is no live

8

dispute regarding Rash's production: It was resolved by Rash and the Parties two months ago. Rather, they say it is important to brief past, resolved disputes to show that BDO is likely to engage in improper behavior going forward, thus necessitating the appointment of a special master. Nonsense. "There is no reason for the court to appoint a special master to investigate an issue that has been resolved." *United States v. Dyer*, 2022 WL 267894, at *3 (E.D. Wis. Jan. 28, 2022); *Borom*, 2008 WL 155018, at *1 (denying motion to appoint special master "on the basis of nothing more than the threat of future disputes").[3]

### E. Byron Nickens, Ankura's Spoliation, and the Only Live Dispute

Defendants spend much of their brief alleging that BDO caused a third party, Byron Nickens, to spoliate evidence and withhold evidence in response to a subpoena. Once again, this is largely a red herring, irrelevant to the appointment of a special master because there is only one dispute and it is sitting with Defendants to resolve.

---

[3] It is also another example of Defendants' one-sided account of the dispute. While BDO is loath to burden the Court with more briefing on a resolved issue, given the *ad hominin* attacks, a short response is necessary. Like Phan, Rash was a non-equity partner at BDO, and after Phan left Rash worked closely with the head of BDO's TAS practice, Patrick Donoghue, to attempt to retain BDO's Healthcare TAS clients. Phan has engaged in scorched earth discovery, hoping to prove that subordinates, peers (like Rash), and former bosses were also angry about BDO's ESOP transaction, which he claims they perceived as creating a liquidity event for the equity partners to the detriment of the remaining BDO personnel. Thus, Defendants issued a subpoena to Rash for emails, text messages, and documents in his personal possession, including generalized discovery into the ESOP transaction. Consistent with the Court's ruling that Defendants' requests for "generalized discovery" into the ESOP was prohibited (*ECF 159 at 9*), Rash produced emails and documents in his personal possession related to Phan's departure from BDO and the damage it caused, but did not produce irrelevant text messages from the initial production. Phan, who already had the text messages from his own phone, demanded that Rash produce every text message between the two, regardless of subject. As Defendants see it, because one's phone stores text messages as a single, continuous conversation, even when they span years of unrelated discussions, a litigant is never permitted to withhold unresponsive and irrelevant messages. Of course, Defendants staked out this position while simultaneously redacting text messages in their own productions. BDO disagreed with Defendants, but here too, BDO compromised. More than two months ago, BDO and Rash simply produced every text message between Phan and Rash. (*Ex. 10*).

9

By way of background, Nickens worked under Phan at BDO. Initially, Nickens planned to follow Phan to Ankura, but changed his mind. Nickens joined a different competitor, Embark. (*Ex. 11 at 293:24-298:2*). As discussed *infra* in more detail, BDO learned that Nickens saved a substantial amount of BDO confidential information to a cloud account shortly before resigning and downloaded it to his Embark device upon commencing his employment. (*Ex. 12, Resp. to Interrog. 20*). Nickens, who had gone to Embark by himself, quickly resolved his dispute with BDO. As part of the settlement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Ex. 13 ¶ 1(a)(ii)*). Defendants have asked in discovery for an image of Nickens' *entire* hard drive for *unfettered* review. (*Ex. 14*).

BDO objected to this extraordinary and improper request. But BDO offered a compromise in the December 17 meeting. BDO agreed to provide this hard drive to a neutral forensic examiner, pursuant to an agreed upon protocol to be proposed in the first instance by Defendants. Defendants agreed to the compromise but have yet to provide the proposed protocol. The ball remains in their court. Defendants make no mention of this unresolved issue, which is sitting in their lap.

Instead, Defendants improperly backdoor into this Motion an entire brief accusing BDO and its counsel of spoliation and witness tampering. Because of the gravity and seriousness of the allegations, BDO will respond.

      ***i.    The Actual Spoliation of Evidence Occurred Because Defendants Failed To Preserve Accounts Their Employees Paid For, or Timely Issue Nickens a Hold Notice***

When Phan resigned in January 2024, seven of his direct reports, including Thomas Bradey and Mitchell Thomas, also resigned to accept employment at Ankura. Before their last day with BDO, Nickens procured and paid for a cloud account through ShareFile. (*Ex. 12, Resp. to Interrog. 20*). Thomas and Bradey then reimbursed Nickens for a portion of the account fees. (*Ex. 11 at*

10

*461:18-462:3; Ex. 15*). Bradey, Thomas, and Nickens then uploaded 7 gigabytes of BDO's confidential, proprietary data to the ShareFile. (*Ex. 12, Resp. to Interrog. 20; Ex. 11 at 461:14-462:3*).

Nickens joined Embark on January 30, 2024. Thereafter, he downloaded BDO information from the ShareFile to his personal external hard drive. Bradey and Thomas joined Ankura on January 22, 2024. Thereafter, they both downloaded BDO information from the ShareFile folder to the computers issued to them by Ankura. (*Ex. 11 at 77:2-5, 103:23-109:14; Ex. 16; Ex. 12, Resp. to Interrog. 20*).

Between January 23-29, 2024, BDO issued Bradey, Thomas, and Ankura ***multiple*** litigation-hold notices instructing all three to preserve evidence related to Bradey's and Thomas': (1) resignations from BDO; (2) employment with Ankura; and (3) any **taking of or failure to return BDO's confidential information**. When these hold notices were sent, the ShareFile Nickens, Bradey, and Thomas maintained was active and still contained the BDO data they stole and uploaded. (*Ex. 12, Resp. to Interrog. 20*).

After receiving these notices, Bradey, Thomas, and Ankura made no efforts to preserve this ShareFile folder or any of its contents. Bradey called Nickens to say that BDO had threatened litigation. But neither Bradey, Thomas, their lawyers, nor Ankura notified Nickens to preserve their ShareFile account. (*Ex. 12, Resp. to Interrog. 20; see also Ex. 11 at 462:4-464:22*). On the contrary, Bradey and Thomas attempted to cover up their behavior by deleting WhatsApp messages related to their departures from BDO and their joining Ankura, which they admitted in their text messages:

- [Thomas:] "I went ahead and deleted all work apps from my phone"
- [Bradey:] "Good call. I did the same. I deleted all WhatsApp messages too."

11

(*Ex. 17*).

On February 16, 2024, BDO's counsel interviewed Bradey and Thomas in the presence of their lawyers and Ankura's lawyers. Both admitted to uploading BDO's information to the ShareFile account they established with Nickens and then saving it to their Ankura-issued computers. Before this interview, BDO had no knowledge of their data theft, or Nickens' role in the same. BDO issued Nickens a litigation hold that same day. (*Ex. 12, Resp. to Interrog. 20*).

In response to the hold notice, Nickens retained counsel, Laura Mallory of Maynard Nexsen in Nashville.[4] Nickens, through his counsel, disclosed that he had deleted all the data from the ShareFile and deactivated the account two days earlier, on February 14, 2024—well after the original litigation-hold notices were sent to Defendants, Bradey, and Thomas. Nickens has testified that if Bradey, Thomas or Ankura alerted him in January that they were under a duty to preserve evidence and that he should not delete anything from the ShareFile account, he would not have done so. (*Id.*; *Ex. 11 at 464:1-19*).

On March 7, 2024, Nickens and his legal counsel participated in a recorded Zoom conference with BDO's counsel. The day before the interview, at BDO's request, Nickens reactivated the ShareFile account. On the Zoom, he and BDO's counsel attempted to recover the deleted contents but no information could be restored. In late June of 2024, Nickens' counsel asked if BDO objected to him again deactivating the ShareFile account—**which was empty at this point and had been for months**. Counsel for BDO responded that it had no objection. And as of this date, no Defendant had requested Nickens preserve the ShareFile. So, Nickens, upon advice of his counsel, deactivated the account. (*Ex. 12, Resp. to Interrog. 20*; *Ex. 18*).

---

[4] Mallory is an experienced employment lawyer and shareholder at her firm. She is also a former judicial clerk. (https://www.maynardnexsen.com/professionals-laura-mallory).

12

Defendants now claim that BDO's counsel spoliated evidence when they consented to Nickens deactivating the empty account. This is nonsense. Defendants were or should have been aware of the existence of the ShareFile before BDO, yet they made zero effort to preserve the data. By the time BDO learned of the ShareFile, Nickens had already purged the data and deactivated the account. There was nothing for BDO to preserve at that point. That duty lay with Defendants, who failed to take appropriate action.

### ii.   BDO Settles with Nickens

Nickens and BDO resolved any potential dispute between them in May 2024. As part of that settlement, ███████████████████████████████

███████████████  ███████████████████████

████████████████████████████████████████ (*Ex. 13* ¶ (1)(a)(i)). As part of the settlement process, BDO presented Nickens' counsel with a draft affidavit, which had been written based upon prior interviews with Nickens. Nickens reviewed the draft with his lawyer, made some edits, and then executed it, under oath. (*Ex. 11 at 471:19-472:12*; *ECF 46-1*).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

The final executed affidavit attests that Phan tried to recruit Nickens to Ankura, and that Nickens expressed concern about Phan's plans to solicit BDO employees and customers to follow to Ankura in violation of his restrictive covenants with BDO. (*ECF 46-1* ¶¶ *10, 16*). Phan and Lavin both brushed off such concerns and promised to fully indemnify him for the potential breaches. (*Id.*). Defendants recognize that Nickens' testimony is problematic for their defense and have tried desperately to establish that his affidavit testimony was coerced by BDO's counsel.

In that vein, they have sought *and received* extensive discovery into the communications between Nickens' counsel and BDO's counsel, McDermott Will and Schulte:

- BDO produced the full Zoom recording of its counsel's meeting with Nickens, including the attempt to restore the ShareFile account;

- BDO produced Nickens' affidavit and every draft affidavit exchanged with Nickens' counsel;

- BDO produced the final settlement agreement with Nickens and all drafts exchanged with his counsel;

- BDO produced every single written communication with Nickens;

- Defendants also subpoenaed the same documents directly from Nickens' lawyer and law firm;

- Defendants deposed Nickens for 7 hours on the record. They went through every line of the affidavit, every draft, the settlement agreement, and many other documents in painstaking detail with Nickens.[5] But Nickens never wavered that he signed the affidavit of his own volition and that he believed it to be truthful and accurate. (*Ex. 11 at 29:9-20, 340:12-16, 469:17-472:12*).

- Unsatisfied, Defendants have now subpoenaed Nickens' lawyer to testify about her conversations with BDO's counsel. (*Ex. 19*). That deposition is scheduled for January 20, 2026.

At this point, there is nothing left to discover. Defendants' frustration that discovery has not borne out their conspiracy theory that BDO's lawyer browbeat Nickens into signing an affidavit is hardly grounds to appoint a special master.

---

[5] Defendants take issue with the fact that confidential information had initially been redacted from the agreement and some communications. But BDO later produced unredacted versions under an "Attorneys' Eyes Only" designation. This production occurred long before this Motion was filed and there is no pending dispute. In fact, both parties have redacted information from documents throughout the litigation for a variety of reasons and worked through any disputes regarding these redactions.

Defendants also allege that Nickens admitted to deleting emails from his Gmail account with BDO's knowledge. (*Mot. at 8*). In fact, Nickens testified that he misunderstood Phan's counsel's misleading questions, that he had only been asked by BDO to *return* confidential information to BDO, and that he did not recall deleting any emails from his Gmail account. (*Ex. 11 at 180:16–184:13* ("I don't believe I deleted those emails.")).

## IV. CONCLUSION

Defendants' Motion to appoint a special master must be denied. That process will only add delay. The appointment is also unnecessary because the Parties have not yet exhausted their efforts to cooperate without the need for judicial intervention. *See* Fed. R. Civ. P. 26, Advisory Committee Notes to 2000 Amendment ("In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.").

Defendants, citing a November 6, 2025 exchange, contend that "animosity has reached a level that impedes such cooperation." (*Mot. at 16*). But that email was cherry picked to again falsely suggest discovery disputes and that heated conversations between counsel have been one-sided. That is not the case. To be sure, counsel for all Parties have zealously advocated for their clients during the discovery process, and each points the finger at the other as the source of the friction. But a single email between the Parties does not establish that the Parties are incapable of collegiality and cooperation. In fact, six weeks after that email exchange, during the December 17 meet and confer, lead counsel for Ankura personally thanked the author of that email for her professional and pragmatic approaches to resolving discovery disputes.

The only impediment to cooperation now is the Defendants' request for a special master, which would enable them to keep standing on principle in every dispute, and lead to the very delay this Court sought to avoid. The Parties should be given more time to resolve these disputes on their own. If they cannot do so, BDO would ask the Court to hold a status the week of January 12 to resolve the remaining disputes, with some imposed limit and what can be brought forward to further incentivize cooperation. *See Lloyd v. Valley Forge Life Ins. Co.*, 2007 WL 906150, at *1-2 (W.D. Wash. Mar. 23, 2007) (denying plaintiff's motion for appointment of discovery master "to oversee and resolve future discovery disputes" because the court could "and shall manage the

15

discovery in this case" given "the contentious nature of this litigation, the number of witnesses and documents involved"); *Hudson-RPM Distributors, LLC v. Bowditch & Dewey, LLP*, 2020 WL 13579435, at *2-3 (D. Mass. Nov. 10, 2020) (denying motion to appoint a discovery master despite that the case was "likely to see many further disputes" because the disputes were not "so complicated as to warrant appointment of a discovery master").

16

Dated: January 2, 2026                    Respectfully submitted,

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ Julie H. McConnell*
Julie H. McConnell (VSB No. 89245)
David A. Beach (admitted *pro hac vice*)
500 North Capitol Street, N.W.
Washington, D.C. 20001
Tele: +1 202 756 8000
Fax: +1 202 591 2755
jmcconnell@mwe.com
dbeach@mwe.com

Michael Sheehan (admitted *pro hac vice*)
Rachel Cowen (admitted *pro hac vice*)
444 W. Lake Street, Suite 4000
Chicago, IL 60654
Tele: + 1 312 372 2000
Fax: + 1 312 277 2366
msheehan@mwe.com
rcowen@mwe.com

Mark D. Meredith (admitted *pro hac vice*)
Nicholas C. Meyer (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY 10017
Tele: +1 212 547 5400
Fax: +1 646 417 7688
mmeredith@mwe.com
nmeyer@mwe.com

Brian Casillas (admitted *pro hac vice*)
2049 Century Park East, Suite 3200
Los Angeles, CA 90067
Tele: +1 310 788 6137
Fax: +1 310 317 7298
bcasillas@mwe.com

*Counsel for Plaintiff BDO USA, P.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 2, 2026, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the applicable ECF Registrants.

*/s/ Julie H. McConnell*
Julie H. McConnell